## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

UNITED STATES OF AMERICA,

        Plaintiff,

v.

CEMEX, INC.,

        Defendant.

---

## COMPLAINT

---

Plaintiff, the United States of America, by authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), files this complaint and alleges as follows:

### JURISDICTION AND VENUE

1.    This Court has jurisdiction over the subject matter of this action pursuant to Section 113(b) of the Clean Air Act ("CAA"), 42 U.S.C. § 7413(b), and pursuant to 28 U.S.C. §§ 1331 and 1345.

2.    Venue is proper in this District under Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 28 U.S.C. § 1391(b) because the violations occurred in this District, and because the Defendant may be found in this District.

## NATURE OF ACTION

3.      This is a civil action brought against CEMEX, Inc., ("CEMEX" or "Defendant"),

pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and Section 167 of the CAA, 42

U.S.C. § 7477, for the assessment of injunctive relief and civil penalties for violations of the

CAA and Colorado's State Implementation Plan, occurring at its facility located in Lyons,

Boulder County, Colorado.

## AUTHORITY

4.      Authority to bring this action is vested in the United States Department of Justice

pursuant to 28 U.S.C. §§ 516 and 519 and Section 305(a) of the CAA, 42 U.S.C. § 7605(a).

5.      Notice of the commencement of this action has been given to the appropriate air

pollution control agency in the state of Colorado, as required by Section 113(b) of the CAA, 42

U.S.C. § 7413(b).

## DEFENDANT

6.      Defendant is a Louisiana corporation, and maintains its corporate headquarters at

840 Gessner Road, Suite 1400, in Houston, Texas.  Defendant owns and operates a number of

Portland cement manufacturing facilities, including one located at 5134 Ute Highway in Lyons,

Colorado (hereinafter the "Facility"), which is the subject of this Complaint.

7.      Defendant is a "person" as defined in Section 302(e) of the CAA, 42 U.S.C. §

7602(e).

8.      The Lyons Facility consists of two components, the Portland cement

manufacturing plant and the Dowe Flats quarry.  These two manufacturing components are

connected by a two mile long conveyor belt system, which transports raw materials from the quarry to the Portland cement manufacturing plant.

9.      At the quarry, limestone, clay and other raw materials are processed through a primary crusher for transport via the conveyor belt to be stockpiled at the cement manufacturing plant. This stockpiled material is then further processed through a primary crusher, a dryer and a secondary crusher. This material is combined with other materials and is further processed through a calciner and a rotary kiln to form "clinker," small dark gray nodules 3-4 centimeters in diameter. The clinker is then further ground and combined with gypsum to produce cement.

10.     During the clinker and cement production processes, the Facility emits pollutants, including, but not limited to, carbon monoxide ("CO"), nitrogen oxides ("NOx") and particulate matter smaller than 10 microns in size ("PM-10").

## STATUTORY AND REGULATORY BACKGROUND

### CAA and National Ambient Air Quality Standards

11.     The CAA was enacted to protect and enhance the quality of the Nation's air. Section 101(b) of the CAA, 42 U.S.C. § 7401(b).

12.     Section 109(a) of the CAA, 42 U.S.C. § 7409(a), requires the Administrator of EPA to publish national ambient air quality standards ("NAAQS") for certain air pollutants. The NAAQS establish primary air quality standards to protect public health and secondary standards to protect public welfare. Section 109(b) of the CAA, 42 U.S.C. § 7409(b).

13.     The Administrator has promulgated NAAQS for several air pollutants, including PM-10 and NOx. 40 C.F.R. §§ 50.6 and 50.11 (2000).

3

14.     Under Section 107(d)(1)(A) of the CAA, 42 U.S.C. § 7407(d)(1)(A), each state is required to designate areas, within its boundaries, where the air quality attains the NAAQS, fails to attain the NAAQS, or cannot be classified due to insufficient data. Areas that meet the NAAQS for a particular pollutant are called "attainment" areas for that pollutant, while areas that do not meet the NAAQS for a particular pollutant are called "non-attainment" areas. Areas that can not be classified are called "unclassifiable."

15.     The Facility is located in Boulder County, Colorado.

16.     At all times relevant to this action, the State of Colorado, including the Boulder County Area was designated as attainment for NOx. 40 C.F.R. § 81.306. At the time of the modifications that form the basis of Counts 1 and 2, the Denver Metropolitan PM-10 Area ("Area") was designated as a non-attainment area for PM-10.[1] The Area was designated and classified as a moderate PM-10 non-attainment area by operation of law upon enactment of the Clean Air Act Amendments of 1990 (November 15, 1990). 42 U.S.C. § 7407(d)(4)(B), 56 Fed. Reg. 56705-06 (November 6, 1991). The Area was redesignated to attainment effective October 16, 2002. 67 Fed. Reg. 58335 (September 19, 2002).

17.     To achieve the objectives of the NAAQS and the CAA, Section 110(a) of the CAA, 42 U.S.C. § 7410(a), requires each state to submit a plan to the Administrator that provides for the attainment and maintenance of the NAAQS in each air quality control region. This plan

---

[1]     The Denver Metropolitan PM-10 Area is defined as: All of Denver, Jefferson and Douglas Counties, Boulder County (excluding the Rocky Mountain National Park), and the Colorado Automotive Inspection and Readjustment portions of Adams and Arapahoe Counties. 40 C.F.R. § 81.306.

is known as a State Implementation Plan ("SIP" or "applicable implementation plan").

**Prevention of Significant Deterioration of Air Quality**

18.     Areas that are designated attainment or unclassifiable are subject to statutory and regulatory Prevention of Significant Deterioration of Air Quality ("PSD") provisions. Subchapter I, Part C of the CAA, 42 U.S.C. §§ 7470-7492 and 40 C.F.R. § 52.21 (1997 Edition).

19.     The PSD program seeks to prevent significant deterioration of air quality where ambient air standards are being met or the area has not been classified.  Specifically, its purposes are to: 1) prevent significant deterioration of air quality in attainment areas, 2) protect the public health and welfare from adverse effects from air pollution, 3) ensure that emissions from a source do not interfere with the prevention of significant deterioration of air quality in other areas, and 4) ensure that any decision to permit increased air pollution in an attainment or unclassifiable area is made only after careful evaluation of the consequences, an opportunity for public participation and an informed decision-making process.  Section 160 of the CAA, 42 U.S.C. § 7470.

20.     The core of the program is that "[n]o major emitting facility . . . may be constructed in any area to which this part applies unless" various requirements are met.  Section 165(a) of the CAA, 42 U.S.C. § 7475(a).  These requirements include obtaining a permit with emission limits, demonstrating that emissions will not contribute to a NAAQS exceedance  and applying "best available control technology" ("BACT") to control emissions.  Id.

21.     Section 110(a)(2)(C) of the CAA, 42 U.S.C. § 7410(a)(2)(C), requires that each applicable implementation plan include a PSD permit program as provided in Subchapter I, Part

C of the CAA, 42 U.S.C. §§ 7470-7492.

22.     Section 161 of the CAA, 42 U.S.C. § 7471, requires each applicable implementation plan to contain "emission limitations and such other measures as may be necessary . . . to prevent significant deterioration of air quality" in attainment and unclassifiable areas.

23.     Pursuant to Subchapter I, Part C of the CAA, 42 U.S.C. §§ 7470-7492, EPA promulgated 40 C.F.R. § 52.21, the PSD regulations.

24.     The provisions of 40 C.F.R. § 52.21(b) through (w) were incorporated by reference and made part of Colorado's SIP in 1986.  40 C.F.R. § 52.343(b).  EPA approved Colorado's PSD program as part of the SIP on September 2, 1986.  51 Fed. Reg. 31125.  The PSD provisions of the Colorado SIP can be found in Colorado Air Quality Control Regulation No. 3, 5CCR §§ 1001-05.

25.     The authority to issue PSD permits in Colorado has been delegated to the Colorado Department of Public Health and Environment ("CDPHE").

26.     In general, the PSD regulations require major stationary sources and major modifications to major stationary sources to apply for, obtain and operate in accordance with a PSD permit.

27.     In pertinent part, the PSD regulations define a "major stationary source" to be, among others, a Portland cement plant that emits or has the potential to emit regulated pollutants in amounts equal to or greater than 100 tons per year ("tpy").  40 C.F.R. § 52.21(b)(1)(i)(a) (1997).

6

28.     The PSD regulations define "potential to emit" as "the maximum capacity of a stationary source to emit a pollutant under its physical and operational design." 40 C.F.R. § 52.21(b)(4) (1997).  Physical and operational limitations on a source's capacity to emit may be considered only if they meet certain criteria, such as inclusion in a federally enforceable permit. Id.

29.     "Major modification" is defined as "any physical change in or change in the method of operation of a major stationary source that would result in a significant net emissions increase of any pollutant subject to regulation under the Act." 40 C.F.R. § 52.21(b)(2)(i) (1997).

30.     An emissions increase is "significant" if the net increase or potential to emit is equal to or greater than 40 tpy of NOx, among others.  40 C.F.R. § 52.21(b)(23)(i) (1997).

31.     "Net emissions increase" is defined as "[a]ny increase in actual emissions from a particular physical change or change in method of operation" and any other emissions increase or decrease at the source that is contemporaneous and creditable.  40 C.F.R. § 52.21(b)(3)(i) (1997).

32.     The PSD regulations define "actual emissions" as follows:  "In general, actual emissions as of a particular date shall equal the average rate, in tons per year, at which the unit actually emitted the pollutant during a two-year period which precedes the particular date and which is representative of normal source operation."  40 C.F.R. § 52.21(b)(21)(i)-(ii) (1997).  In addition, "[f]or any emissions unit . . . which has not begun normal operations on the particular date, actual emissions shall equal the potential to emit of the unit on that date." 40 C.F.R. § 52.21(b)(21)(iv) (1997).

7

33.     The requirements of paragraphs (j) through (r) of 40 C.F.R. § 52.21 (1997) apply to any major stationary source and any major modification proposed to be constructed in an attainment or unclassifiable area. The requirements apply with respect to each pollutant, subject to regulation under the CAA, that it would emit. 40 C.F.R. § 52.21(i)(2)-(3) (1997).

34.     If a source meets the criteria above, then it is subject to the PSD permitting process. The PSD permitting process requires among other things, applying for, obtaining and operating pursuant to a PSD permit, an analysis of source impacts, air quality modeling and analysis, the application of best available control technology and meaningful public participation in the process. 40 C.F.R. § 52.21(j)-(q) (1997).

35.     No stationary source or modification to which the requirements of paragraphs (j) through (r) of 40 C.F.R. § 52.21 apply shall begin actual construction without a permit which states that the stationary source or modification will meet those requirements. 40 C.F.R. § 52.21(i)(1) (1997).

36.     Any owner or operator of a source or modification subject to 40 C.F.R. § 52.21 who commences construction without applying for and receiving a PSD permit thereunder, or who operates a source without having obtained a PSD permit is subject to an enforcement action. 40 C.F.R. § 52.21(r)(1) (1997).

**Nonattainment New Source Review ("NNSR")**

37.     Sections 171 through 193 of the CAA, 42 U.S.C. §§ 7501-7515 impose SIP requirements for non-attainment areas. Among other things, the CAA requires that States adopt SIP provisions establishing a NNSR program which includes permitting requirements and other

requirements governing the construction and operation of new or modified major sources in non-attainment areas.

38.     A State's NNSR program must include a requirement that any source undergoing a "major modification" comply with the lowest achievable emission rate ("LAER").  CAA § 173(a)(2), 42 U.S.C. § 7503(a)(2).  LAER typically includes installation and operation of state of the art pollution control equipment.

39.     A State's NNSR program must also include provisions requiring that new or modified sources located in nonattainment areas must obtain offsetting emissions reductions. CAA § 173(a)(1), 42 U.S.C. § 7503(a)(1).

40.     EPA approved Colorado's SIP requirements implementing the NNSR program on September 2, 1986.  51 Fed. Reg. 31125.

41.     Colorado Air Quality Control Commission Regulation No. 3, 5 CCR 1001-5, Part A, § I.B.35.B.a provides that in the Denver Metropolitan PM-10 nonattainment area, any net emission increase that is significant for NOx "shall be considered significant for PM-10."

42.     Any owner or operator of a major emitting facility who constructs, modifies or operates a source not in accordance with a NNSR application or commences construction without applying for and receiving approval thereunder is subject to an enforcement action. CAA § 113(b)(1), 42 U.S.C. § 7413(b)(1).  40 C.F.R. § 52.23.

**Title V Permitting Program**

43.     Section 502(a) of the CAA, 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b) provide that, after the effective date of any permit program approved or promulgated under Title V of the

CAA, no source subject to Title V may operate except in compliance with a Title V permit.

44.     40 C.F.R. § 70.1(b) and Colorado Air Quality Control Commission Regulation No. 3, 5 CCR 1001-5, Part C, Sections II.A.1 and V.C.1 provide that all sources subject to the Part 70 regulations shall have a permit to operate that assures compliance by the source with all applicable requirements.

45.     Colorado's Title V operating permit program was granted interim approval by EPA, effective February 23, 1995. 60 Fed. Reg. 4563 (Jan. 24, 1995); 40 C.F.R. part 70, Appendix A. EPA granted final approval, effective October 16, 2000. 65 Fed. Reg. 49919 (August 16, 2000). Colorado's Title V operating permit program is implemented by CDPHE.

46.     The CAA and Colorado Regulations make it unlawful for any person to violate any requirement of a permit issued under Title V or to operate a major source except in compliance with a permit issued by a permitting authority under Title V. Section 502(a) of the CAA, 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b).

**National Emissions Standards for Hazardous Air Pollutants**

47.     Pursuant to Section 112 of the CAA, 42 U.S.C. § 7412, the Administrator promulgated regulations establishing the National Emission Standards for Hazardous Air Pollutants for Portland Cement Manufacturing Industry. These Maximum Achievable Control Technology ("MACT") regulations are codified at 40 C.F.R. Part 63, Subpart LLL and 40 C.F.R. Part 63 of the General Provisions, Subpart A.

10

**Enforcement Authority**

48.     The Administrator is authorized to bring a civil action, in accordance with Section 113(b) of the CAA, 42 U.S.C. § 7413(b), whenever he finds that a person has violated or is in violation of any requirement or prohibition of an applicable implementation plan or permit or that a person has violated or is in violation of certain subchapters of the CAA including PSD and Title V and any requirement or prohibition issued or approved under these provisions.  Section 113(a)(1), (3) of the CAA, 42 U.S.C. § 7413(a)(1), (3) and Section 113(b)(1)-(2) of the CAA, 42 U.S.C. § 7413(b)(1)-(2).  See also 40 C.F.R. § 52.23 (1997).

49.     EPA may commence a civil action and seek injunctive relief as well as civil penalties for each day of violation.  Section 113(b) of the CAA, 42 U.S.C. § 7413(b).  Pursuant to the Debt Collection Improvement Act of 1996, Pub. L. 104-134, and 40 C.F.R. § 19.4 (2004) (Table), civil penalties of up to $27,500 per day per violation may be assessed for violations occurring between January 30, 1997, and March 15, 2004, and up to $32,500 per day per violation for violations occurring after March 15, 2004.

50.     The Administrator is authorized to take such measures, including seeking injunctive relief, to prevent the construction, modification or operation of a major emitting facility which does not conform to the PSD requirements in Part C of the Act.  Section 167 of the CAA, 42 U.S.C. § 7477.

51.     On March 28, 2007, EPA issued a Notice of Violation to Defendant for violations of the CAA and the applicable implementation plan.

## GENERAL ALLEGATIONS

52.     Defendant owns and operates a Portland cement manufacturing facility located in Lyons, Colorado.  Portland cement is a component of the product concrete.

53.     Over the course of its operation, the Facility has undergone numerous changes and upgrades.  This action focuses on a series of modifications Defendant undertook at its Facility between 1997 and 1999, which resulted in violations of the CAA and the applicable implementation plan, and on its operations subsequent to the completion of these modifications.

54.     At all times relevant to this action, CEMEX, Inc., has owned and operated the Facility.  Construction of the Lyons Facility was originally commissioned in December 1969, by Martin Marietta, Inc., which owned the Facility until selling it in 1984 to Southdown, Inc. CEMEX acquired the Facility from Southdown, Inc., in November 2000 when it became the owner of Southdown, Inc.  At that time, Southdown, Inc., became a wholly owned subsidiary of CEMEX and subsequently changed its name to CEMEX, Inc.

55.     At all times relevant to this action, the Facility was a "major stationary source" within the meaning of the CAA, the PSD regulations and the Colorado SIP and was a "major source" within the meaning of the CAA's and Colorado's Title V program.

## FIRST CLAIM FOR RELIEF

### (PSD Violations )

56.     Paragraphs 1 through 55 of the Complaint are realleged and incorporated herein.

57.     Beginning in 1997, and ending some time in 1999, Defendant commenced construction of one or more major modifications at its Facility, including upgrading the Raw Mill

12

System, the Kiln System, the Finish Mill System and the Oxygen Plant in an effort to increase production.

58.    The modification(s) resulted in significant net emissions increases, as defined by the relevant PSD regulations and the applicable implementation plan, of NOx, which triggered the PSD requirements.

59.    Defendant failed to apply for, obtain or operate pursuant to a PSD permit for the modification(s).

60.    By failing to apply for and obtain a PSD permit, Defendant failed to:  1) undergo proper PSD BACT analysis;  2) install and operate the best available control  technology for the control of NOx;  3) demonstrate that allowable emission increases from the modification would not cause or contribute to air pollution violations; and  4) provide for review and public comment on the air quality impacts of the modification.  Section 165(a) of the CAA, 42 U.S.C. § 7475(a) and 40 C.F.R. § 52.21(j)-(q).

61.    Defendant's modification and operation of its Facility without a PSD permit constitutes a continuing violation of the CAA and the Colorado SIP.  Unless restrained by an order of this Court, these violations will continue.

62.    As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b) and Section 167 of the CAA, 42 U.S.C. § 7477, the violations set forth above subject Defendant to injunctive relief and civil penalties of up to $27,500 per violation for each day of violation occurring between January 30, 1997, and March 15, 2004, and up to $32,500 per violation for each day of violation after March 15, 2004.  40 C.F.R. § 19.4 (Table).

## SECOND CLAIM FOR RELIEF

### (Non-attainment New Source Review Violations)

63.    Paragraphs 1 through 55 of the Complaint are realleged and incorporated herein.

64.    Colorado Air Quality Control Commission Regulation No. 3, 5 CCR 1001-5 Section IV.D.2.a requires that sources undergoing construction or a major modification in a non-attainment area must obtain a permit which sets forth emissions limitations that are based on LAER.

65.    At the time of the Lyons Capacity Increase project, the Denver Metropolitan area was designated as non-attainment for PM-10.  Defendant's modifications resulted in a significant increase of PM-10.

66.    Defendant failed to obtain a NNSR permit which included applying LAER and offsets prior to commencing construction in violation of Colorado Air Quality Control Commission Regulation No. 3, 5 CCR 1001-5, Section IV.D.2.a and Colorado Air Quality Control Commission Regulation No. 3, 5 CCR 1001-5 Part B, Section IV.D.2.a.

67.    Defendant's modification and operation of its Facility without a NNSR permit constitutes a continuing violation of the CAA and the Colorado SIP.  Unless restrained by an order of this Court, these violations will continue.

68.    As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b) and Section 167 of the CAA, 42 U.S.C. § 7477, the violations set forth above subject Defendant to injunctive relief and civil penalties of up to $27,500 per violation for each day of violation occurring between January 30, 1997, and March 15, 2004, and up to $32,500 per violation for each day of

14

violation after March 15, 2004.  40 C.F.R. § 19.4 (Table).

## THIRD CLAIM FOR RELIEF

### (Title V Violations )

69.     Paragraphs 1 through 55 of the Complaint are realleged and incorporated herein.

70.     CDPHE issued CEMEX Title V Operating Permit No. 95OPBO082 ("Title V Permit") on February 1, 2000.  This permit has been revised, most recently on October 8, 2002.

71.     CEMEX's Title V Permit, Conditions 1.3.7, 3.5.7, 11.6.7 and 13.5.10 require that Defendant suspend activities that cause fugitive dust emissions whenever wind speeds reach or exceed 30 miles per hour, averaged over a 60-minute period.

72.     On approximately 116 occasions since January 2004, Defendant has failed to suspend activities at its Facility when wind speeds reached or exceeded 30 miles per hour, averaged over a 60 minute period, as required by its Title V Permit.

73.     CEMEX's Title V Permit, Conditions 1.3, 3.5, 11.6 and 13.5 require that Defendant install, calibrate, and operate a wind speed instrument that will be used to alert plant operators when wind speeds reach or exceed 30 miles per hour.

74.     Between August 18, 2004, and April 12, 2006, Defendant's wind speed measuring device recorded wind speeds of less than zero miles per hour or greater than 150 miles per hour for over 9,500 minutes, over 9,300 of which were reported as "valid" data points.  Defendant failed to calibrate and operate its wind speed instrument as required by its Title V Permit.

75.     CEMEX's Title V Permit, Condition 3.5.1 requires that the height of any discharge from the stacker belt shall be adjusted to minimize the drop height to less than three

15

feet.

76.     On or about April 12, 2006, EPA inspectors observed raw materials being discharged from a height greater than three feet above the top of the raw materials pile, in violation of CEMEX's Title V Permit.

77.     CEMEX's Title V Permit, Conditions 19 and 24.4.1 require that at all times, including periods of startup, shutdown and malfunction, plant operators operate any affected source, including associated air pollution control equipment, in a manner consistent with good air pollution control practices for minimizing emissions at least to the levels required by all relevant standards.

78.     On or about April 10, 2006, EPA inspectors witnessed nearly 100 percent opacity generated from a conveyor transfer point when the baghouse continued to discharge dust onto a conveyor belt which had been shut down because of high wind conditions.  Defendant's failure to prevent these baghouse discharges represents a failure to maintain and operate its Facility, including associated air pollution control equipment, in a manner consistent with good air pollution control practices for minimizing emissions as required by its Title V Permit.

79.     Unless restrained by an order of this Court, Defendant's violations of the terms and conditions of its Title V Permit will continue.

80.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), the violations set forth above subject Defendant to injunctive relief and civil penalties of up to $27,500 per violation for each day of violation occurring between January 30, 1997, and March 15, 2004, and up to $32,500 per violation for each day of violation after March 15, 2004.  40 C.F.R. § 19.4 (Table).

## FOURTH CLAIM FOR RELIEF

### (MACT Violations)

81.     Paragraphs 1 through 55 of the Complaint are realleged and incorporated herein.

82.     Pursuant to 40 C.F.R. § 63.1343(b)(2), no owner or operator of an existing kiln shall cause to be discharged into the atmosphere from any affected sources, any gases which exhibit opacity greater than 20 percent.

83.     Between January 2004 and April 2006, Defendant exceeded the applicable opacity standard at its kiln stack approximately 290 times, in violation of 40 C.F.R. §§ 63.1343(b)(2) and 63.1350(c)(3).

84.     Pursuant to 40 C.F.R. § 63.1354(b)(8), and as required by 40 C.F.R. § 63.10(e)(3), the owner or operator of an affected source equipped with a continuous emission monitor shall submit an excess and continuous monitoring system performance report for any event when the continuous monitoring system data indicate that the source is not in compliance with the applicable emission limitation or operating parameter limit.

85.     Between January 2004 and December 2005, Defendant failed to report opacity exceedances for the kiln stack on approximately 210 occasions, in violation of 40 C.F.R. § 63.1354(b)(8).

86.     Pursuant to 40 C.F.R. § 63.1345(a)(2), no owner or operator of a new or existing clinker cooler at a facility which is a major source shall cause to be discharged into the atmosphere from the clinker cooler any gases which exhibit opacity greater than ten percent.

87.     Between January 2004 and April 2006, Defendant exceeded the applicable

17

opacity limit at the clinker cooler stack on approximately 145 occasions, in violation of 40 C.F.R. § 1345(a)(2).

88.     Pursuant to 40 C.F.R. § 63.1345(a)(2), and as required by 40 C.F.R. § 63.10(e)(3), the owner or operator of an affected source equipped with a continuous emission monitor shall submit an excess emissions and continuous monitoring system performance report for any event when the continuous monitoring system data indicate that the source is not in compliance with the applicable emission limitation or operating parameter limit.

89.     Between January 2004 and December 2005, Defendant failed to report opacity exceedances for the clinker cooler stack on approximately 120 occasions, in violation of 40 C.F.R. § 63.1354(b)(8).

90.     Unless restrained by an order of this Court, these violations will continue.

91.     As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), the violations set forth above subject Defendant to injunctive relief and civil penalties of up to $27,500 per violation for each day of violation occurring between January 30, 1997, and March 15, 2004, and up to $32,500 per violation for each day of violation after March 15, 2004.  40 C.F.R. § 19.4 (Table).

## PRAYER FOR RELIEF

WHEREFORE, the United States respectfully prays and requests that this Court:

1.     Permanently enjoin the Defendant from operating the Facility, including the construction of future modifications, except in accordance with the CAA and the applicable implementation plan;

2.     Require Defendant to remedy its past violations by ordering Defendant to apply for and obtain permits that are in conformity with the requirements of the PSD, NNSR and Title V programs;

3.     Require Defendant to remedy its past violations by, among other things, ordering Defendant to install and operate, the best available control technology and achieve the lowest achievable emission rate as required by the CAA and the Colorado SIP;

4.     Require Defendant to remedy its past violations by, among other things, ordering Defendant to submit an excess emissions report for any event when the continuous monitoring system data indicate that the source is not in compliance with the applicable emission limitation or operating parameter limit, as required by the National Emissions Standards for Hazardous Air Pollutants for the Portland Cement Manufacturing Industry;

5.     Require Defendant to take other appropriate actions to address or offset the unlawful emissions of NOx attributable to the violations of the Clean Air Act alleged above;

6.     Assess civil penalties of up to $27,500 per violation for each day of each violation occurring between January 30, 1997, and March 15, 2004, and up to $32,500 per violation for each violation after March 15, 2004;

7.     Award the United States its costs; and

8.     Grant the United States such other relief as the Court deems just and proper.

Respectfully submitted,

RONALD J. TENPAS
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division
Office of the Assistant Attorney General
950 Pennsylvania Avenue, N.W.
Room 2143
Washington, D.C. 20530


ROBERT R. HOMIAK
Senior Attorney
United States Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
1961 Stout Street, Suite 800
Denver, CO  80294
Telephone: (303) 844-1391
Facsimile: (303) 844-1350
Email: Robert.Homiak@usdoj.gov