**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**


Civil Action No.  09-cv-00019-MSK-MEH


UNITED STATES OF AMERICA,

        Plaintiff,

        v.

CEMEX, INC.,

        Defendant.

---

**UNITED STATES' MEMORANDUM IN OPPOSITION TO CEMEX, INC.'s MOTION**
**TO DISMISS PURSUANT TO FED. R. CIV. P 12(b)(6)**

---

## TABLE OF CONTENTS

TABLE OF CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -iii-

**INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**STANDARD OF REVIEW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**FACTUAL ALLEGATIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**I.**    **PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION:  DISPUTES OF
       LAW AND FACT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

       A.    Defendant's Statement of Fact  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

       B.    First and Second Claims For Relief  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

       C.    Burden of Proof For PSD, NNSR, and Title V Claims  . . . . . . . . . . . . . . . . . . 14

             (1)  Contested Elements of the United States' PSD and NNSR Claims  . . . . . . 15

             (2)  Contested Elements of the United States' Title V Claims  . . . . . . . . . . . . . 16

**II.**   **28 U.S.C. § 2462 DOES NOT APPLY TO PLAINTIFF'S CLAIMS FOR
       INJUNCTIVE RELIEF UNDER THE CLEAN AIR ACT** . . . . . . . . . . . . . . . . . . . 18

**III**. **THE UNITED STATES' PSD AND NNSR CLAIMS FOR CIVIL PENALTIES
       ARE NOT BARRED BY  28 U.S.C. § 2462** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

       A.    The Doctrine of Continuing Violations has been Applied to Environmental
             Causes of Action in this District  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

       B.    The PSD and NNSR Construction Permitting Requirements Create a
             Continuing Cause of Action  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

             (1)    The Structure and Text of the CAA Reflect Congress's Intent to Make
                    Permitting Requirements Ongoing Obligations  . . . . . . . . . . . . . . . . . . . 25

      (2)     Failure to Obtain a NNSR Construction Permit Is Also an Ongoing Violation That Is Subject to Civil Penalties . . . . . . . . . . . . . . . . . . . . . . . 30

      (3)     As a Result of Defendant's Failure to Install BACT and LAER, Public Harm Continues Every Day That Defendant Operates in Violation of Statutory and Regulatory Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . 31

      (4)     The United States' View That the Violations Are Continuing Is Shared by the Majority of the Circuits That Have Examined This Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

      (5)     A District Court in California Has Rejected Defendant's Argument That 28 U.S.C. § 2462 Bars the United States' Civil Penalty Claims . . . . . . 40

      (6)     An Examination of the Colorado SIP Makes It Clear That Defendant's Failure to Secure PSD and NNSR Construction Permits Is a Continuing Violation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

IV.    THE UNITED STATES' FIRST AMENDED COMPLAINT STATES A VALID CLAM FOR RELIEF UNDER TITLE V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

    A.    The United States' Title V Claims Are Timely . . . . . . . . . . . . . . . . . . . . . . . 46

    B.    An Incomplete Title V Permit Application Is Actionable under the CAA . . . . . 48

    C.    42 U.S.C. § 7661c(f) Does Not Bar the United States Title V Claims . . . . . . . . 53

      (1)     The Permit Shield Does Not Bar Claims for a Deficient Permit Resulting from an Incomplete Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

      (2)     Defendant's Incomplete Permit May Not Be Raised as a Shield To PSD and NNSR Claims When the Violations Commenced Before or At the Time the Permit Was Issued . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

V.     IN THE ALTERNATIVE, UNDER APPLICABLE PRINCIPLES OF EQUITY, RULING ON THE INSTANT MOTION SHOULD BE DEFERRED UNTIL DISCOVERY IS COMPLETED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

**TABLE OF CASES**

Aldrich v. McCulloch Props., Inc., 627 F.2d 1036 (10th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . 15

A.M.R. Enters. v. City of Phoenix, No. CIV.-94-2007-PHX-ROS(BGS), 1997 WL 150104 (D.
    Ariz. Mar. 25, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Bank of Denver v. Se. Capital Group, Inc., 763 F. Supp. 1552 (D. Colo. 1991) . . . . . . . . . . . 59

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 15

Benefield v. McDowall, 241 F.3d 1267 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Brunilius v. Brill, Civ. Action No. 07-cv-02581-BNB, 2008 WL 2673793
    (D. Colo. July 2, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Burkley v. Corr. Healthcare Mgmt. of Oklahoma Inc., 141 Fed. App'x 714, 2005 WL 1595699
    (10th Cir. July 8, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Carr v. Alta Verde Indus., Inc., 931 F.2d 1055 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . 29

Chevron U.S.A. Inc. v. NRDC, 467 U.S. 837 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Clean Air Implementation Project v. E.P.A., 150 F.3d 1200 (D.C. Cir. 1998) . . . . . . . . . . . . 53

Cmt'ys for a Better Env't v. Cenco Refining Co., 180 F. Supp. 2d 1062 (C.D. Cal. 2001) . . . . 30

Detroit Edison Co. v. Mich. Dep't of Envtl. Quality, 39 F. Supp. 2d 875 (E.D. Mich. 1999) . . 35

Georgacarakos v. Wiley, Civ. Action No. 07-cv-01712-MSK-MEH, 2008 WL 4216265
    (D. Colo. Sept. 12, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381 (10th Cir. 1997) . . . . . . . . 10

Glus v. Brooklyn E. Dist. Terminal, 359 U.S. 231 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Harmon Indus., Inc. v. Browner, 19 F. Supp. 2d 988 (W.D. Mo. 1998) . . . . . . . . . . . . . . 22, 29

Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

Headwaters, Inc. v. Talent Irrigation Dist., 243 F.3d 526 (9th Cir. 2001) . . . . . . . . . . . . . . . . 22

Heil v. Wells Fargo Bank, N.A., 298 Fed. App'x 703, 2008 WL 4516685 (10th Cir. 2008)  . . 58

Indus. Constructors Corp. v. United States Bureau of Reclamation, 15 F.3d 963
        (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

McCormick v. Farrar, Civ. Action No. 03-3131, 2005 WL 2083027
        (10th Cir. Aug. 30, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Miller v. Glanz, 948 F.2d 1562, 1565 (10th Cir. 1991)  . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 13

Montana v. Hargett, Civ. Action No. 07-cv-00545-CMA-KLM, 2008 WL 4964717
        (D. Colo. Nov. 17, 2008)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Nat'l Parks & Conservation Ass'n v. Tennessee Valley Auth., 502 F.3d 1316
        (11th Cir. 2007), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35-38

Nat'l Parks Conservation Ass'n, Inc. v. Tenn. Valley Auth., 480 F.3d 410
        (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 36, 41

New York v. Niagara Mohawk Power Corp., 263 F. Supp. 2d 650,
        (W.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 38, 39, 53, 55

Newell Recycling Co. v. United States EPA, 231 F.3d 204 (5th Cir. 2000)  . . . . . . . . . . . . . . 29

Oxendine v. Kaplan, 241 F.3d 1272 (10th Cir. 2001)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Pennsylvania v. Allegheny Energy, Inc., No. Civ. A. 05-885, 2006 WL 1509061
        (W.D.Pa. Apr. 19, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Ranch Realty, Inc. v. DC Ranch Realty, LLC, No. CV-07-843-PHX-SMM, 2007 WL 3207469
        (D. Ariz. Oct. 29, 2007)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Rassam v. San Juan College Bd., No. 95-2292, 1997 WL 253048 (10th Cir. May 15, 1997)  . . 23

Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d 1174 (10th Cir. 2007)  . . . . . . . . . . . . . . . 10

Sasser v. EPA, 990 F.2d 127, 129 (4th Cir. 1993)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Scheuer v. Rhodes, 416 U.S. 232 (1974)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Sharp ex rel. N.L.R.B. v. Webco Indus., Inc., 225 F.3d 1130 (10th Cir. 2000)  . . . . . . . . . . . . 21

Sierra Club v. Dayton Power & Light, Inc., No. 2:04 CV 905, 2005 WL 1972549
        (S.D. Ohio Aug. 12, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 35

Sierra Club v. Johnson, 541 F.3d 1257 (11th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Sierra Club v. Leavitt, 368 F.3d 1300 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Sierra Club v. United States E.P.A., 557 F.3d 401 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . 46

Sivulich-Boddy v. Clearfield City, 365 F. Supp. 2d 1174 (D. Utah 2005) . . . . . . . . . . . . . . . 59

Smith v. Leyba, Civ. Action No. 07-cv-02580-MSK-BNB, 2009 WL 564270
        (D. Colo. Mar. 5, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Tello v. Dean Witter Reynolds, Inc., 410 F.3d 1275 (11th Cir. 2005) . . . . . . . . . . . . . 10, 14, 60

TRW Inc. v Andrews, 534 U.S. 19 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

United States v. Am. Elec. Power Serv. Corp, 136 F. Supp. 2d 808 (S.D. Ohio 2001) . . . . . . . 20

United States v. Am. Elec. Power Serv. Corp., 137 F. Supp. 2d 1060 (S.D. Ohio 2001) . . . . . . 31

United States v. Brotech Corp., No. Civ. A. 00-2428, 2000 WL 1368023)
        (E.D. Pa. Sept. 19, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

United States v. Campbell Soup Co., No. Civ. S-95-1854 DFL, 1997 WL 258894
        (E.D. Cal. Mar. 11, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 38

United States v. CEMEX California Cement, LLC, No. CV 07-0023
        (C.D. Cal. July 10, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40-42, 53

United States v. Cinergy Corp., 397 F. Supp. 2d 1025 (S.D. Ind. 2005) . . . . . . . . . . . . . . . . . 38

United States v. Duke Energy Corp., 278 F. Supp. 2d 619 (M.D.N.C. 2003) . . 32, 34, 35, 38-40

United States v. E. Kentucky Power Co-op, Inc., 498 F. Supp. 2d 970 (E.D. Ky. 2007) . . . . . 41

United States v. E. Kentucky Power Co-op., Inc., 498 F. Supp. 2d 1010 (E.D. Ky. 2007) . 52, 53

United States v. Illinois Power Co., 245 F. Supp. 2d 951 (S.D. Ill. 2003) . . . . . . . . 20, 38, 39, 53

United States v. ITT Cont'l Baking Co., 420 U.S. 223 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . 22

United States v. Louisiana- Pacific Corp., 682 F. Supp. 1122 (D. Colo. 1987) . . . . . . . . . . . 39

United States v. Marine Shale Processors, 81 F.3d 1329 (5th Cir. 1996) . . . . . . . . . . 28, 34, 41

United States v. Murphy Oil USA, Inc., 143 F. Supp. 2d 1054 (W.D. Wis. 2001) . . . . . . . . . 20

United States v. Ohio Edison Co., Case No. 2:99-CV-1181, 2003 WL 23415140
     (S.D. Ohio Jan. 17, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 31, 32, 35

United States v. Power Eng'g Co., 10 F. Supp. 2d 1145 (D. Colo. 1998) . . . . . . . . . . . . . 23, 24

United States v. Reaves, 923 F. Supp. 1530 (M.D. Fla. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . 23

United States v. S. Ind. Gas & Elec. Co., No. IP 99-1692-C-M/F, 2002 WL 1760752
     (S.D. Ind. July 26, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 53

United States v. Telluride Co., 146 F.3d 1241 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . 19, 20

United States v. Telluride Co., 884 F. Supp. 404 (D. Colo. 1995) . . . . . . . . . . . . . . . . . . . . . . 24

United States v. Titanium Metals Corp., No. CV-S-98-682-HDM (RLH)
     (D. Nev. Sept. 16, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

United States v. Westvaco Corp., 144 F. Supp. 2d 439 (D. Md. 2001) . . . . . . . . . . . . . . . 20, 38

United States ex rel. Nelson v. Reliance Ins. Co., 436 F.2d 1366 (10th Cir. 1971) . . . . . . . . . 58

Villabona-Alvarado v. Rios, Civ. Action No. 07-cv-01937-MSK-MEH, 2009 WL 723308
     (D. Colo. Mar. 18,  2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

White v. Tharp, Civ. Action No. 06-cv-01179-EWN-KLM, 2008 WL 596156
     (D. Colo. Feb. 29, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 13

Young v. United States, 535 U.S. 43, 49 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

The United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), submits this Opposition to the "Motion to Dismiss of Defendant CEMEX, Inc., Pursuant to Fed. R. Civ. P. 12(b)(6)" ("Defendant's Motion"), and Defendant's supporting memorandum ("Defendant's Memorandum") (respectively, Docs. 19 and 20). Defendant has moved pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the United States' First and Second Claims for Relief in their entirety, or alternatively, to dismiss them to the extent that they seek civil penalties. Between 1997 and 1999, Defendant unlawfully modified its Portland cement plant in Lyons, Colorado, causing significant increases in emissions of nitrogen oxides and particulate matter into the air. Since that time, without applying for and receiving permits that would have eliminated or mitigated the volume of pollutants emitted into the air, Defendant has operated these modified units in violation of the Clean Air Act's Prevention of Significant Deterioration and Non-attainment New Source Review provisions. From the time Defendant modified these units, and then commenced operation of the modified units, these violations have been ongoing. The United States alleges that these violations continue every day, or in the alternative, accrue anew each day that Defendant operates the modified units, and that therefore, the statute of limitations does not bar the United States' claims. Because the United States' First and Second Claims for Relief state claims for which this Court may grant relief, Defendant's Motion should be denied.

## **INTRODUCTION**

The United States brings this action under the following provisions of the Clean Air Act, 42 U.S.C. §§ 7401 - 7671q ("CAA"): the Prevention of Significant Deterioration ("PSD")

provisions, 42 U.S.C. §§ 7470 - 7492; the Non-attainment New Source Review ("NNSR")

provisions, 42 U.S.C. §§ 7501 - 7515; and the Title V provisions of the CAA, 42 U.S.C. § 7661 -

7661f.  The United States also seeks relief under Colorado's federally-enforceable State

Implementation Plan ("SIP"), adopted by the State of Colorado and approved by EPA pursuant

to Section 110 of the CAA, 42 U.S.C. § 7410, and the Colorado's Title V regulations, Colorado

Air Quality Control Commission ("CAQCC") Reg. 3, Part C (1995).[1]  The United States brings

this action to prevent ongoing, excess emissions of nitrogen oxides ("NOx") and particulate

matter smaller than 10 microns in size ("PM-10") that are released into the air every day from

Defendant's cement manufacturing operation located near the city of Lyons in Boulder County,

Colorado (the "Facility") and to enforce the CAA's permitting regime.   First Amended

Complaint, Doc. 16, ¶¶ 3 and 10.

　　　　The United States alleges that between 1997 and 1999 Defendant modified its Raw Mill

System, Kiln System, Finish Mill System and Oxygen Plant at its Facility and further, that these

modifications triggered PSD and NNSR requirements to control and monitor emissions of NOx

and PM-10.  Id. ¶¶ 57 - 61 and 65 - 67.  Defendant, however, failed to obtain PSD and NNSR

---

[1]　　　Exhibit 1 is a copy of the 1995 and 1998 EPA approved Colorado SIP, CAQCC
Regulation No. 3, 5 Colo. Code Regs. § 1001-5, as maintained by EPA with annotations to
record when portions of the SIP were approved.  Because referencing this version of the SIP is
cumbersome, the United States has consecutively renumbered the pages.  After each cite to a SIP
provision, a bracketed reference to the page numbers in Exhibit 1 are provided, i.e., CAQCC
Reg. 3, Part B, Section IV.D.2.a.(iii) (1998) [page].

　　　　Colorado's Title V regulations, also included in Exhibit 1 and found at CAQCC Reg. 3,
Part C (1995) [0002-0049], are not part of the EPA-approved SIP but rather are regulations
adopted by Colorado to implement, under EPA's oversight, the CAA's Title V requirements.

2

construction permits prior to the modification of these units.  These permits would have

established on these units the physical and operational controls necessary to prevent excess NOx

and PM-10 emissions.  Id.  Defendant then commenced and, to this day, continues to operate the

modified units without having the required PSD and NNSR standards and controls incorporated

into a permit issued under Colorado's SIP for the modified units and, further, without

incorporating the standards and controls for those modified units into the Facility's blanket Title

V permit.  Id.[2]  The United States alleges that Defendant's omissions have resulted in the

ongoing release of unlawful quantities of pollutants into the environment and, as such, constitute

either continuing violations of the PSD and NNSR regulations contained in the CAA and

Colorado SIP, or alternatively, are violations that accrue anew each day.  Further, because

Defendant did not incorporate applicable PSD and NNSR requirements into its Title V permit

application, it has operated these units without a permit, or alternatively without an adequate

---

[2]     Under Colorado's permitting scheme, no person may commence construction of a
stationary source without first obtaining from CDPHE a valid [construction] permit.  See
CAQCC Reg. 3, Section III.A.1. (1995) (general permit requirements) [0103]; CAQCC Reg. 3,
Part B, Section III.A.1. (1998) (same) [0250].  Once construction is complete and the source's
compliance with the terms of the construction permit is demonstrated, Colorado then determines
whether the operating terms of that permit have been met.  If they have, Colorado grants "Final
Permit Approval" for the construction permit.  CAQCC Reg. 3, Part B, Section IV.H.5. (1998)
[0276 - 77].  The source then operates under the terms of that permit – which it should be
remembered – was issued under Colorado's SIP.

        A facility like Defendant's, may have multiple sources, and hence, multiple permits
issued under Colorado's SIP.  Applicable requirements from each source's SIP permit must then
be aggregated into the facility's Title V permit.  CAQCC Reg. 3, Part C, Section V.C.1. (1995)
[0025].  Because both the source's permit issued under the SIP and the Title V permit are often
referred to as "operating permits," the unwary may often become confused by this terminology
unless it is remembered that the Title V permit is a blanket permit for the facility that
summarizes the applicable requirements from each source's SIP authorized permit.

permit, in continuing violation of the CAA's Title V provisions, 40 C.F.R. Part 70,  and

Colorado's Title V permit requirements, CAQCC Reg. 3, Part C, Section V.C.1. (1995) [0025].

These violations are ongoing and will persist unless and until restrained by this Court.  Id. ¶¶ 61

and 67.

       The plain language of the CAA and Colorado's SIP impose integrated construction and

operating requirements on new and modified sources.  Modification and the operation of

modified units without complying with PSD and NNSR requirements constitute violations that

continue, or alternatively accrue, each day that the modified units are operated.  Because a

majority of courts agree that a statute of limitations does not run against operating violations

which, by their very nature, are continuing violations, they have held that the general statute of

limitations does not bar civil penalties for PSD, NNSR, or Title V claims similar to those

asserted here by the United States.  Alternatively, two of the three appellate courts to address

these issues have found that these violations accrued anew each day the unauthorized emissions

continued thus warranting the imposition of "per-day" civil penalties for the five-year period

preceding the complaint.  Accordingly, the United States' First and Second Claims for Relief

state claims for which civil penalties may be granted.

       The United States also seeks injunctive relief directing Defendant to submit the necessary

permit applications, and obtain final permits, which provide, where necessary, for the installation

of appropriate physical pollution controls and the imposition of applicable operational controls

and limitations on the modified units.  Id. ¶¶ 3, 62, and 68.  Even though modifications to the

Raw Mill System, Kiln System, Finish Mill System and Oxygen Plant are complete, permit

4

applications containing operational data regarding the modified units are a necessary predicate

for evaluating and identifying whether and what physical pollution controls and operational

controls are required and for determining what limits are to be applied to the modified units so

that they can, going forward, be operated in compliance with PSD and NNSR requirements.  The

injunctive relief sought by the United States is not barred as Defendant half-heartedly suggests.

See Defendant's Memorandum, Doc. 20, at 10 n.2.  The increased air emissions caused by

Defendant's failure to comply with PSD and NNSR requirements of the CAA and Colorado SIP

have continued on a daily basis since Defendant commenced operation of the modified units and

must be redressed in order to ensure that these uncontrolled emissions do not continue in the

future to further degrade Colorado's air quality.  First Amended Complaint, Doc. 16, ¶¶ 61 and

67.

　　　As discussed, infra, in Section III, Defendant's contrary arguments rest on a narrow

reading of the CAA and Colorado SIP which assumes that construction modifications that trigger

PSD and NNSR requirements are wholly unrelated to the post-construction operation and

performance of the modified units – a suggestion that defies common sense.  Further,

Defendant's position regarding construction and operating permit violations wrongly suggests

that a regulated entity should be rewarded for its errors and omissions by being allowed to

escape any civil penalty for ignoring federal and state regulatory requirements.  To remain

consistent, Defendant then compounds this initial error by suggesting that its operation of the

modified units without applying to have these requirements included in its facility's Title V

permit is not a sanctionable, ongoing violation of Defendant's Title V obligations under federal

and state law.  The construction of the CAA and Colorado regulations tendered by Defendant simply cannot be squared with the stated objective of the CAA: "to protect and enhance the quality of the Nation's air."  42 U.S.C. § 7401(b).

Because of the foregoing arguments, we respectfully request that this Court deny Defendant's Motion by holding that the United States' First and Second Claims for Relief do state claims for which both civil penalties and injunctive relief may be granted.[3/]

## BACKGROUND

To achieve the objectives of the CAA, Section 110(a) of the CAA, 42 U.S.C. § 7410(a), requires each state to submit a plan to the Administrator that provides for the attainment and maintenance of the national ambient air quality standards ("NAAQS") for certain criteria air pollutants in each air quality control region.  This plan is known as a State Implementation Plan ("SIP").  Under Section 107(d) of the CAA, 42 U.S.C. § 7407(d), for each criteria air pollutant, a state is required to designate those areas within its boundaries where the air quality is better or worse than the NAAQS.  An area that meets the NAAQS for a particular pollutant is classified as an "attainment area," one that does not is classified as a "non-attainment area."  Because the classification is pollutant-specific, an area may be designated as "attainment" for one pollutant and "non-attainment" for another.

Areas designated attainment are subject to statutory and regulatory PSD provisions that are intended to prevent the deterioration of air quality.  Subchapter I, Part C of the CAA, 42

---

[3/]     In the alternative, as explained, _infra_, in Section V, the United States requests that a final ruling on this matter be postponed until the close of fact discovery.

U.S.C. §§ 7470 - 7492 and 40 C.F.R. § 52.21 (1997).  The core of the PSD program is that "[n]o major emitting facility . . . may be  constructed in any area to which this part applies unless" certain specific requirements are met.[4]  42 U.S.C. § 7475(a).  A PSD permit is sometimes referred to as a "pre-construction" or "construction" permit because it requires an owner or operator of a "major source" to obtain a PSD permit before commencing construction of a "major modification."  First Amended Complaint, Doc. 16, ¶¶ 20, 26, 27 and 29.  The timing of a construction permit affords the state or federal permitting authority the opportunity to analyze the potential impact that the source's operations will have on an area's air quality and, if necessary, to minimize that impact by requiring the installation of BACT and emissions monitoring.  See, e.g., 42 U.S.C. § 7475(a); 40 C.F.R. § 52.21(j)(1), (3); and (m)(2), (3).  See also CAQCC Reg. 3, Section IV.D.1.a. - g. (1995) (general permit requirements) [0110 - 0111]; CAQCC Reg. 3, Part B, Section IV.D.1.a - e. (1998)(same) [0260 - 0261], and CAQCC Reg. 3, Section IV.D.3.a.(i) - (iii) and (vi) (1995) (Requirements Applicable to Attainment and Unclassifiable Areas) [0114 - 0118]; CAQCC Reg. 3, Part B, Section IV.D.3.a.(i) - (iii) and (vi) (1998) [0265 - 0269] (attainment area BACT analysis).  This set of PSD operating requirements remains in effect for the life of the source.

Sections 171 through 193 of the CAA, 42 U.S.C. §§ 7501 - 7515, impose requirements for "Non-attainment areas."  Among other things, the CAA requires that States adopt SIP provisions establishing a NNSR program which includes permitting requirements and other

---

[4]    The definition of the term "construction" includes any "modification" of any source of facility.  42 U.S.C. § 7479(2)(C).

7

requirements governing the construction and operation of new or modified major sources in non-attainment areas.  42 U.S.C. § 7503.  The purpose of the NNSR program is to improve air quality in areas where it has deteriorated to unacceptable levels.  Subchapter I, Part D of the CAA, 42 U.S.C. §§ 7501 - 7515.  A state's NNSR program must include the requirement that any new source, or source undergoing a "major modification," obtain a permit, CAA Section 173(a) and (c), 42 U.S.C. § 7503(a) and (c), and CAQCC Reg. 3, Section IV.D.2.a. (1995) [0111], CAQCC Reg. No. 3, Part B, Section IV.D.2.a. (1998) [0261 - 0262]; comply with LAER, 42 U.S.C. § 7503(a)(2), CAQCC Reg. 3, Section IV.D.2.a.(i) (1995) [0111], and CAQCC Reg. 3, Part B, Section IV.D.2.a.(i) (1998) [0262]; and obtain offsetting emissions reductions, 42 U.S.C. § 7503(a)(1)(A), CAQCC Reg. 3, Section IV.D.2.a.(iii) (1995) [0112], and CAQCC Reg. 3, Part B, Section IV.D.2.a.(iii) (1998) [0262].

Section 502(a) of the CAA, 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b) and CAQCC Reg. 3, Part C, Section II.A.1 (1995) [0006] provide that, after the effective date of any permit program approved or promulgated pursuant to Title (Subchapter) V of the CAA, no source that is required to have a permit under the PSD or NNSR programs may operate except in compliance with a Title V permit which includes all applicable requirements.[5]  See 42 U.S.C. §§ 7661a(a) and 7661c(a), 40 C.F.R. § 70.1(b), and CAQCC Reg. 3, Part C, Section V.C.1 (1995) [0025].

EPA approved Colorado's PSD program as part of the Colorado SIP on September 2,

_____

[5]    Title V does not generally impose substantive new requirements.  See 40 C.F.R. § 70.1(b).  Rather, the program was designed to "clarify, in a single document, which requirements apply to a source" because "a source's obligations under the Act . . . are, in many cases, scattered among numerous provisions of the SIP or Federal regulations."  57 Fed. Reg. 32,250, 32,251 (July 21, 1992).

1986.  51 Fed. Reg. 31,125.  EPA approved Colorado's NNSR program as part of the Colorado

SIP on September 2, 1986.  51 Fed. Reg. 31,125.  <u>See</u> First Amended Complaint, Doc. 16, ¶¶ 24

and 40.  The PSD and NNSR provisions of the Colorado SIP (both the 1995 and 1998 versions)

can be found in CAQCC Regulation No. 3, 5 Colo. Code Regs. § 1001-5.  On February 23, 1995,

Colorado's Title V operating permit program was granted interim approval by EPA.  Effective

October 16, 2000, EPA granted final approval of Colorado's Title V operating permit program.

<u>Id.</u> ¶ 45.

<b><u>STANDARD OF REVIEW</u></b>

"When a federal court reviews the sufficiency of a complaint, before the reception of any

evidence either by affidavit or admissions, its task is necessarily a limited one.  The issue is not

whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to

support the claims."  <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974), <u>overruled on other grounds</u>

<u>by</u> <u>Harlow v. Fitzgerald</u>, 457 U.S. 800 (1982).  A "court's function on a Rule 12(b)(6) motion is

not to weigh potential evidence that the parties might present at trial, but to assess whether the

plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."

<u>Miller v. Glanz</u>, 948 F.2d 1562, 1565 (10th Cir. 1991).  Review should be limited to the four

corners of the complaint.  <u>Oxendine v. Kaplan</u>, 241 F.3d 1272, 1275 (10th Cir. 2001).

A "[c]omplaint should not be dismissed for failure to state a claim unless it appears

beyond doubt that the plaintiff can prove no set of facts in support of his claim which would

entitle him to relief."  <u>Smith v. Leyba</u>, Civ. Action No. 07-cv-02580-MSK-BNB, 2009 WL

9

564270, at *1 (D. Colo. Mar. 5, 2009) (internal quotation omitted).[9]  See also  Benefield v. McDowall, 241 F.3d 1267, 1270 (10th Cir. 2001); GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997).  To withstand a motion to dismiss, a complaint must contain enough allegations of fact "to state a claim to relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).  As the Tenth Circuit explained in Ridge at Red Hawk, L.L.C. v. Schneider, "the complaint must give the court reason to believe that [a] plaintiff has a reasonable likelihood of mustering factual support for [its] claims."  493 F.3d 1174, 1177 (10th Cir. 2007).

        "In reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept all well-plead allegations in the complaint as true and view those allegations in the light most favorable to the non-moving party."  Villabona-Alvarado v. Rios, Civ. Action No. 07-cv-01937-MSK-MEH, 2009 WL 723308, at *1 (D. Colo. Mar. 18,  2009) (citing Stidham v. Peace Officer Standards and Training, 265 F.3d 1144, 1149 (10th Cir. 2001), quoting Sutton v. Utah State Sch. for the Deaf & Blind, 173 F.3d 1226, 1236 (10th Cir. 1999)).  See also White v. Tharp, Civ. Action No. 06-cv-01179-EWN-KLM, 2008 WL 596156, at *2 (D. Colo. Feb. 29, 2008) (same). At the motion to dismiss stage, a complaint may be dismissed on the basis of a statute of limitations defense "only if it appears beyond a doubt that Plaintiffs can prove no set of facts that toll the statute."  Tello v. Dean Witter Reynolds, Inc., 410 F.3d 1275, 1288 n.13 (11th Cir. 2005) (citations omitted).

---

[9]      Unpublished cases are attached hereto in Exhibit 2.

## FACTUAL ALLEGATIONS

Under the foregoing standard of review, this Court should presume the following allegations to be true. At all times relevant to this action, the Facility was a "major stationary source" subject to PSD and NNSR requirements because it was a Portland cement plant that emits or has the potential to emit regulated pollutants in amounts equal to or greater than 100 tons per year. See First Amended Complaint, Doc. 16, ¶¶ 27, 55. The State of Colorado, including the area in which the Facility is located was designated as attainment for NOx. 40 C.F.R. § 81.306. Id. ¶ 16. At the time Defendant modified the units at its Facility that are the subject of the United States' First and Second Claims for Relief, the Denver Metropolitan PM-10 Area, which is defined to include the Facility, 40 C.F.R. § 81.306, was designated as a non-attainment area for PM-10.[7] Id. Because the Facility is located in an area that is designated attainment for NOx and nonattainment for PM-10, both PSD and NNSR permitting requirements apply to Defendant's Facility. Id. ¶¶ 58 - 59 and 64 - 65.

Between 1997 and 1999, in an effort to increase production, Defendant modified its Facility by upgrading the Raw Mill System, the Kiln System, the Finish Mill System and the Oxygen Plant. Id. ¶ 57. These modifications resulted in significant net increases in NOx and PM-10 emissions from the modified units. Id. ¶¶ 58 and 65. Defendant implemented these modifications without first obtaining the necessary PSD construction permit from CDPHE, id. ¶¶ 59 and 66, thereby, among other things, failing to perform a BACT analysis, identify applicable

---

[7]     The Colorado SIP states that in the Denver Metropolitan PM-10 nonattainment area, any net emission increase that is significant for sulfur dioxide or nitrogen oxides shall be considered significant for PM-10. CAQCC Reg. 3, Part A, Section I.B.35.B.a. (1998) [0188].

11

NOx emissions limits, and install the necessary pollution control technology to achieve that NOx limit. Id. ¶¶ 60 and 61. Because Defendant also implemented these modifications without obtaining the necessary NNSR construction permit from CDPHE, id. ¶ 66, Defendant further, failed to perform a LAER analysis, failed to identify applicable PM-10 emissions limits, failed to install the necessary pollution control technology to achieve the applicable PM-10 limit, and failed to obtain offsetting PM-10 emissions reductions. Id. ¶¶ 38, 65, and 66. As a consequence of bypassing the SIP construction permitting process, Defendant did not include in its application to CDPHE for its Title V permit (Permit No. 95OPBO082) the applicable PSD and NNSR physical and operational standards and controls for the modified units that would have been identified in the SIP construction permitting process. Id. ¶¶ 59, 61, 66, 67, and 70. Because of these omissions, since the time the modified units began to operate, they have – within 11 miles from Rocky Mountain National Park – released on a continuous basis unlawful quantities of NOx and PM-10 into the air. Id. ¶¶ 3, 61, and 67.

Defendant did not inform EPA of its plans for the construction of this modification, the commencement of construction of this modification, or the commencement of the operation of the modified Facility. EPA was unaware of and did not discover these modifications until EPA inspected the CEMEX Facility in 2006. Id. ¶¶ 57 and 65.

## ARGUMENT

I.    **PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION:  DISPUTES OF LAW AND FACT**

A.    Defendant's Statement of Fact

Well pled allegations of fact made in the United States' First Amended Complaint must be accepted as true and must be construed in a light most favorable to the United States.  See, in general, discussion, supra, under Standard of Review, and in particular,  White, 2008 WL 596156, at *2.  Defendant's recitation of "Facts" (Defendant's Motion, Doc. 19, at 1 - 4, incorporated by reference into Defendant's Memorandum, Doc. 20, at 8) does not controvert the facts alleged in the United States' First Amended Complaint.  Rather, by contrasting the United States' Complaint, Doc. 1, with the United States' First Amended Complaint, Doc. 16, Defendant seeks to suggest that the United States' First Amended Complaint contains "new allegations."  Defendant's Motion, Doc. 19, at 2 - 3.  Aside from the complete irrelevancy of this argument to a determination of whether the First and Second Claims for Relief as asserted in the United States' First Amended complaint are "legally sufficient to state a claim for which relief may be granted," Miller, 948 F.2d at 1565, the United States notes that its Complaint did allege that CEMEX modified certain sources at its Facility without the appropriate PSD and NNSR construction permits and then operated these sources without installing BACT and LAER.  By merely supplementing its statement of the statutory bases for these allegations, the United States' First Amended Complaint does not raise "new allegations" but simply makes explicit what was implicit in First and Second Claims for Relief as formulated in the United States' Complaint –

13

that Defendant's operating violations are ongoing.[9]

      B.     <u>First and Second Claims For Relief</u>

      Defendant's editorialized synopsis of the United States' First and Second Claims for Relief, Defendant's Motion, Doc. 19, at 2 - 4, is not required by MSK Civ. Practice Standard, V.I.2.c. To the extent any disparity exists between Defendant's summation and the United States' First Amended Complaint, the United States disputes Defendant's characterization of the United States' claims and refers the Court to its First Amended Complaint, Doc. 16, ¶¶ 56 - 62 (First Claim for Relief) and ¶¶ 63 - 68 (Second Claim for Relief) for an accurate recitation of the United States' claims.

      C.     <u>Burden of Proof For PSD, NNSR, and Title V Claims</u>

      The United States disputes the burden of proof standard identified by Defendant as one, which if applicable at all, would be relevant only to a final evidentiary determination of whether the statutory elements of the CAA in an enforcement action have been met. Defendant's Motion, Doc 19, at 4 - 6. The United States submits that its burden at this juncture is different. "At the motion-to-dismiss stage, a complaint may be dismissed on the basis of a statute of limitations defense only if it appears beyond a doubt that Plaintiffs can prove no set of facts that toll the statute." <u>Tello</u>, 410 F.3d at 1288 n.13. Where viewing nothing more than the dates stated in the complaint would suggest that the right sued upon has been extinguished, the United States has

---

[9]     The United States does, however, agree with Defendant that, "CEMEX's Motion is concerned only with the First and Second Claims for Relief," Defendant's Motion, Doc. 19, at 2, and that the United States' Third and Fourth Claims for Relief have not been put in issue by Defendant's Motion.

the burden of establishing a "plausible basis" for its claims, <u>Bell Atlantic</u>, 550 U.S. at 570, upon

which one could conclude that either: a later accrual date applies, <u>Georgacarakos v. Wiley</u>, Civ.

Action No. 07-cv-01712-MSK-MEH, 2008 WL 4216265, at *8 (D. Colo. Sept. 12, 2008); that

the time limitation should be equitably tolled,  <u>Brunilius v. Brill</u>, Civ. Action No. 07-cv-02581-

BNB, 2008 WL 2673793, at *2 (D. Colo. July 2, 2008); or that there is a factual basis for tolling

the statute, <u>Montana v. Hargett</u>, Civ. Action No. 07-cv-00545-CMA-KLM, 2008 WL 4964717,

at *3 (D. Colo. Nov. 17, 2008) and <u>Aldrich v. McCulloch Props., Inc.</u>, 627 F.2d 1036, 1041 n.4

(10th Cir. 1980).

(1)  Contested Elements of the United States' PSD and NNSR Claims

Defendant contends that the United States has failed to allege that Defendant began

construction at its Facility without complying with the CAA's PSD permitting and other

requirements and without an NNSR permit "<u>within five years from the date when [the United</u>

<u>States] Plaintiff commenced its action</u>."  Defendant's Motion, Doc. 19, at 5 and 6 (emphasis

added).  The United States has acknowledged that this action was not commenced within five

years of the date when Defendant began construction of the modification at issue at Defendant's

Facility.  <u>See</u> First Amended Complaint, Doc. 16, ¶ 53.  However, as explained in more detail in

Section III below, the United States specifically alleges that its PSD and NNSR claims are

continuing violations, or alternatively, violations that accrue anew every day that Defendant

operates its Facility without BACT and LAER.  <u>Id.</u> ¶¶ 61 and 67.  As such, the United States

contends that these claims are not barred by 28 U.S.C. § 2462.

In addition, the United States has specifically alleged that Defendant did not notify EPA

15

of its plans for, or construction of, the modification which forms the core of the United States'

PSD and NNSR claims and further that EPA was unaware of and did not discover the

modification until EPA inspected the Facility in 2006. First Amended Complaint, Doc. 16, at ¶¶

57 and 65. As explained in Section V, infra, under the doctrines of equitable tolling, equitable

estoppel, or the discovery rule, Defendant's conduct may toll the date under 28 U.S.C. § 2462

during which these claims may be brought.

Therefore, the United States asserts that "proper and sufficient factual allegation[s]

ha[ve] been made" in its First Amended Complaint to withstand Defendant's Motion. MSK Civ.

Practice Standard V.I.2.c.2.

(2)  Contested Elements of the United States' Title V Claims

Defendant contends that the United States has failed to allege that Defendant "is

operating without a Title V permit or that it is not in compliance with a PSD or NNSR

requirement of its Title V permit." Defendant's Motion, Doc. 19, at 6. Defendant's rendition of

the United States's claims is misleadingly narrow and rests on the false proposition that

Defendant had, in the first instance, obtained a "proper" permit – one which, as it must,

contained all applicable requirements. As explained in detail in Section IV below, the United

States has specifically alleged that, having undertaken a modification to its Facility without first

obtaining the required construction permits under Colorado's SIP, First Amended Complaint,

Doc. 16, ¶¶ 57 - 59 (PSD violations) and ¶¶ 64 - 66 (NNSR violations), Defendant, upon

completion of the modification, then commenced and has continued to operate its Facility

without including in its initial application for a Title V permit, or any subsequent renewal its

Title V permit, the applicable PSD and NNSR requirements for the modified units.  Id.  Because

of Defendant's failure to incorporate into its Title V permit BACT and LAER operating

requirements, or means to assure compliance with those requirements, the United States alleges

that from the time of the modification to present, Defendant has been operating in violation of

Section 502(a) which states that "it shall be unlawful for any person . . . to operate . . . a major

source . . . except in compliance with a permit issued by a permitting authority under [the

CAA]."  42 U.S.C. § 7661a(a).  This violation is continuing or, in the alternative, arises anew

each day Defendant operates the modified units.

    In addition, the United States has specifically alleged that Defendant did not notify EPA

of its plans for, or construction of, the modification which is the subject of the United States'

Title V claim.  Further, the United States has alleged that EPA was unaware of and did not

discover the modification until EPA inspected the Facility in 2006.  First Amended Complaint,

Doc. 16, ¶¶ 57 and 65.  As explained in Section V, infra, under the doctrines of equitable tolling,

equitable estoppel, or the discovery rule, Defendant's conduct may have tolled the date by which

these claims may be brought.

    Finally, as part of its general challenge to the United States' Title V claims, Defendant

asserts that, "[t]he CAA does not create a cause of action against a private entity under Section

504, 42 U.S.C. § 7661c."  Defendant's Motion, Doc. 19, at 7.  Defendant misconstrues the

United States' allegations.  The alleged violation lies in Section 502(a), 42 U.S.C. § 7661a(a),

coupled with Section 504, 42 U.S.C. § 7661c, not in Section 504 alone.  Section 504(f), 42

U.S.C. § 7661c(f), the permit shield provision, specifies that a source shall be deemed to be in

17

compliance with Section 502(a) if it is operating in compliance with a Title V permit that was

"issued in accordance with this subchapter."  In other words, the permit must be issued in

accordance with all requirements of Title V.  One of the key requirements imposed by Title V is

the facility's obligation to submit an application that is true, accurate, and complete.[9]  42 U.S.C.

§ 7661b(c) and (d).  Section 502(a), in turn, requires sources to have a Title V permit as a

condition of operation, and operate in compliance with "a permit issued under this subchapter."

42 U.S.C. § 7661a(a).[10]  Here, Defendant's Title V permit lacks applicable PSD and NNSR

requirements because it is based on an applications that were not true, accurate, and complete.

Therefore, the permit was not issued in accordance with the requirements of Title V and as such

cannot be raised as a shield to the United States' claims.

    For these reasons, the United States asserts that "proper and sufficient factual

allegation[s] ha[ve] been made" in its First Amended Complaint to withstand Defendant's

Motion.  MSK Civ. Practice Standard V.I.2.c.2.

## II.     28 U.S.C. § 2462 DOES NOT APPLY TO PLAINTIFF'S CLAIMS FOR INJUNCTIVE RELIEF UNDER THE CLEAN AIR ACT

    Defendant's Motion asserts in the alternative that the First Amended Complaint should

---

[9]     See also  40 C.F.R. § 70.5(a) and (d) (source's duty to submit a complete Title V application, and to certify to its truth, accuracy and completeness); § 70.5(b) (source's duty to supplement Title V application).

[10]     See also 42 U.S.C. § 7661c(a) ("Each permit issued under this subchapter shall include enforceable emission limitations and standards, a schedule of compliance, a requirement that the permittee submit to the permitting authority . . . the results of any required monitoring, and such other conditions as are necessary to assure compliance with applicable requirements of this chapter, including the requirements of the applicable implementation plan.") (emphasis added).

be dismissed, in toto, thereby seeking to strike the United States' request not only for civil penalties but for injunctive relief as well. See Defendant's Motion, Doc. 19, at 1; Defendant's Memorandum, Doc 20, at 9 - 10 and n.2. However, as held by the Tenth Circuit, injunctive relief sought by the government to remedy environmental harm is not subject to the statute of limitations under 28 U.S.C. § 2462. For this reason, the injunctive relief sought by the United States' First and Second Claims for Relief is not time-barred.

In United States v. Telluride Co., 146 F.3d 1241 (10th Cir. 1998), the Tenth Circuit considered the government's appeal from the district court's ruling that its claims for injunctive relief were barred by the statute of limitations. The case involved an enforcement action brought by EPA against a developer that had illegally discharged fill into wetlands without a permit, in violation of the Clean Water Act. Relying upon the fact that the discharges had stopped more than five years prior to the date of the government's complaint, the district court held that the government's claims for injunctive relief and civil penalties were barred by application of 28 U.S.C. § 2462.[11] The Tenth Circuit reversed the district court's decision, noting that "[s]tatutes of limitation sought to be applied to bar rights of the government must receive a strict construction in favor of the government." Id. at 1244 - 45 (quoting E.I. Dupont De Nemours & Co. v. Davis, 264 U.S. 456, 462 (1924)). Because the government merely sought to remedy the damage caused by the defendant's illegal actions, and did not seek compensation in excess of the damages caused by defendant's acts, the Tenth Circuit specifically found that the injunctive

_____

[11] The district court decision is discussed more fully infra at 24 - 25. The government did not raise on appeal the district court's dismissal of civil penalties.

relief sought by the government did not constitute a "civil fine, penalty, or forfeiture" within the meaning of 42 U.S.C. § 2462. Id. at 1247 - 48. Similarly, the injunctive relief sought by the government here is to remedy the ongoing unauthorized emissions of pollutants by Defendant and is not a "civil fine, penalty, or forfeiture" within the meaning of 28 U.S.C. § 2462.

In other environmental enforcement cases, courts have uniformly rejected the application of 42 U.S.C. § 2462 to bar claims for equitable relief. For example, in United States v. Am. Elec. Power Serv. Corp, 136 F. Supp. 2d 808, 811 (S.D. Ohio 2001), a PSD/NNSR ("NSR") enforcement case, the court held that the plain language of Section 2462 demonstrates that Congress did not intend this section to "control[] measures of equitable relief." (citations omitted). See also New York v. Niagara Mohawk Power Corp., 263 F. Supp. 2d 650, 663 n.22 (W.D.N.Y. 2003) (rejecting defendant's argument that claims for injunctive relief regarding modifications that occurred more than five years prior to commencement of the action were barred by Section 2462); United States v. Illinois Power Co., 245 F. Supp. 2d 951, 958 n.3 (S.D. Ill. 2003) (same); United States v. Westvaco Corp., 144 F. Supp. 2d 439, 443 n.2 (D. Md. 2001) (same); United States v. Murphy Oil USA, Inc., 143 F. Supp. 2d 1054, 1086 - 87 (W.D. Wis. 2001) (same); United States v. Campbell Soup Co., No. Civ. S-95-1854 DFL, 1997 WL 258894, at *3 (E.D. Cal. Mar. 11, 1997) (same); United States v. Ohio Edison Co., Case No. 2:99-CV-1181, 2003 WL 23415140, at *2 n.3 (S.D. Ohio Jan. 17, 2003) (Defendant does not dispute that statute of limitations does not bar injunctive relief).

While Defendant acknowledges that the government is not generally barred from seeking injunctive relief for violations occurring outside the five year statute of limitations, Defendant's

Memorandum, Doc 20, at 10 n.2, Defendant nonetheless suggests that striking the government's

injunctive claims may be appropriate here.  In support of this contention, Defendant makes a

passing reference to Sharp ex rel. N.L.R.B. v. Webco Indus., Inc., 225 F.3d 1130, 1135 - 36 (10th

Cir. 2000).  Sharp, however, is wholly inapposite to the present case.  Sharp does not address a

cause of action under the CAA nor does it apply a statute of limitations analysis under 28 U.S.C.

§ 2462.  Sharp examines a request for temporary injunctive relief sought pursuant to Section

10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j), which specifically provides

"jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and

proper."  Sharp, 225 F.3d at 1132, n.1 (emphasis added).  Because the "just and proper" standard

discussed in Sharp is wholly a creature born of 29 U.S.C. § 160(j), it is completely inapplicable

here.  Moreover, because the Court must consider as true the United States' allegation that

Defendant's Facility has been continually emitting into the environment unlawful quantities of

NOx and PM-10,[17] there can be little doubt as to whether the requested injunctive relief will be

efficacious.  Thus, the United States' First and Second Claims for Relief clearly state claims for

which injunctive relief may be granted.

III.    **THE UNITED STATES' PSD AND NNSR CLAIMS FOR CIVIL PENALTIES ARE NOT BARRED BY  28 U.S.C. § 2462**

> A.    The Doctrine of Continuing Violations has been Applied to Environmental Causes of Action in this District

Statutes of limitation do not bar claims for continuing violations.  See Havens Realty

---

[17]    First Amended Complaint, Doc. 16, ¶¶ 59 - 61 (PSD violations) and ¶¶ 66 - 67 (NNSR violations),

<u>Corp. v. Coleman</u>, 455 U.S. 363, 380 (1982) (citation omitted) (holding that "[s]tatutes of limitations . . . are intended to keep stale claims out of the courts.  Where the challenged violation is a continuing one, the staleness concern disappears").  In <u>United States v. ITT Cont'l Baking Co.</u>, 420 U.S. 223 (1975), the Court held that a Federal Trade Commission order forbidding the acquisition of certain companies should be interpreted so that the violation continued each day of retention of the acquired company, because:

> <u>the detrimental effect to the public and the advantage to the [defendant] continue and increase over a period of time</u>, and the [defendant] could eliminate the effects of the violation if it were motivated to do so, after it had begun.

<u>Id.</u> at 231 (emphasis added).  The same rationale should prevail here where "the detrimental effect to the public and the advantage to [CEMEX]" from its ongoing introduction of pollutants into the environment, "continue[s] and increase[s] over a period of time, and [CEMEX] could eliminate the effects of the violation if it were motivated to do so."  <u>Id.</u>

The continuing violation concept has often been applied in environmental cases.  <u>See</u> <u>Headwaters, Inc. v. Talent Irrigation Dist.</u>, 243 F.3d 526, 529 (9th Cir. 2001) (spraying herbicide into irrigation canals without a Clean Water Act permit is a continuing violation); <u>Sasser v. EPA</u>, 990 F.2d 127, 129 (4th Cir. 1993) (discharging pollutants into a wetland without a Clean Water Act permit is a continuing violation which, each day the pollutant remains in the wetlands without a permit, constitutes an additional day of violation);  <u>Harmon Indus., Inc. v. Browner</u>, 19 F. Supp. 2d 988, 998 - 99 (W.D. Mo. 1998) <u>aff'd</u>, 191 F.3d 894, 904 (8th Cir. 1999) (continuing violation doctrine applied to toll statute of limitations in enforcement action by EPA against corporation which continuously violated hazardous waste disposal statute, until date of most

22

recent violation prior to EPA complaint); <u>United States v. Reaves</u>, 923 F. Supp. 1530, 1533 - 34

(M.D. Fla. 1996) (unpermitted discharge of dredged or fill materials into wetlands was

continuing violation for as long as fill remained, for purposes of five-year limitations statute

applicable to government's claims for civil penalties and injunctive relief under Clean Water

Act).

Here, Defendant asserts that "[a] diligent case law search has revealed <u>no</u> cases in which

the Tenth Circuit has applied the [continuing violation] doctrine outside of the employment

discrimination context."  Defendant's Memorandum, Doc 20, at 12 n.6 (emphasis in original).[13]

Defendant is simply incorrect to the extent that it implies that the continuing violations

doctrine is in any way limited to employment cases.  In an environmental case, a court in this

district considered the question of whether ongoing pollution arising from the defendant's illegal

disposal of hazardous waste constituted a continuing violation.  In an action for a preliminary

injunction in <u>United States v. Power Eng'g Co.</u>, 10 F. Supp. 2d 1145, 1159 - 60 (D. Colo. 1998),

<u>aff'd</u>, 191 F.3d 1224 (10th Cir. 1999), <u>cert. denied</u>, 529 U.S. 1086 (2000), the court held that

---

[13]     Defendant's claim that "[t]he Tenth Circuit does not recognize continuing violations
outside of the discrimination context" is overly broad.  Defendant's Memorandum, Doc. 20, at
11.  For this proposition, Defendant primarily relies on <u>Rassam v. San Juan College Bd.</u>, No. 95-
2292, 1997 WL 253048, at *3 (10th Cir. May 15, 1997), which noted, "courts have observed that
the 'continuing violation doctrine' has rarely been applied outside of the Title VII employment
discrimination context."  <u>See</u> Defendant's Memorandum, Doc. 20, at 11 - 13.  However,
<u>McCormick v. Farrar</u>, Civ. Action No. 03-3131, 2005 WL 2083027 at *3 (10th Cir. Aug. 30,
2005), cited <u>en passant</u>, by Defendant in footnote 6 of its Memorandum, casts serious doubt over
the soundness of <u>Rassam</u> even in the limited employment law setting.  "This court has not,
however, announced a precedential blanket rule that the continuing violation doctrine is
inapplicable to § 1983 suits . . . . <u>Rassam</u>, the case relied on by the district court, is an
unpublished order and judgment and has no precedential value. . . ."  <u>Id.</u>

passive migration from contaminated soils constituted a continuing disposal under the Resource

Conservation and Recovery Act, 42 U.S.C. 6901 - 6992k ("RCRA").  There the court stated:

> Courts have grappled with the issue whether the continued presence of an
> illegally disposed hazardous waste constitutes a continuing violation under the
> RCRA.  The overwhelming majority have found continuing violations for
> substantive violations of the RCRA when the environmental harms caused by the
> violations are curable, even when the affirmative act that initiates the violation
> occurred on a single day. . . . .  Accordingly, I conclude that the leaching of
> hazardous waste into the groundwater from this soil constitutes continuing
> disposal of hazardous waste.

Id.  (emphasis added).  As was the case in Power Eng'g, the environmental harms caused by

Defendant's violations are "curable."  Unlike Power Eng'g, here the affirmative acts occurred

not only at the time of construction, but every day thereafter that Defendant operates the

modified units.

Likewise, United States v. Telluride Co., 884 F. Supp. 404, 408 (D. Colo. 1995), rev'd on

other grounds, 146 F.3d 1241 (10th Cir. 1998), the district court considered a case in which the

defendant had illegally filled wetlands, but the discharges had stopped more than five years

before the government filed its complaint.  Although the court held that the government's claims

for injunctive relief and civil penalties under 33 U.S.C. § 1311(a) were barred by the limitations

period imposed under 28 U.S.C. § 2462, its ruling turned on the fact that the defendant was "not

presently discharging pollutants, and thus no present or continuing violation exists for the

purpose of the statute of limitations."  Id. at 408 (emphasis added).  Here, unlike in Telluride, the

United States has specifically alleged that Defendant's Facility has, from the time of the

modifications, emitted and, to this day, is emitting unlawful quantities of NOx and PM-10 into

the environment.  First Amended Complaint, Doc. 16, ¶¶ 61 and 67.  In this regard Defendant is

more like the respondent in <u>Power Eng'g</u>, where the court found that the illegal disposal was a

continuing violation because it caused ongoing pollution from the continuous leaching of the

hazardous waste into the groundwater.  Contrary to Defendant's arguments, courts, including

courts within this district, have applied the continuing violation doctrine to environmental

claims.

      B.      <u>The PSD and NNSR Construction Permitting Requirements Create a Continuing Cause of Action</u>

          (1)      The Structure and Text of the CAA Reflect Congress's Intent to Make Permitting Requirements Ongoing Obligations

Defendant argues that the language and structure of the CAA make it clear that violations

of the PSD program are "one-time violations" of the preconstruction requirements.  Defendant's

Memorandum, Doc 20, at 14.  Not so.  There is strong structural and textual evidence in the

CAA that Congress, in enacting the PSD provisions, and EPA, in implementing them, intended

to create ongoing obligations.  The PSD provisions are by their terms ongoing requirements

applicable to the operation of major emitting facilities.  The provisions specify obligations that

must be, and can only be, implemented once the source begins operating.  The most significant

of those requirements provides that a permit must set forth "emission limitations" identified by

the reviewing authority as BACT.  42 U.S.C. § 7475(a)(1), (4).  BACT is defined as an

"emission limitation based on the maximum degree of reduction of each pollutant" emitted from

a facility.  42 U.S.C. § 7479(3).  An "emission limitation" is defined in turn as a "requirement . .

. which limits the quantity, rate, or concentration of emissions of air pollutants on a <u>continuous</u>

25

basis, including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction." 42 U.S.C. § 7602(k) (emphases added). A unit does not "emit" until it begins to operate. Further, the use of the word "continuous" demonstrates that BACT is a continuing requirement that does not apply only at the time of construction. The BACT requirement is both a requirement applied through permitting and a freestanding statutory requirement to install and operate the required control technology. Both requirements are ongoing and are separately actionable. 42 U.S.C. § 7475(a)(4); 40 C.F.R. § 51.166(j)(3); 45 Fed. Reg. 52,676, 52,722 (Aug. 7, 1980) (stating that "Section 165 of the Act provides in part that any 'major emitting facility' constructed in a PSD area must apply best available control technology"). Thus, to meet the BACT requirement, a facility must both install and operate the required control technology.

Other provisions also make clear that PSD requirements apply on an ongoing basis to a source's operation, rather than only at the time of the source's construction or modification. For example, the statute allows issuance of a permit only if "the owner or operator of such facility demonstrates . . . that emissions from construction or operation of such facility" will not compromise compliance with applicable air quality standards. 42 U.S.C. § 7475(a)(3) (emphasis added). The statute also requires an owner or operator to submit to appropriate monitoring requirements, 42 U.S.C. § 7475(a)(7); those, too, are ongoing, operational requirements as there is nothing to monitor until operations commence. EPA's regulations for the federal PSD program (that is, the program applicable in areas that lack an approved SIP) incorporate EPA's view that the CAA is properly construed to impose a continuing statutory obligation to obtain a

26

PSD permit even after construction.[14]  Therefore, the CAA does not, as Defendant suggests,

draw a sharp distinction between construction requirements and operating requirements.[15]

The language of the CAA's enforcement provisions further confirms the foregoing

analysis.  For instance, 42 U.S.C. § 7604(a)(1)(A) authorizes citizen suits for any "violation of

. . . an emission standard or limitation," a category that includes, "any condition or requirement

of a permit under part C of subchapter I of this chapter (relating to significant deterioration of air

quality) or part D of subchapter I of this chapter (relating to nonattainment)," and, "any other

standard, limitation, or schedule established under any permit issued pursuant to subchapter V of

this chapter or under any applicable State implementation plan," and "any permit term or

condition, and any requirement to obtain a permit as a condition of operations."  42 U.S.C. §

7604(f)(3), (4).[16]  The citizen and federal enforcement provisions of the CAA also allow civil

penalties to be imposed for each day a violation continues.  See 42 U.S.C. § 7413(b), (e)(2).

These provisions further support the view that the CAA creates ongoing obligations.  See, e.g.,

---

[14]     See 40 C.F.R. 52.21(r)(1) ("Any owner or operator who . . . operates a source or modification not in accordance with the application submitted pursuant to this section or with the terms of any approval to construct . . .shall be subject to appropriate enforcement action."). Under that provision, an owner or operator that secures an operating permit based on a particular description of its facility, and then makes a modification to that facility, is under an ongoing obligation to obtain a corrected permit.

[15]     See discussion, infra, at 35 and 40 - 42, regarding the construction and operating permitting regimes under the Colorado SIP.

[16]     Cf. 136 Cong. Rec. 36,083, 36,084 (Oct. 27, 1990) (Senate managers' statement) (stating, with regard to the similarly structured governmental enforcement provisions, that the 1990 CAA amendments "follows existing law," which allows EPA to "take enforcement action against operating sources that have circumvented [NSR] requirements" and to "halt the construction or modification of new sources that are violating new source review requirements").

United States v. Marine Shale Processors, 81 F.3d 1329, 1357 (5th Cir. 1996) (court rejected

statute of limitations defense reasoning that because 42 U.S.C. § 7413(b) provides penalties "per

day for each violation, . . . Section 7413(b) contemplates a fine for each day a minor source

operates in violation of law").

The framework of the CAA does not create the divide between construction permits and

operating permits suggested by Defendant. Defendant's Memorandum, Doc 20, at 14 - 15. In

reality, the CAA's PSD program imposes operating requirements in the construction permitting

program. The timing of the PSD construction permitting process allows emission-control

requirements to be taken into account early in the design and construction process so that

appropriate physical controls will be installed prior to the operation of a new or modified unit.

Generally, the pre-construction permit serves two functions. First, it imposes construction

requirements. Second, once the source is constructed (or the modification completed) the

construction permit (i.e., the PSD permit) serves as the operating permit because it includes

BACT emission rates and other requirements that govern the operation of the source. It's these

operating requirements that must then be incorporated into the facility's Title V permit.

Although some SIPs (but not Colorado's) require separate construction and operating permits,

the fact that the PSD requirements themselves independently impose conditions on a source's

operations, Marine Shale, 81 F.3d at 1355 - 56, shows that the relationship between construction

and operating permits is not, as Defendant posits, distinct.

A reading which interprets the duty to comply with the CAA's PSD permitting

requirements as an ongoing obligation is consistent with Congress's intent in enacting the

statute.  The common law analogue to CAA remedies is an action to abate a nuisance.  At common law, such an action remains available during the continuation of the nuisance.[17]  Thus, permitting and operating obligations like those contained in the CAA and Colorado SIP are presumptively treated as ongoing in nature.  See Newell Recycling Co. v. United States EPA, 231 F.3d 204, 206 - 07 (5th Cir. 2000); Carr v. Alta Verde Indus., Inc., 931 F.2d 1055, 1063 (5th Cir. 1991); Harmon Indus., 19 F. Supp. 2d at 998.

The federal PSD regulations enacted by EPA, consistent with the CAA's statutory scheme, likewise impose ongoing requirements.  See 40 C.F.R. §§ 52.21(j)(1) (requiring each source to meet emissions limitations); 52.21(j)(3) (requiring each modified source to apply BACT); 52.21(m)(2), (3) (requiring post-construction emissions monitoring and operation of monitoring stations); and 52.21(r)(1) (stating that any source that "constructs or operates a source or modification not in accordance . . . with the terms of any approval to construct . . . shall be subject to appropriate enforcement action").[18]  Accordingly, consistent with Congressional intent as expressed through the structure of the CAA and its implementing regulations, this Court should find that the PSD construction permitting requirements create ongoing obligations.

[17]    "[E]ach day's continuance of a temporary nuisance creates a new cause of action," and therefore "the statute of limitations begins to run day by day, and plaintiff may at any time recover for the nuisance committed during the statutory period next before bringing of the action."  1 Fowler V. Harper et al., The Law of Torts § 1.30 at 1:139 (3d ed. 1996); see also William L. Prosser, Handbook of the Law of Torts § 90, at 616 (3d ed. 1964) (noting that "a continuing trespass, such as the erection of a structure on the plaintiff's land, affords a continuing cause of action, which can hardly be distinguished from nuisance").

[18]    EPA's regulatory interpretation of its statutory authority is entitled to deference in the absence of clear contrary Congressional intent.  Chevron U.S.A. Inc. v. NRDC, 467 U.S. 837, 843 - 45 (1984).

29

(2)    Failure to Obtain a NNSR Construction Permit Is Also an Ongoing
Violation That Is Subject to Civil Penalties

Section 172(c)(5) of the CAA which establishes controls for modified major facilities located in nonattainment areas, expressly compels states to require permits "for the construction and operation of new or modified major stationary sources anywhere in the nonattainment area." 42 U.S.C. § 7502(c)(5).  Similarly, Section 173(a) provides that NNSR permits are "permits to construct and operate."  42 U.S.C. § 7503(a) (emphasis added).  See also 42 U.S.C. § 7429(h)(5) (referring to Section 172(c)(5) as "relating to permits for construction and operation in nonattainment areas").  Although NNSR permits must be secured prior to the construction or modification of a source, the requirements are directed at ensuring that the operation of the new or modified source does not adversely affect air quality. See, e.g., 42 U.S.C. § 7503(a)(2) (requiring modified sources in nonattainment areas to comply with LAER, which like BACT is applicable only to operation of the source).[19]

In Cmt'ys for a Better Env't v. Cenco Refining Co., 180 F. Supp. 2d 1062, 1081 (C.D. Cal. 2001), the court denied defendant's motion to dismiss a suit by a citizens group where, even though the refinery had an operating permit, Cenco had failed to undertake an NNSR review as part of its proposed refinery expansion project.  There the court reasoned that failure to obtain a NNSR permit constituted a failure to "obtain a permit as a condition of operations" under Section 304(f)(4), thereby giving the court citizen suit jurisdiction under Section 304(a)(l).

---

[19]    The NNSR program is a sister program to PSD under Subchapter I of the CAA and thus, these two programs should be read consistently (i.e., both programs impose continuing operating obligations).

The United States' First Amended Complaint alleges that Defendant failed to acquire

PSD and NNSR permits prior to modifying the Raw Mill System, Kiln System, Finish Mill

System and Oxygen Plant and that Defendant continues to operate these modified units without

the requisite NNSR physical controls (LAER), emissions limits, and operating requirements.

These failures will continue until Defendant submits its Facility to a NNSR review.  Therefore,

because these requirements are ongoing, the First Amended Complaint states a claim for civil

penalties for which relief may be granted.

        (3)      As a Result of Defendant's Failure to Install BACT and LAER,
                     Public Harm Continues Every Day That Defendant Operates in
                     Violation of Statutory and Regulatory Requirements

Unlawful excess pollution, NOx and PM-10, is emitted every day that Defendant

operates the modified units at its Facility because Defendant has not installed BACT (to control

NOx emissions) and LAER (to control PM-10) emissions.  Thus, harm to the public and the

environment continues every day that Defendant operates the modified Raw Mill System, Kiln

System, Finish Mill System and Oxygen Plant.  Moreover, Defendant could mitigate this harm

by promptly taking steps now to install BACT and LAER on the modified units.  For this reason,

courts often find that PSD and NNSR violations constitute continuing violations, or alternatively,

violations which arise anew each day.  For example, the Southern District of Ohio found that

modification without a PSD permit constitutes an ongoing violation, because the PSD

"requirements clearly contemplate limitations on emissions that occur after a source is

constructed or modified."  See United States v. Am. Elec. Power Serv. Corp., 137 F. Supp. 2d

1060, 1066 (S.D. Ohio 2001). See also United States v. Ohio Edison Co., No. 2:99-CV-1181,

31

2003 WL 23415140, at *5 - 6 (S.D. Ohio Jan. 17, 2003) ("the PSD provisions contemplate not

only certain preconstruction obligations but also subsequent operation after modification.");

Sierra Club v. Dayton Power & Light, Inc., No. 2:04 CV 905, 2005 WL 1972549, at *3 (S.D.

Ohio Aug. 12, 2005) ("The [PSD] requirements clearly contemplate limitations on emissions that

occur after a source is constructed or modified"); United States v. Duke Energy Corp., 278 F.

Supp. 2d 619, 651 (M.D.N.C. 2003)[20] ("The violation continues because each day that Duke

Energy operates an allegedly modified plant and emits pollutants into the atmosphere, it may be

in violation of the requirement to comply with the operation conditions, i.e., the emission

limitations, that would have been contained within a PSD permit had Duke Energy submitted to

the permitting process."), aff'd on other grounds, 411 F.3d 539 (4th Cir. 2005), vacated sub

nom., Envt'l Def. v. Duke Energy Corp., 549 U.S. 561 (2007).

Because the harm to the environment and to the community propagates long after

construction is complete, courts have recognized that the PSD and NNSR programs impose

ongoing operating requirements that survive construction and continue for the life of the

modified unit.

> (4)    The United States' View That the Violations Are Continuing Is
> Shared by the Majority of the Circuits That Have Examined This
> Issue

Defendant claims that its position – that a violation of the PSD program is a "one time"

---

[20]    Those portions of the district court opinion in Duke Energy relied on herein concerning the continuing nature of the violation resulting from a failure to undergo the PSD permitting process were not addressed in the appellate decision United States v. Duke Energy Corp., 411 F.3d 539 (4th Cir. 2005), and thus undisturbed by the Supreme Court's decision to vacate in Envt'l Def. v. Duke Energy Corp. 549 U.S. 561 (2007).

violation of the construction permitting requirements – is one it shares with the "vast majority of courts." Defendant's Memorandum, Doc. 20, at 14 and 21. In fact, however, two of the three circuit courts that have addressed this matter have issued opinions which support the claims asserted here by the United States.

In Nat'l Parks Conservation Ass'n, Inc. v. Tenn. Valley Auth., 480 F.3d 410, 418 (6th Cir. 2007) ("National Parks"), the Sixth Circuit adopted the "accrual" concept in rejecting the same statute of limitations defense raised by Defendant here.[21] There the court found that the requirement to install and operate BACT imposed by PSD "by its own terms, creates an ongoing obligation to apply BACT, regardless of what terms a preconstruction permit may or may not contain." Id. at 418 (emphasis added). The court further found that "failing to apply BACT is actionable, and this cause of action manifests itself anew each day a plant operates without BACT limits on emissions." Id. at 419 (emphasis added). Accordingly, although construction without a PSD permit occurred outside the five-year limitations period, the Sixth Circuit nonetheless allowed the National Parks Conservation Association to seek civil penalties for PSD violations which occurred during the five year period preceding the date it filed its complaint.

---

[21]     "The continuing violation doctrine permits a court to look backwards to the entirety of the continuing wrong to assess its cumulative effect, so long as an injurious act falls within the statute of limitations period." Burkley v. Corr. Healthcare Mgmt. of Oklahoma Inc., 141 Fed. App'x 714, 2005 WL 1595699, at *2 (10th Cir. July 8, 2005). Under an accrual theory, "[a] new cause of action accrues and the statute of limitations runs anew whenever a defendant commits a new overt act." A.M.R. Enters. v. City of Phoenix, No. CIV-94-2007-PHX-ROS(BGS), 1997 WL 150104, at *8 (D. Ariz Mar. 25, 1997). Here, applying the continuing violation doctrine, penalties would be assessed from the time Defendant made the modification to the date the United States filed its Complaint because the violations continued into period included within the stature of limitations. Under an accrual theory, penalties would only be assessed for the five-year period preceding the filing of the Complaint.

Id.  Applying the Sixth Circuit's reasoning in National Parks here, the United States should be

entitled to recover civil penalties for PSD and NNSR violations for the five year period

preceding January 6, 2009, the date the United States filed its Complaint, on the theory that each

day Defendant operates its Facility without BACT or LEAR, the cause of action manifests itself

anew.

In the Fifth Circuit's decision in Marine Shale, 81 F.3d at 1357, the government assessed

civil penalties against the defendant for operation of its facility without a PSD permit.  The

defendant contended that the statute of limitations barred the penalties because its emissions had

started more than five years prior to the date of the complaint.  The Fifth Circuit found this

argument to be "frivolous" and held that pursuant to the per-day penalty provisions of Section

313(b), 42 U.S.C. § 7413(b), the government was entitled to collect penalties for each day of

violation within the prior five-year limitations period.  Id.

Following the analysis adopted by the Fifth and Sixth Circuits, the North Carolina district

court in Duke Energy allowed the United States to seek civil penalties for PSD claims based on

modifications constructed more than five years before that lawsuit was initiated.  The court

reasoned:

> [B]ecause the PSD permitting provisions provide both preconstruction obligations and
> subsequent obligations on operations, Duke Energy's alleged violation of failing to
> undergo the PSD permitting process does not terminate upon the completion of
> construction activity.  The violation continues because each day that Duke Energy
> operates an allegedly modified plant and emits pollutants into the atmosphere, it may be
> in violation of the requirement to comply with the operation conditions, *i.e.*, the emission
> limitations, that would have been contained within a PSD permit had Duke Energy
> submitted to the permitting process.

Duke Energy Corp., 278 F. Supp.2d at 651 (emphasis added).  See also United States v. Titanium Metals Corp., No. CV-S-98-682-HDM (RLH), slip op. at 2 (D. Nev. Sept. 16, 1998) (same); Ohio Edison Co., 2003 WL 23415140 , at *5 ("The Court adheres to its decision . . . . that 'it is illogical to conclude that a defendant may only be held liable for constructing a facility, rather than operating such facility, without complying with the permit requirements.'"); Sierra Club, 2005 WL 1972549, at *3 (allowing claims for PSD construction violations for period of five years preceding complaint); Detroit Edison Co. v. Mich. Dep't of Envtl. Quality, 39 F. Supp. 2d 875, 877 (E.D. Mich. 1999) (finding Edison in violation of the CAA, its regulations, and Michigan's SIP because it renovated, restarted, and operated, the Plant without having first obtained the necessary PSD permits).  As in Duke, Titanium Metals Corp, Ohio Edison Co., and Detroit Edison Co., here the United States contends that Defendant is in violation of the requirements to comply with the operation conditions, *i.e.*, BACT and LAER, that would have been contained within a construction permit had Defendant submitted to the permitting process. As in the foregoing cases, Defendant's violation continues, or accrues anew each day Defendant operates its Facility because each day it does so it emits excess pollutants into the atmosphere from these modified units.

Defendant relies on the Eleventh Circuit's decision in Nat'l Parks & Conservation Ass'n v. Tennessee Valley Auth., 502 F.3d 1316, 1319 n.1, 1324 (11th Cir. 2007), cert. denied, 128 S. Ct. 2958 (2008) (herein referred to as "Nat'l Parks v. TVA"), for the proposition that "courts have found that PSD and NNSR violations occur only one time and only upon commencement of construction."  Defendant's Memorandum, Doc. 20, at 16 - 18.

35

In <u>Nat'l Parks v. TVA</u>, environmental groups brought a citizen suit alleging that the Tennessee Valley Authority violated the Clean Air Act in connection with work it performed on coal-fired boilers at its power plant. The district court dismissed two claims as time-barred and dismissed the remaining claim for failure to provide proper pre-suit notice.

In distinguishing the holding it arrived at in <u>Nat'l Parks v. TVA</u> from the Sixth Circuit's opinion in <u>National Parks</u>, 480 F.3d 410, the Eleventh Circuit relied on what it believed to be an "important difference" between the Tennessee and Alabama SIPs. <u>Nat'l Parks v. TVA</u>, 502 F.3d at 1325. The Eleventh Circuit observed that the Sixth Circuit had found a continuing obligation to comply with requirements of the construction permitting process because of a specific provision in the Tennessee SIP that stated that if a party failed to obtain a construction permit specifying emission limitations at the time of construction or modification, a construction permit could be issued at a later date "to assure that these regulatory requirements are met." <u>Id.</u> Based on this distinction alone, the Eleventh Circuit then concluded that unlike Tennessee, the Alabama SIP limited the obligation to apply BACT to the construction permitting process with "<u>no caveat continuing the obligation for the operating life of the source if it was not met during the construction phase</u>." <u>Id.</u> (emphasis added).

Defendant contends that the Colorado SIP, like the Alabama SIP, does not carry over PSD and NNSR requirements from the construction permits into the operating permits. Defendant's Memorandum, Doc. 20, at 17 - 18. <u>Defendant is wrong</u>. As discussed above, in Colorado, the construction permit addresses both construction and operating requirements because it is in the construction permit that BACT and LAER are established. In fact, in

36

Colorado, the construction permit <u>becomes</u> the "operating" permit.  Colorado's SIP provides:

> Final Permit Approval . . . .Within (180) calendar days <u>after commencement of operation, the source shall demonstrate to the Division compliance with the terms and conditions of the construction</u> permit [including, PSD and NNSR requirements] and the Division shall inspect the source to determine whether or not the operating terms and conditions of the emissions permit have been satisfied.

CAQCC Reg. 3, Part B, Section IV.H.2. (1998) [0276] (emphasis added).  Colorado's SIP then

states:

> If the Division determines that the terms and conditions of the [construction] permit have been satisfied, the Division shall issue in writing its <u>final permit approval</u> to the applicant.

CAQCC Reg. 3, Part B, Section IV.H.5. (1998) [0276 - 77] (emphasis added).  Under the

Colorado SIP, it is the construction permit, once finally approved by CDPHE, under which the

source operates.  <u>Id.</u>

Once the mechanism within the Colorado SIP which transitions the source from the

construction phase to the operating phase is understood, the distinction between the Colorado

SIP and the Alabama SIP becomes starkly clear.  Unlike the distinct permits contemplated by the

Alabama SIP, the construction permit in Colorado, once finally approved, becomes the source's

operating permit.  Under Colorado's permitting scheme, there can be no doubt that the

PSD/BACT and NNSR/LAER requirements – which Defendant should have incorporated into its

construction permit – would have and should have been part of Defendant's continuing operating

requirements.  For the foregoing reasons, the Eleventh Circuit's decision in <u>Nat'l Parks v. TVA</u>

is not persuasive here.  In fact, the Eleventh Circuit's emphasis on the Tennessee SIP's

obligation to carry over the construction permitting requirements into the "operating life of the source," Nat'l Parks v. TVA, 502 F.3d at 1325, actually supports the United States' position here.

Defendant also relies heavily on United States v. Campbell Soup Co., No. CIV. S-95-1854 DFL, 1997 WL 258894, at *2 (E.D. Cal. Mar. 11, 1997), and its progeny.[22] Defendant's Memorandum, Doc. 20, at 14 - 16. This group of cases all rest on the fundamental assumption that where a state SIP provides separate requirements for construction permits and permits to operate there can be no continuing violation where a facility fails to secure a construction permit with PSD and NNSR standards and controls. As noted immediately above, no such dichotomy exists in Colorado's SIP. Further, this view is also wrong because state and federal Title V requirements do not displace PSD and NNSR provisions which are independent, stand alone requirements.

When "permitting provisions provide both preconstruction obligations and subsequent obligations on operations," the violation "does not terminate upon the completion of construction activity." Duke Energy, 278 F. Supp. 2d at 651. Instead, the violation persists so long as Defendant operates the unpermitted modifications. Once the different permitting regimes are

---

[22] Almost all of the cases cited by Defendant cite Campbell Soup. See, e.g., New York v. Niagara Mohawk Power Corp., 263 F. Supp. 2d 650, 661 - 63 (W.D.N.Y. 2003) (holding failure to acquire a PSD construction permit is a one-time violation, but that operating a facility following a modification may constitute a continuing violation of an operating permit); United States v. Cinergy Corp., 397 F. Supp. 2d 1025, 1031 (S.D. Ind. 2005); United States v. Illinois Power Co., 245 F. Supp. 2d 951, 956 (S.D. Ill. 2003); United States v. S. Gas & Elec. Co., No. IP 99-1692-C-M/F, 2002 WL 1760752, at *5 (S.D. Ind. July 26, 2002); United States v. Westvaco Corp., 144 F. Supp. 2d 439, 443 - 44 (D. Md. 2001); United States v. Brotech Corp., No. Civ. A. 00-2428, 2000 WL 1368023, at *3 - 4 (E.D. Pa. Sept. 19, 2000).

understood, Campbell Soup is not adverse to the United States' position because the Colorado

SIP clearly establishes the PSD/BACT and NNSR/LAER requirements in the construction phase,

allows the facility to operate under those standards once "Final Permit Approval" is granted, and

then requires that the facility incorporate those very standards into its Title V permit. "Thus, the

requirement of obtaining a preconstruction permit amounts to a condition of operation and

establishes ongoing obligations." Duke Energy, 278 F. Supp. 2d at 651.[23]

Defendant also relies on cases that erroneously construe the relationship between PSD

and NNSR construction requirements and the Title V program. See Illinois Power, 245 F. Supp.

2d at 957 (holding that "all of the requirements enumerated in § 7475," as well as the

construction permit requirement found in the applicable federal PSD regulations at 40 C.F.R. §

52.2, must be met "prior to construction or modification" and "not at some later point in time")

(emphasis in original); Niagara Mohawk, 263 F. Supp. 2d at 661 (holding that the provisions of

42 U.S.C. § 7475 and EPA's own implementing regulations at 40 C.F.R. § 52.21 "apply only at

the time of construction or modification"). These courts incorrectly view Title V as the

"operating arm" of the PSD program, thus relieving PSD of any stand-alone operating

---

[23]    Defendant discusses a Colorado case, United States v. Louisiana- Pacific Corp., 682 F.
Supp. 1122, 1130 (D. Colo. 1987), to support its contention that the PSD violation is a one-time
infraction that occurs when an begins construction. Defendant's Memorandum, Doc. 20, at 10,
15 n.9 and 16 n.10. Louisiana- Pacific Corp. can be distinguished from the present case because
it did not turned on whether the PSD violations were continuing, but rather, whether the
defendant could rely upon a state permit limitation that did not exist at the time of construction
to avoid the PSD "potential to emit" category. There the court concluded, "even if the court
were to accept the argument that state permit limitations should be considered in determining
'potential to emit,' such limitations could not be a defense in this case since they did not even
exist when the alleged violation occurred." Id. at 1130.

component.  This view is incorrect for three reasons.  First, the PSD provisions of the Colorado

SIP and the Colorado Title V regulations themselves, clearly impose operating requirements.

Second, Title V "does not impose substantive new requirements."  40 C.F.R. § 70.1(b).  Rather,

Title V permits simply cumulate the requirements that have been established elsewhere, such as

PSD and NNSR physical and operating requirements established during SIP permitting process.

See 42 U.S.C. § 7661c(a), (b).  Third, Title V was enacted 13 years after the statutory PSD

program thus making it unlikely that Title V is the "operating permit arm" of the earlier PSD

program.

The Duke Energy court explicitly rejected the argument that Title V is the operating

permit arm of the PSD program, explaining that:

> [T]he Title V operating permit program does not supplant the PSD program.  Title
> V does not establish additional substantive requirements, but merely brings
> together applicable requirements, such as the PSD provisions, into one permitting
> scheme.  57 Fed. Reg. 32,250, 32,251 (July 21, 1992).

Duke Energy, 278 F. Supp. 2d at 651 - 52.  The United States respectfully suggests that courts

that found that the SIP's PSD and NNSR programs contains no operating requirements

misunderstood the relationship between PSD and Title V and those rulings should not be

followed by this Court.

(5)    A District Court in California Has Rejected Defendant's Argument That
28 U.S.C. § 2462 Bars the United States' Civil Penalty Claims

Defendant briefly discusses United States v. CEMEX California Cement, LLC, No. CV

07-0023 (C.D. Cal. July 10, 2007), hereafter "CEMEX California," in the context of the Section

7661c(f) permit shield.  Defendant's Memorandum, Doc. 20, at 27.  A significant part of that

40

decision, which discusses in detail many of the cases relied upon by Defendant's Memorandum,

however, does not address the "shield" issue, but rather focuses on CEMEX's motion to dismiss

the United States' claims that "CEMEX's modification, construction and operation of the kilns

without an appropriate PSD permit is a 'continuing' violation of the CAA and the State of

California's applicable implementation plan." Id., slip op. at 1.  These are the very matters at

issue here.  There the court noted, that:

> Several courts agree (occasionally without much analysis) with Cemex's position
> that claims alleging a failure to obtain a preconstruction permit accrue at the time
> of the construction or modification, and are singular, not continuing.

Id., slip op. at 5.  It observed further, however, that "[o]ther courts, however, have reached the

opposite conclusion, relying on the fact that PSD permits have some operational components."

Id. (emphasis added).  The CEMEX California court focused on the fact that:

> Whether or not a PSD permit is to be considered a 'pre-construction permit,' there
> can be no question but that the PSD permit provisions contain some operational
> components.

Id.  The court then approvingly cites a lament from Marine Shale:

> The CAA statutory scheme contemplates at least two different types of air permits
> unhappily named 'preconstruction permits' and 'operating permits,' with
> confusion easily resulting from the fact that preconstruction permits often include
> limits upon a source's operations.

CEMEX California, slip op. at 6 (quoting Marine Shale, 81 F.3d at 1355 - 56) (emphasis added).

In reaching its decision, the court relied on National Parks, 480 F.3d 419, and United States v. E.

Kentucky Power Co-op, Inc., 498 F. Supp. 2d 970, 974 (E.D. Ky. 2007) which each concluded

that where construction permitting provisions in the state SIP imposed PSD operational

requirements, as they do here, failing to install the best available control technology on the modified unit is actionable, and is a cause of action which manifests itself anew each day a plant operates without BACT limits on emissions.  CEMEX California, slip op. at 7.  Applying that rationale to the matter before it, the court in CEMEX California held:

> Because the federal statutes and regulations governing the PSD permitting process that would have applied to Cemex clearly contains operational components, it is not clear that any violation of those provisions would have amounted to one-time, non-continuing violations, occurring at the onset of the construction or modification projects.  As a result, the Court will **deny** Cemex's motion to dismiss or strike the first and second claims to the extent they seek civil penalties.

CEMEX California, slip op. at 12 (additional emphasis added).  The legal issues presented here are "on all fours" with those considered in CEMEX California, and for the same reasons applied by the court in CEMEX California, this Court should deny Defendant's Motion to Dismiss the United States' First and Second Claims for Relief.

(6)     An Examination of the Colorado SIP Makes It Clear That Defendant's Failure to Secure PSD and NNSR Construction Permits Is a Continuing Violation

Defendant contends that the Government attempts to circumvent the applicable statute of limitations by misconstruing the Colorado regulations.  Defendant asserts that those regulations contain separate and distinct construction and operating permit provisions.  Defendant's Memorandum, Doc. 20, at 20.[24]  As explained further below, under Colorado's SIP, the physical

---

[24]     Defendant conflates the State's PSD construction and operating permit requirements found at CAQCC Reg. 3, Part B, with the State's Title V regulations, CAQCC Reg. 3, Part C to manufacture an argument that Colorado's construction requirements are distinct from its operating requirements.  As we have noted elsewhere, under Colorado's SIP the construction permit once approved by CDPHE becomes the facility's operating permit. See CAQCC Reg. 3,

and operational parameters identified during the construction permitting process become the

facility's operating requirements, and the construction permit, after final approval by CDPHE,

becomes the permit under which the facility operates.  The standards and controls of the

approved SIP construction permit are the operating standards and controls that then must be

incorporated in the facility's Title V permit.

Construction permit applications for modifications which trigger PSD and NNSR

requirements must contain information sufficient to allow CDPHE to determine whether, when

put into operation, the modified source will comply with all applicable emissions control

regulations, the requirements of the attainment and nonattainment programs (PSD and NNSR)

(CAQCC Reg. 3  Sections IV.D.2 and IV.D.3 (1995) [0111 - 0122]; CAQCC Reg. 3, Part B,

Sections IV.D.2. and IV.D.3. (1998) [0261 - 0273]), and the applicable ambient air quality

standards.  A construction permit application must also include analysis describing the impact

the source, once operational, will have on attainment, nonattainment, and unclassifiable areas

(CAQCC Reg. 3 Section IV.B.4.a. - d. (1995) [0106 - 1007]; CAQCC Reg. 3, Part B, Section

IV.B.4.a. - d. (1998) [0256]).  Unless the facility can affirmatively demonstrate that the

modification does not exceed the PSD and NNSR thresholds,[25] it must show that the

_____

Part B, Section IV.H.5. (1998) [0277].   Also as noted above, the PSD program is a stand-alone
requirement and Title V is not the "operating arm" of the PSD program.  This view is further
reinforced by the fact that under the Colorado regulations, the submission of a complete Title V
operating permit application does not obviate the need for a valid construction permit.  CAQCC
Reg. 3, Part C, Section IV.A. (1995) [0022].

[25]     The thresholds established in the Colorado SIP are 15 tons per year ("tpy") of PM-10 and
40 tpy of NOx.  CAQCC "Common Provisions Regulations" Section I.G. "significant" part (a.)
(1995) [0081]; CAQCC Reg. 3, Part A, Section I.B.57.a. (1998) [0200].

modification will meet BACT (in attainment and unclassifiable areas) and LAER (in

nonattainment areas).  See CAQCC Reg. 3 Section IV.D.2.a.(i) and Section IV.D.3.a.(i)(B)

(1995) [0111 & 0115]; CAQCC Reg. 3, Part B, Section IV.D.2.a.(i) and Section IV.D.3a.(i)(B)

(1998) [0262 & 0266].  The analysis that takes place at the construction permitting phase not

only defines the type of pollution control technology and emissions limits that a facility must

employ during operations, but also requires, as part of the "construction" permitting process, that

the facility identify operating and maintenance plans for all control equipment and practices

employed during operations and that the facility propose a recordkeeping format for

demonstrating compliance during the facility's operational life.  See CAQCC Reg. 3, Section

IV.B.2.(i) and (ii) (1995) [0106]; CAQCC Reg. 3, Part B, Section IV.B.2.(i) and (ii) (1998)

[0255].

     Once CDPHE determines that the terms and conditions of the construction permit have

been satisfied, CDPHE then approves that "construction" permit as a final permit under which

the facility may operate.  CAQCC Reg. 3, Part B, Section IV.H.5. (1998) [0277].  The continuity

and relevancy of the construction permitting process to the operational life of the modified units

is, contrary to Defendant's contention, undeniably clear.[26]

     For the reasons discussed in this Section, this Court should follow the path chosen by the

Fifth Circuit in Marine Shale, the Sixth Circuit in National Parks, and the district courts in Duke

Energy and CEMEX California which have held, under either an accrual or continuing violation

_____

[26]    See discussion at 50 - 51 discussing the process by which the State PSD and NNSR
permit standards and controls are incorporated into the facility's Title V permit.

theory, that claims for civil penalties for ongoing violations of PSD and NNSR construction permitting violations are not barred by the general statute of limitations because those violations are either continuing or accrue anew each day.  For that reason, the First Amended Complaint states PSD and NNSR claims for which civil penalties and injunctive relief may be granted.

IV.    **THE UNITED STATES' FIRST AMENDED COMPLAINT STATES A VALID CLAM FOR RELIEF UNDER TITLE V**

Defendant argues that, "the Government fabricates new claims under Title V of the CAA, 42 U.S.C. §§ 7661a, 7661c, for failure to obtain and operate with a 'proper' Title V permit, and shoehorns [those] claim[s] into the existing First and Second Claims for Relief."[27]  Defendant's Memorandum, Doc. 20, at 24.  Defendant supports its position with the contentions that the government's claims are untimely, id. at 25, that Defendant is not violating the Facility's existing Title V permit, id., and that the government's Title V claim is barred by 42 U.S.C. § 7661c.  Id. at 26.  The United States alleges that, because Defendant did not incorporate applicable PSD and NNSR requirements into its Title V permit, it has operated these units without a permit, or alternatively without an adequate permit, in continuing violation of the CAA's Title V provisions, 40 C.F.R. Part 70,  and Colorado's Title V permit requirements.  First Amended Complaint, Doc. 16, ¶¶ 57, 59, 61, 66, and 67.  The United States alleges that this violation is ongoing, id. ¶¶ 61 and 67, and contends that its Title V claim is not barred by 42 U.S.C. § 7661c.  For these reasons, the United States asserts that "proper and sufficient factual allegation[s] ha[ve] been made" in its First Amended Complaint to withstand Defendant's

---

[27]    The United States has explained why 42 U.S.C. §§ 7661c was plead in conjunction with 42 U.S.C. § 7661a.  See discussion at 16 - 18, supra.

Motion.  MSK Civ. Practice Standard V.I.2.c.2.[28]/

    A.    <u>The United States' Title V Claims Are Timely</u>

Defendant first argues that because the government's PSD and NNSR claims are

untimely, any Title V claims that grow out of them must also fail.  Defendant's Memorandum,

Doc. 20, at 25.  As the United States has explained in Section III, <u>supra</u>, its PSD and NNSR

claims are timely because Defendant's violations of those requirements are continuing

violations, or alternatively, violations which accrue anew each day.  Moreover, while there is a

relationship between Defendant's PSD and NNSR construction permitting violations and its

violation of Title V, the United States' Title V allegations stand on their own.

An examination of the relevant statutory provisions demonstrates the error of

---

[28]/    Relying on <u>Sierra Club v. United States E.P.A.</u>, 557 F.3d 401, 405 (6th Cir. 2009) and <u>Sierra Club v. Johnson</u>, 541 F.3d 1257, 1260, 1262 - 63, 1269 (11th Cir. 2008), Defendant suggests that the Government's claims here are "implausible" in light of EPA's failure in those cases to object to the issuance of Title V permits which allegedly were incomplete.  Defendant's Memorandum, Doc 20, at 24 n.15.  In both of these cases, the courts held that under U.S.C. § 7661d(b)(2) a petitioner who seeks to compel EPA to object to a state-issued permit must demonstrate to the Administrator that the challenged permit is not in compliance with the requirements of the CAA (<u>e.g.</u> does not contain an applicable  requirement).  Where all that petitioners relied on to make this demonstration was that EPA had issued a notice of violation and commenced a civil action, these courts held that EPA reasonably found that more was necessary to trigger EPA's non-discretionary duty to object to the permits.  Observing that these actions were but EPA's initial steps in determining whether a source was in violation of the CAA, these courts stated that EPA reasonably concluded that, absent a final adjudication, issuance of a notice of violation and initiation of a civil action alone did not demonstrate under Section 505(b)(2) that the missing permit requirements conclusively constituted a violation of the CAA.  <u>Sierra Club v. Johnson</u>, 541 F.3d at 1263, 1267 - 69; <u>Sierra Club v. United States E.P.A.</u>, 557 F.3d at 408, 409 and 411.  Defendant's argument then is that EPA's unwillingness to reject state-issued Title V permits in the above cited <u>Sierra Club</u> decisions somehow makes EPA's assertion of similar violations here in its civil complaint, "implausible."  Because Defendant's reasoning is disjointed, it is unpersuasive.

Defendant's argument.  Section 502 of the CAA, 42 U.S.C. § 7661a, provides in part:

> After the effective date of any permit program approved or promulgated under this subchapter, <u>it shall be unlawful</u> for any person to violate any requirement of a permit issued under this subchapter, <u>or to operate</u> an affected source (as provided in subchapter IV-A of this chapter), <u>a major source</u>, any other source (including an area source) . . . <u>except in compliance with a permit issued by a permitting authority under this subchapter</u>.  (Emphasis added.)

Thus, operating without a Title V permit – which we assert includes operating with an incomplete permit as Defendant has done here – is unlawful.  The continuing nature of that violation is explicit in the CAA's enforcement provisions which provide that EPA may:

> [C]ommence a civil action for a permanent or temporary injunction, or to assess and recover a civil penalty of not more than $25,000 <u>per day for each violation</u> . . . . Whenever such person has violated, or is in violation of, <u>any other requirement</u> or prohibition of this subchapter, section 7603 of this title, subchapter IV-A, <u>subchapter V</u>, or subchapter VI of this chapter, <u>including, but not limited to, a requirement or prohibition of any rule, order, waiver or permit promulgated, issued, or approved under this chapter</u>.

42 U.S.C. § 7413(b) and (b)(2) (emphasis added).  The provision of a daily penalty is consistent with the ongoing nature of the violation and catches within its sweep facilities that file and continue to operate pursuant to incomplete and/or inaccurate Title V permit applications.

Contrary to the principal thrust of Defendant's arguments, if the language of the CAA is to have any meaning, it must clearly reach facilities that operate on an ongoing basis without a permit that meets all of the applicable requirements of Title V.  <u>See</u>, <u>infra</u>, Section IV.B. Because the United States has alleged as much in its First Amended Complaint, Doc. 16, ¶¶ 26, 37, 42, 46, 55, 59 and 67, the United States' First and Second Claims for Relief are timely and

do state claims for which civil penalties and injunctive relief may be granted.[29]

     B.    <u>An Incomplete Title V Permit Application Is Actionable under the CAA</u>

Second, Defendant contends that the United States' claims must fail because, "the CAA does not recognize claims for failure to apply for, obtain, or operate pursuant to a 'proper' Title V permit." Defendant's Memorandum, Doc. 20, at 25. The United States has advanced facts sufficient to allege that Defendant is and was operating the modified units without having incorporated into its Title V permit application, or subsequent application for permit renewal, information regarding the required PSD and NNSR standards and controls. See First Amended Complaint, Doc. 16, ¶¶ 59, 61, 66, and 67. Indeed, Defendant itself has admitted that, "the Facility's Title V permit does not include any PSD or NNSR requirements for an alleged modification made between 1997 and 1999." Defendant's Memorandum, Doc. 20, at 25. "Sources subject to Title V may not operate in violation of, or without, a Title V permit <u>containing all applicable requirements</u>. 42 U.S.C. §§ 7661a(a); 40 C.F.R. §§ 70.7(b) 70.6(a)(1)." <u>Sierra Club v. Leavitt</u>, 368 F.3d 1300, 1302 (11th Cir. 2004). Because the United States has alleged that Defendant is continuing to operate without a Title V permit that includes all "applicable requirements," <u>id.</u>, First Amended Complaint, Doc. 16, ¶¶ 59, 61, 66, and 67, the

_____

[29]    The ongoing nature of this violation is further evidenced by the fact that when Defendant applied to renew its Title V permit on February 2, 2004, it once again excluded from that application applicable requirements including, among other things, PSD and NNSR standards and controls for the modified units. See Air Pollution Control Division Colorado Operating Permit 95PBO082 at <u>http://www.cdphe.state.co.us/ap/downop/bo082p06.pdf.</u> Because Defendant's application for renewal was filed within the five-year period preceding January 6, 2009, the date upon which the United States filed its Complaint, Doc. 1, civil penalties related to violations arising from that application are not barred by 28 U.S.C. § 2462.

United States asserts that "proper and sufficient factual allegation[s] ha[ve] been made" in its First Amended Complaint to withstand Defendant's Motion.  MSK Civ. Practice Standard V.I.2.c.2.[30/]

Title V of the Clean Air Act, 42 U.S.C. §§ 7661 - 7661f, established a comprehensive operating permit program to enable states and local permitting authorities, with EPA oversight, to better ensure that major sources of air pollution comply with the various substantive air pollution control requirements, including those found in state SIPs.  Title V of the CAA requires major stationary sources of air pollution to obtain operating permits that include emissions limitations and a compliance schedule, 42 U.S.C. § 7661c(a), inspection, monitoring, certification, and reporting requirements to assure compliance with the permit, § 7661c(c), and "such other conditions <u>as are necessary to assure compliance with applicable requirements of this chapter</u>."  42 U.S.C. § 7661c(a) (emphasis added).  <u>See also</u> 40 C.F.R. § 70.6(a) (noting that "[e]ach permit issued under this part shall include [inter alia] . . . Emission limitations and standards, including those operational requirements and limitations that assure compliance with all applicable requirements at the time of permit issuance").

"Applicable requirements" include PSD and NNSR program requirements.  <u>See</u> 40 C.F.R. § 70.2 (including, among other things, in definition of "applicable requirement," "[a]ny standard or other requirement provided for in the applicable [state] implementation plan

_____

[30/]      Defendant's only argument here seems to be that EPA could have pursued administrative remedies.  Defendant's Memorandum, Doc. 20, 26 n.16.  Defendant, however, fails to cite any authority which would support its position that the mere existence of administrative remedies forecloses EPA's ability to pursue the matter judicially.

approved or promulgated by EPA," and "[a]ny term or condition of any preconstruction permits issued pursuant to regulations approved or promulgated through rulemaking under title I, including parts C [PSD] or D [NNSR], of the Act."). Title V puts the burden squarely on the source to identify the applicable Title V permit requirements. See 40 C.F.R. § 70.5(a) ("[f]or each part 70 source, the owner or operator shall submit a timely and complete application in accordance with this section") (emphasis added).

"To be deemed complete, an application must provide all information required pursuant to paragraph (c) of this section. . . . ." 40 C.F.R. § 70.5(a)(2). Paragraph (c) requires, inter alia:

> (4)   The following air pollution control requirements:
>   (i)    Citation and description of all applicable requirements, and
>   (ii)   Description of or reference to any applicable test method for determining compliance with each applicable requirement.
> (5)   Other specific information that may be necessary to implement and enforce other applicable requirements of the Act or of this part or to determine the applicability of such requirements. . . .
> (8)   A compliance plan for all part 70 sources  . . . .

40 C.F.R. § 70.5(c) (emphasis added).

A facility's obligation to submit a complete Title V application, is ongoing.

> Any applicant who fails to submit any relevant facts or who has submitted incorrect information in a permit application shall, upon becoming aware of such failure or incorrect submittal, promptly submit such supplementary facts or corrected information.

40 C.F.R. § 70.5(b) (emphasis added).

Similarly, Colorado directs that a facility include all "applicable requirements" in its Title V operating permit by providing:

> An operating permit shall contain, at a minimum, the following . . .

50

> Emissions limitations and standards, including those operational requirements and limitations that assure compliance with <u>all applicable requirements</u> at the time of permit issuance . . . .

CAQCC Reg. 3, Part C, Section V.C.1. (1995) [0025] (emphasis added).  Colorado defines the term "applicable requirements" to include, "any term or condition of any construction permit," as well as "<u>any standard or other requirement provided for [sic.] the in state implementation plan</u>."  CAQCC Reg. 3, Part A, Section I.B.9.a & b. (1998) [0179] (emphasis added).  Under Colorado's Title V regulations, Title V permit applications must include PSD and NNSR program requirements when such requirements are terms and conditions of their construction permits.  Colorado's regulations also require that Title V program applications be complete, accurate and truthful.  <u>See</u> CAQCC Reg. 3, Part C, Section III.B.2. (1995) [0016] ("A new or modified source shall submit a complete application for an operating permit . . . .'); CAQCC Reg. 3, Part C, Section III.B.9. (1995) [0017] ("Each application . . . shall contain a certification by a responsible official of the truth, accuracy and completeness of such form . . . .").  Like the federal Title V regime,  Colorado's requirement that Title V applications be complete is an ongoing requirement.  <u>See</u> CAQCC Reg. 3, Part C, Section IV.B.3. (1995) [0023].

To increase production, between 1997 and 1999 Defendant modified certain units at its Facility.  First Amended Complaint, Doc. 16, ¶ 57.  Because these modifications constituted physical or operational changes that increased emissions, PSD and NNSR requirements were triggered.  However, even though Defendant's Title V permit application was pending before CDPHE for this entire period, Defendant did not modify or supplement its Title V permit application to include information regarding PSD and NNSR requirements, <u>id.</u> ¶¶ 59 and 66,

even though it was obligated to do so.  See 40 C.F.R. § 70.5(b).  Further, even though Defendant

had a continuing obligation to do so, these requirements were not included in Defendant's Title

V permit application when Defendant sought in 2004 to renew that permit.[31/]

Courts have read the CAA to authorize enforcement action where, as here, the source's

permit application is incomplete, e.g. lacking information regarding PSD and NNSR provisions

for the modified units.  See Pennsylvania v. Allegheny Energy, Inc., No. Civ. A. 05-885, 2006

WL 1509061, *at 8 (W.D.Pa. Apr. 19, 2006) (where plaintiff contended that Allegheny failed to

supplement the applications with information regarding the modifications at its facilities,

including the air pollution control standards, the court held that, "[s]ince it was unlawful for any

person to . . .  operate a source subject to Title V regulations that is not in compliance with all

applicable requirements of a Title V operating permit,"  plaintiff's claims "should not be

dismissed").

In United States v. E. Kentucky Power Co-op., Inc., 498 F. Supp. 2d 1010 (E.D. Ky.

2007) there was no dispute that Title V permit had been reviewed by EPA.  Subsequently,

however, EPA claimed that the applications were not complete because East Kentucky Power

did not identify all applicable requirements – specifically, PSD and NNSR requirements.  In

declining to grant East Kentucky Power's motion to dismiss the United States' claims that the

defendant violated Title V, the court observed:

> Pursuant to 40 C.F.R. § 70.6(f)(1)(i), compliance with the terms of the permit are
> deemed compliance with any applicable requirements, so long as the applicable
> requirements are included and are specifically identified in the permit.  In the

[31/] See n.29, supra.

present case, the PSD and NSPS requirements are not included or specifically identified in the Title V permits, so the permit shield is not applicable.

Id. at 1018 (emphasis added).  See also  Clean Air Implementation Project v. E.P.A., 150 F.3d 1200, 1208 (D.C. Cir. 1998) (describing Title V permit program as requiring that "each permit issued must include all emissions limitations and standards applicable to the source, as well as provisions concerning inspection, monitoring, compliance, certification, and reporting requirements"); Niagara Mohawk, 263 F. Supp. 2d at 657 ("The operating permits must include limitations on emissions and other conditions necessary to ensure compliance with the provisions of the Clean Air Act, including the PSD program."); Illinois Power, 245 F. Supp. 2d at 959; S. Ind. Gas & Elec. Co., 2002 WL 1760752, at *5.[32]  Because Defendant's Title V permit does not contain all "applicable requirements," and conditions necessary to assure compliance with those requirements, and because the United States has alleged as much in its First Amended Complaint, Doc. 16, ¶¶ 26, 37, 42, 55, 59, 61, 66, and 67, the United States' First and Second Claims for Relief are timely and do state claims for which civil penalties and injunctive relief may be granted.

C.    42 U.S.C. § 7661c(f) Does Not Bar the United States Title V Claims

Defendant's third and final argument is, that because it is operating in compliance with the terms and conditions of its Title V permit, the United States cannot state a claim that Defendant is in violation of Title V.  Defendant's Memorandum, Doc. 20, at 26 - 28.

---

[32]    See, however, CEMEX California, slip op., at 12 - 16 dismissing United States' Title V claims.  The dismissal, however, was without prejudice, leaving open to the United States an opportunity to correct pleading defects.

Defendant's interpretation is a legally erroneous one. In essence, Defendant is saying that it is immune from federal enforcement for its failure to submit a complete and accurate application and operate in compliance with a Title V permit containing all applicable requirements because the regulators did not "catch" Defendant at the construction permitting phase.

There are two types of "permit shields" in Title V: one that shields a source from claims for failure to comply with Section 502 of the CAA, 42 U.S.C. § 7661a (the requirement that a source complies with "a permit issued in accordance with [Title V]"); and a second that provides a shield against claims for failure to comply with any applicable provisions of the CAA so long as a source complies with its Title V permit and either: 1) "the permit includes the applicable requirements of such provisions" or 2) "the permitting authority in acting on the permit application makes a determination . . . that such other provisions . . . are not applicable and the permit includes the determination . . . ." 42 U.S.C. § 7661c(f) (emphasis added). Defendant's overly broad reading of these permit shields is contradicted by the plain language of the CAA and Part 70, and would perversely reward sources for submitting Title V applications that were not complete, accurate and truthful. See 40 C.F.R. § 70.5(a) (requiring timely and complete applications); CAQCC Reg. 3, Part C, Section III.B.2. (1995) [0016] (requiring a complete application); and CAQCC Reg. 3, Part C, Section III.B.9. (1995) [0017] (requiring certification that application is true, accurate and complete).

> (1)     The Permit Shield Does Not Bar Claims for a Deficient Permit Resulting from an Incomplete Application

For the most part, Defendant relies on the first type of Title V permit shield, arguing that

even a deficient permit is a permit issued in accordance with Title V.  <u>See</u> Defendant's

Memorandum, Doc. 20, at 26 ("the permit shield applies even if it is later determined that the

Title V permit does not include all applicable requirements").  However, if as here,  Defendant's

permit lacks applicable requirements, because it is based on an application that was not

complete, accurate and truthful, then the permit was not "issued in accordance with [Title V]."

42 U.S.C. § 7661c(f)  Therefore, Defendant is not entitled to this permit shield.

    One purpose of the Title V program is to "provide a degree of certainty to the source

regarding its obligations."  57 Fed. Reg. 32,250, 32,277 (July 21, 1992).  However, Title V was

also enacted to:

> implement the Act and to generate improvements in air quality through the
> enforcement of existing regulations and the timely implementation of newly
> promulgated regulations. Thus, a balance must be struck between providing
> certainty to sources as to which requirements are applicable to them and how
> these requirements are interpreted, and achieving improvement in air quality.
> This balance can be achieved by appropriately defining the scope of the permit
> shield.

 <u>Id.</u>  Title V squarely places the burden on the source to identify all applicable requirements.

<u>See</u>, <u>supra</u>, at 47 - 48.  Given this clear obligation under the CAA, when a source has been issued

and continues to operate with a deficient permit because the source did not identify all applicable

requirements in its application, it is not appropriate for the source to invoke the permit shield.

<u>See</u> <u>Niagara Mohawk</u>, 263 F. Supp. 2d at 663 - 64 (observing that the defendant's "failure to

comply with the requirements of the [CAA] cannot now inure to its benefit . . . . Permitting

[defendant] to rely on its own inaction as a shield would lead to absurd and surely unintended

results").

55

       (2)     Defendant's Incomplete Permit May Not Be Raised as a Shield To PSD and NNSR Claims When the Violations Commenced Before or At the Time the Permit Was Issued

Colorado's regulations make it clear that a permit may only be raised as a shield against an enforcement action when, "<u>the permit includes all applicable requirements of such acts</u>." CAQCC Reg. 3, Part A, Section B.43 (1998) [0196] (emphasis added).  This provision also makes it clear that "<u>the permit shield [shall not] affect the liability of an owner or operator of a source for any violation of applicable requirements prior to or at the time of permit issuance</u>." <u>Id.</u>  (emphasis added).  Defendant's permit specifically incorporates these limitations:

> This permit shield shall not alter or affect the following: . . .
>
> > The liability of an owner or operator of a source for any violation of applicable requirements prior to or at the time of permit issuance.

CEMEX Title V Operating Permit No. 95OPBO082, February 1, 2000.

The United States has alleged that Defendant was in violation of Title V's provisions before and at the time Defendant's Facility initially received its Title V permit on February 1, 2000 because Defendant failed to include in its Title V permit application information regarding PSD and NNSR operating requirements for the modified units.  First Amended Complaint, Doc. 16, ¶¶ 57, 66, 67, and 70.  CEMEX has not asserted that its existing Title V permit contains PSD and NNSR operating standards and controls for the modified Raw Mill System, Kiln System, Finish Mill System and Oxygen Plant.  Therefore, CAQCC Reg. 3, Part C, Section V.D (1995) [0032] and CEMEX's Title V Operating Permit No. 95OPBO082, by their express terms bar CEMEX from raising its existing permit as a shield to allegations in the United States' First

Amended Complaint.  Thus, the United States asserts that "proper and sufficient factual allegation[s] ha[ve] been made" in its First Amended Complaint to withstand Defendant's Motion.  MSK Civ. Practice Standard V.I.2.c.2.

## V.    IN THE ALTERNATIVE, UNDER APPLICABLE PRINCIPLES OF EQUITY, RULING ON THE INSTANT MOTION SHOULD BE DEFERRED UNTIL DISCOVERY IS COMPLETED

The United States has alleged that Defendant did not notify EPA of its plans for the construction of this modification, the commencement of construction of this modification, or the commencement of the operation of the modified Facility and further that EPA was unaware of and did not discover the modification until EPA inspected the CEMEX Facility in 2006.  First Amended Complaint, Doc. 16, ¶¶ 57 and 65.  While we think that there is a more than ample basis upon which the Court should deny Defendant's Motion to Dismiss set forth in Sections I - IV, supra, in the alternative, should the Court be inclined to do otherwise, then, for reasons explained in this Section, the United States respectfully requests that the Court defer ruling on that Motion until the United States has had an opportunity to take discovery on whether the statute of limitations should be tolled and tender supplemental briefing.

Courts in this Circuit have recognized a number of equitable circumstances which, if they apply, would toll the running of a statute of limitations.  Under the Discovery Rule, it has been held that the statute of limitations should not run until a plaintiff has reason to know of the underlying "injury."  In Indus. Constructors Corp. v. United States Bureau of Reclamation, 15 F.3d 963, 969 (10th Cir. 1994) (citations omitted), the court held:

Federal law, not state law, controls the issue of when a federal cause of action

57

accrues.  The statute of limitations begins to run when the plaintiff knows or has reason to know of the existence and cause of the injury which is the basis of his action.  A plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence

In discussing the Equitable Tolling Doctrine, the Supreme Court has stated that "equity tolls the statute of limitations in cases of fraud or concealment." TRW Inc. v Andrews, 534 U.S. 19, 27 (2001) (citing Holmberg v. Armbrecht, 327 U.S. 392 (1946)).  "It is hornbook law that limitations periods are 'customarily subject to equitable tolling . . . .'" Young v. United States, 535 U.S. 43, 49 (2002) (quoting Irvin v. Dep't of Veterans Affairs, 498 U.S. 89, 95 (1990)). Furthermore, "Congress must be presumed to draft limitations periods in light of this background principle." Id.  See also Heil v. Wells Fargo Bank, N.A., 298 Fed. App'x 703, 706, 2008 WL 4516685, at *3 (10th Cir. 2008) ("'Equitable tolling' is the doctrine under which plaintiffs may sue after the statutory time period has expired if they have been prevented from doing so due to inequitable circumstances.").

Courts have also recognized that statutes of limitation can be tolled under an Equitable Estoppel Doctrine.  Equitable estoppel arises where the parties recognize the basis for suit, but the wrongdoer prevails upon the other to forgo enforcing his right until the statutory time has lapsed. See, e.g., Glus v. Brooklyn E. Dist. Terminal, 359 U.S. 231, 233 - 34 (1959); United States ex rel. Nelson v. Reliance Ins. Co., 436 F.2d 1366, 1370 - 71 (10th Cir. 1971).

Where, as here, questions of fact exist that may determine whether one or more of the foregoing doctrines would toll the date of the violations asserted in the United States' First and Second Claims for Relief, courts have been reluctant to grant a motion to dismiss.  In an action alleging breach of contract, unfair competition, and trademark infringement under state and

federal law, where a defendant moved to dismiss under Rule 12(b)(6), an Arizona District Court

reasoned:

> A court should not dismiss a complaint unless plaintiff cannot plausibly prove a
> set of facts demonstrating the timeliness of the claim. Since the court cannot
> consider materials outside the pleadings for Rule 12(b)(6) purposes, and since the
> applicability of doctrines related to filing deadlines often depends on matters
> outside the pleadings, whether a claim is time-barred is 'not generally amenable
> to resolution on a Rule 12(b)(6) motion.

Ranch Realty, Inc. v. DC Ranch Realty, LLC, No. CV-07-843-PHX-SMM, 2007 WL 3207469,

at *2 (D. Ariz. Oct. 29, 2007) (citations omitted) (quoting Cervantes v. City of San Diego, 5 F.3d

1273, 1276 (9th Cir.1993) (discussing California's fact-intensive test for equitable tolling)). See

also Bank of Denver v. Se. Capital Group, Inc., 763 F. Supp. 1552, 1556 (D. Colo. 1991) (In a

holding on a motion to dismiss complaint alleging securities violations, court held that it could

not "conclude that the action [was] barred by the statute of limitations . . . because federal

equitable tolling rules apply, the Bank may be able to show that the statute of limitations has not

run."); Sivulich-Boddy v. Clearfield City, 365 F. Supp. 2d 1174, 1188 (D. Utah 2005) ("This

court concludes that at the pleading stage there has been no evidence that it was possible for

Plaintiff to discover the adverse reference . . . . Discovery on this issue may lead to facts that

would be relevant to an analysis of the Warren factors. Therefore, at this stage, the court denies

[the] motion to dismiss . . . .").

Until the United States has had an opportunity through the discovery process to

determine why, when Defendant implemented the modification in 1997 - 1999, Defendant did

not disclose to either EPA or CDPHE that the modifications triggered PSD, NNSR and Title V

requirements, and why at that time Defendant did not seek the appropriate construction and

operating permits, it would be premature for the Court to rule on Defendant's Motion.  See

Tello, 410 F.3d at 1288 n.13 ("a complaint may be dismissed on the basis of a statute-of-

limitations defense only if it appears beyond a doubt that Plaintiffs can prove no set of facts that

toll the statute") (quotations omitted).  Therefore, in the alternative, the United States requests

that this Court defer ruling on Defendant's Motion until after the close of discovery in this case

and permit the United States an opportunity to submit supplemental briefing on the question of

whether the Discovery Rule, or the doctrines of Equitable Tolling or Equitable Estoppel, apply

here so as to toll the general limitation period under 28 U.S.C. § 2462 for the causes of action

pled in the United States First and Second Claims for Relief.

**CONCLUSION**

For such reasons as are set forth herein, the United States requests that this Court deny

Defendant's Motion, or in the alternative, defer ruling on Defendant's Motion until the close of

discovery in this case and allow the United States an opportunity to submit supplemental briefing

on the question of whether the Discovery Rule, or the doctrines of Equitable Tolling or Equitable

Estoppel apply here so as to toll the general limitation period under 28 U.S.C. § 2462.

Dated, May 18, 2009.

Respectfully submitted by:


s/ John N. Moscato
John N. Moscato
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice

60

1961 Stout Street, 8th Floor
Denver, CO 80294
Telephone: (303) 844-1380
Facsimile: (303) 844-1350
Email: John.Moscato@usdoj.gov


ROBERT R. HOMIAK
Senior Attorney
United States Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
1961 Stout Street, Suite 800
Denver, CO  80294
Telephone: (303) 844-1391
Facsimile: (303) 844-1350
Email: Robert.Homiak@usdoj.gov

61

## CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on May 18, 2009, I electronically filed the foregoing **United States' Memorandum in Opposition to Cemex, Inc.'s Motion to Dismiss Pursuant to Fed. R. Civ. P 12(b)(6)** with the Court using the CM/ECF system which will send notification of such filing to the following email addresses:

Hugh Q. Gottschalk
gottschalk@wtklaw.com,hart@wtklaw.com,gottesfeld@wtklaw.com
Robert R. Homiak
robert.homiak@usdoj.gov,corrine.lill@usdoj.gov
John N. Moscato
John.Moscato@usdoj.gov,Corrine.lill@usdoj.gov
Chet M. Thompson
cthompson@crowell.com
Christina J. Valerio
valerio@wtklaw.com,wheatley@wtklaw.com

s/ Corrine A Lill
CORRINE A. LILL, C.P.
Paralegal Specialist
U.S. Department of Justice
Environment and Natural Resources
   Division
Environmental Enforcement Section
1961 Stout Street, 8th Floor
Denver, CO 80294

62