**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Honorable Marcia S. Krieger**

Civil Action No. 09-cv-00019-MSK-MEH

UNITED STATES OF AMERICA,

        Plaintiff,

   v.

CEMEX, INC.,

        Defendant.

---

**CEMEX, INC.'S RESPONSE IN OPPOSITION TO UNITED STATES' MOTION FOR**
**PARTIAL SUMMARY JUDGMENT**

---

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................... 1

SUMMARY OF ARGUMENT .............................................................................................. 1

LEGAL BACKGROUND ....................................................................................................... 3

PORTION OF CLAIM UPON WHICH JUDGMENT IS SOUGHT ......................................... 6

A.   There are multiple genuine issues of material fact that preclude granting the
     government's Motion ..................................................................................................... 6

     1.   Burden of proof and elements .............................................................................. 7

     2.   There are disputed issues of material fact as to whether CEMEX had
          begun "normal operations" ................................................................................. 8

          a.   Whether a unit has "begun normal operations" is a fact-based
               inquiry that depends on the nature and extent of the changes at
               issue.......................................................................................................... 9

          b.   Ample evidence demonstrates that the Lyons facility had
               commenced normal operations ............................................................... 13

               (1)   Combustion chamber ................................................................. 14

               (2)   Lyons Expansion Project ........................................................... 16

               (3)   Booster fan ................................................................................ 18

     3.   There are disputed issues of material fact relevant to defining the scope of
          the alleged modification that further preclude summary judgment ..................... 19

          a.   Project aggregation involves a highly fact-intensive inquiry ................. 21

          b.   There are disputed issues of fact as to whether all of the projects
               identified in the government's Motion must be aggregated ................... 22

               (1)   The combustion chamber refractory improvement was an
                     independent project that addressed a longstanding problem
                     unrelated to the other changes.................................................... 23

               (2)   The booster fan project is unrelated to the Lyons Expansion
                     Project and occurred after that project was completed ............... 26

B.   Resolution of the government's Motion will not eliminate the relevance of post-
     project actual emissions data ...................................................................................... 29

CONCLUSION ...................................................................................................................... 34

## INTRODUCTION

After extensive discovery, the United States has learned that the relevant facts are inconvenient, so it is attempting to avoid them.  The Prevention of Significant Deterioration ("PSD") program requires that the United States prove that the projects that the Lyons plant undertook almost fifteen years ago resulted in a significant increase of *actual* emissions of nitrogen oxides ("NOx").  The facts, however, do not bear this out.  The United States' Motion for Partial Summary Judgment ("Motion") is an attempt to circumvent these inconvenient facts.  The legal foundation of the government's Motion is the theory that the United States does not need to prove that the Lyons projects caused an increase in *actual* emissions.  Instead, the United States wants this Court to condone the use of an "actual-to-potential" test, which would greatly distort the facility's actual emissions profile, in hopes that it may be relieved of its statutory obligation to prove that the projects at issue caused an *actual* increase in NOx emissions.  The Court should deny this end run around the Clean Air Act for several reasons: (1) it is predicated on a theory that omits a statutory element of liability (*i.e.*, causation); (2) the United States fails to demonstrate that there are no genuine issues of material fact regarding whether the Lyons plant had not begun "normal operations;" and (3) it is also predicated on the aggregation of individual projects into a single project, which raises other genuine issues of material fact.

## SUMMARY OF ARGUMENT

The United States' Motion argues that there "is no genuine dispute of material fact that CEMEX has not 'begun normal operations' within the meaning of the SIP and federal regulations," and thus the so-called "actual-to-potential" test must apply.  The government offers virtually no evidentiary support for its assertion that the facility has not commenced normal operations.  Instead, the government relies on the erroneous legal argument that any facility that has undergone a physical or operational change, regardless of its nature, by definition has not

commenced "normal" operations.  In other words, the government argues that the actual-to-potential test applies in all circumstances.

EPA's legal theory is wrong.  It is inconsistent with the Colorado PSD State Implementation Plan ("SIP"), the Environmental Protection Agency's ("EPA's") long-standing interpretation of its own PSD regulations, and case law.  The controlling question of whether a source has commenced normal operations is not merely whether a source makes a "change" – indeed, every source that is potentially subject to PSD has made a "change" – but rather whether the change significantly alters the nature of the facility.  By EPA's own admission this question "is highly fact dependent and its application is inherently case-by-case."  For this reason alone, the government's Motion should be denied.

Moreover, the record is replete with evidence that none of the projects at issue in this case materially altered the normal operations of the facility.  *See infra* Section A.2.  The only undisputed fact cited by the government – the fact that CEMEX implemented a patented oxygen enrichment system – is inadequate to support the granting of this Motion.  It does not undermine, let alone overcome, the testimony of (1) CEMEX's former Plant Manager, (2) its former Production Manager, and (3) its PSD permitting expert that the facility had indeed commenced normal operations prior to the projects at issue here.  This evidence demonstrates that there is a genuine issue of material fact as to whether the facility commenced normal operations at the time of the projects.

The government's Motion is also fatally flawed in that it erroneously and without evidentiary support assumes that all of the projects at issue in this case should be aggregated for PSD purposes.  Aggregation also presents a factual question that is in dispute.  *See infra* Section A.3.  And because the question of whether a facility has commenced normal operations is decided on a project-by-project basis, until the issue of the scope and independence of the projects is resolved (*i.e.*, whether any or all of the projects in this case should be aggregated), the

Court cannot resolve the genuine issue of material fact as to whether the facility has commenced normal operations at the time of a particular project.

Finally, the government argues that granting its Motion would "greatly simplify the scope of the evidence presented at trial" and would render "irrelevant" the issue of "post-modification actual emissions." Not true. Regardless of the test applicable in this case, the government still has the burden to prove a causal relationship between the projects and increased emissions. If no causal relationship exists, PSD cannot apply. Post-modification actual emissions are relevant to that question. They are also relevant to the ultimate legal test this Court must apply: whether CEMEX was reasonable in concluding that none of the projects would cause NOx to increase significantly. In addition, CEMEX plans to use actual emissions data to disprove the government's fundamental theory in this case: that there is a linear relationship between clinker production and NOx emissions. Actual emissions data may be inconvenient to the government's case, but they are not irrelevant.

For all these reasons, CEMEX respectfully requests that the Court deny the government's Motion.

## LEGAL BACKGROUND

A PSD analysis at a major stationary source subject to the federal Clean Air Act is remarkably complex. It involves highly complicated factual analyses, mixed questions of law and fact, and an extensive understanding of the facility and industry subject to permitting. These analyses and inquiries are compelled by the statutory and regulatory structure of the PSD program, both of which are designed to regulate only those projects that are reasonably projected to result in significant increases of actual emissions to the atmosphere.

Because the PSD program requires a facility to obtain a PSD permit before a "major modification," the definition of that term establishes a facility's PSD obligations. A "major

modification" is defined as any physical or operational change at a major source that *would result* in a significant net emissions increase of a pollutant.[1]

The first step in any PSD analysis is to determine whether a change occurred and to define the scope of the change.  For instance, certain changes are exempt from PSD review, such as "routine repair, replacement, and maintenance."[2]  Also, although the plain language of the Colorado SIP requires that each "change" be evaluated independently, in some cases EPA may assert that multiple changes are so intrinsically related that they must be considered collectively, or "aggregated," as a single change for PSD applicability purposes.

The second step is the facility's inquiry as to whether the change will "result in" (cause) an increase in emissions.  If the facility reasonably believes that the change will not cause an increase in emissions, the change does not trigger PSD obligations and the facility need not proceed further with the PSD applicability determination.[3]

Third, assuming the facility determines that the proposed change will cause an increase in emissions, the facility must then determine whether the emissions increase will be "significant." There are two alternative tests under the PSD program for predicting whether an increase in emissions caused by a change will be significant.  Generally, the test measures the difference between the facility's pre-change *actual* emissions and the predicted post-change *actual* emissions (the "actual-to-future-actual" test).  *See United States v. Murphy Oil USA, Inc.*, 143 F.

---

[1] *Docket* #169, Exhibit 1 (Colo. Code Regs. § 1001-2) at 96; *Docket* #169, Exhibit 2 (Colo. Code Regs. § 1001-5) at 188 (emphasis added).

[2] *Docket* #169, Exhibit 2 (Colo. Code Regs. § 1001-5) at 188.

[3] The Clean Air Act requires that a facility act reasonably in conducting a PSD applicability determination.  *See United States v. Cinergy Corp.*, 458 F.3d 705, 709 (7th Cir. 2006).  Thus, in determining CEMEX's PSD liability in this case, this Court should focus on "the reasonableness of the actions taken and the predictions made by [CEMEX] at the time decisions were made regarding the projects at issue."  *Pa. Dep't of Envtl. Prot. v. Allegheny Energy, Inc.*, No. 02:05cv885, 2008 WL 4960090, at *7 (W.D. Pa. Nov. 18, 2008); *see also United States v. Duke Energy Corp.*, 1:00CV1262, 2010 U.S. Dist. LEXIS 77956, at *19 (M.D.N.C. July 28, 2010).

Supp. 2d 1054, 1104 (W.D. Wis. 2001); 57 Fed. Reg. 32,314, 32,317 (July 21, 1992) ("[T]o calculate whether a physical or operational change 'increases' emissions, EPA regulations require it to find an increase in actual emissions.").  Because PSD is a pre-construction permitting program, sources must make a reasonable prediction of post-project future-actual emissions.  If, however, the change is substantial enough to alter the "normal operations" of the facility, the regulations require that the facility predict the increase from the facility's pre-change *actual* emissions to the facility's post-change *potential* emissions (the "actual-to-potential" test).  *See Murphy Oil*, 143 F. Supp. 2d at 1104 ("If normal operations had not begun, an actual-to-potential test applies; otherwise, an actual-to-future-actual prediction is appropriate."); 57 Fed. Reg. at 32,317 ("Where the emissions unit has not 'begun normal operations,' EPA regulations recognize that future actual emissions are difficult to predict and employ future 'potential' emissions as a proxy[.]").  A facility's "potential–to-emit" is the "maximum capacity of a stationary source to emit a pollutant under its physical and operational design."[4]  Thus, the "actual-to-potential" test (*i.e.*, the approach sought by the government here) leads to an estimate of the highest possible increase in emissions (rather than a projected "actual" increase) that could be caused by the change.

The determination of whether the change altered the "normal operations" of a facility such that the "actual-to-potential" test applies is case-specific and fact-dependent.  57 Fed. Reg. at 32,317 ("the 'begun normal operations' criterion is highly fact-dependent and its application is inherently case-by-case").  Thus, "EPA must consider the facts of each case and apply the actual-to-potential test only where the change is sufficiently significant to support a finding that 'normal

---

[4] *Docket* #169, Exhibit 1(Colo. Code Regs. § 1001-2) at 77; *Docket* #169, Exhibit 2 (Colo. Code Regs. § 1001-5) at 196.

operations' have not begun."[5]  If the facility applies the appropriate test and reasonably predicts that no significant increase will occur, no further PSD assessment is required.

If after applying the proper test a source predicts that a proposed change would cause a significant emissions increase, the facility must then perform a netting analysis to take into account facility-wide contemporaneous emission increases and decreases to predict whether the project will cause a significant *net* emission increase triggering PSD.  As Judge Posner of the Seventh Circuit has explained:  "what is required for determining whether a construction permit must be sought for a planned physical change in the plant is not prescience, but merely a reasonable estimate of the amount of additional emissions that the change will cause . . . ." *United States v. Cinergy Corp.*, 458 F.3d 705, 709 (7th Cir. 2006).  Thus, if a facility makes a reasonable determination that a project would not result in a significant net emission increase, it need not apply for or obtain a PSD preconstruction permit.  *See Pa. Dep't of Envtl. Prot. v. Allegheny Energy, Inc.*, No. 02:05cv885, 2008 WL 4960090, at *7 (W.D. Pa. Nov. 18, 2008) (explaining that the inquiry of a court determining an operator's PSD liability is "whether Defendants' prediction that they did not need a permit was 'reasonable' under the circumstances existing at the time.").

## PORTION OF CLAIM UPON WHICH JUDGMENT IS SOUGHT

### A.    There are multiple genuine issues of material fact that preclude granting the government's Motion

The government claims that partial summary judgment should be granted because there is no genuine dispute of material fact that the Lyons facility had not "begun normal operations" prior to completing certain projects.  The government is wrong – there are numerous long-contested genuine issues of material fact that preclude partial summary judgment on this issue.

---

[5] *Id.*

### 1.      Burden of proof and elements

To prevail on its claims, the government must prove by a preponderance of the evidence that CEMEX was unreasonable when it determined that the proposed projects would not cause a significant net increase of NOx emissions.  The six elements that the government must prove to succeed on its PSD claim are:

> [T]he Lyons Facility: (i) is a major source that (ii) undertook a physical change in or change in the method of operation (iii) that would result (iv) in a significant net increase in actual emissions of NOx (v) of 40 tons per year or more (vi) without obtaining a PSD permit.

Docket #169 at 6.[6]

Although the government discusses each element in its Motion, it only seeks summary judgment on the narrow issue of the appropriate test to measure whether an emissions increase is "significant" under element 4 (significant net increase in actual emissions).  *Docket* #169 at 6-7.  The government acknowledges that this issue depends on whether CEMEX had "begun normal operations" at the time of the alleged projects.  *Id.* at 1-2.

CEMEX disputes the government's interpretation of the phrase "begun normal operations" and its assertion that there are no genuine issues of material fact as to whether the facility had commenced normal operations at the time each project was implemented.  Moreover, as discussed in Section A.3. the Court cannot determine whether the changes altered the normal operations of the facility until it resolves the separate factual question of the proper scope of the alleged modifications, or whether certain changes should be combined, or deemed "aggregated."

The government's Motion also ignores element 3 – causation.  As discussed below in Section B, the post-project actual emissions data the government argues will be irrelevant are in

---

[6] The government omitted the term "significant" in its recitation of the elements because the significance threshold for NOx is 40 tons per year, which is addressed in element 5.  For clarity, CEMEX included the term "significant" in element 4 as well.

fact highly relevant to the reasonableness of CEMEX's projection that the projects at issue here would not "result in" a significant emissions increase.

### 2.   There are disputed issues of material fact as to whether CEMEX had begun "normal operations"

The government asks this Court to decide that CEMEX had not "begun normal operations" at the time of the projects identified in its Motion and that accordingly the "actual-to-potential" test applies to determine whether PSD permitting was triggered (*i.e.* whether the projects caused a significant increase in emissions).  The government's request has two fundamental flaws.

First, the government's proffered interpretation of the phrase "normal operations" deprives it of any meaning.  The centerpiece of the government's argument is that "all existing units that will undergo a non-exempt physical or operational change" have not begun normal operations because the existing unit "has no operating history in its altered state."  *Docket* #169 at 12.  In other words, according to the government, *any* change to a facility alters the facility's "normal operations" and thus mandates use of the actual-to-potential test.  The government's current litigation position is unlawful and inconsistent with the Colorado SIP, EPA's own interpretation of its PSD regulations, and the leading cases that have interpreted this provision. All of these authorities make clear that whether a source has commenced normal operations is fact-based and turns on whether a particular change materially alters the manner in which a facility operates after the project, not simply on whether there has been a change.

Second, the government offers no "undisputed facts" in its Motion save the fact that certain projects were done at the facility between 1997 and 2000 and that "CEMEX sought a patent for the new oxygen plant."  *Docket* #169 at 7, 11.  This evidence, however, does not prove that CEMEX had not commenced normal operations.  And it does not come close to trumping the abundance of evidence that CEMEX will present showing that it had "begun normal

operations" at the time of the changes.  CEMEX's evidence clearly demonstrates that this issue is not undisputed.

> ### a.   Whether a unit has "begun normal operations" is a fact-based inquiry that depends on the nature and extent of the changes at issue

As the government concedes, the question of whether the CEMEX facility had "begun normal operations" prior to the changes at issue is the "key" question for determining what "test" should be used to predict the magnitude of an increase in emissions.  *See Docket* #169 at 10; *see also* 57 Fed. Reg. at 32,317 (interpreting equivalent language in the federal regulations: "The linchpin under the current regulations for predicting future emissions after a modification is thus whether the unit has 'begun normal operations.'").

The PSD program establishes two alternative tests for making this prediction (assuming a causal relationship between the project and emissions exist): (1) "actual-to-future-actual," and (2) "actual-to-potential."  Sources can use the actual-to-future-actual test unless they have not commenced normal operations at the time of a particular change.  If a source has not begun "normal operations," the "future actual emissions are difficult to predict" and therefore the sources must use "potential" emissions as a "proxy" for actual emissions, and apply the actual-to-potential test.[7] 57 Fed. Reg. at 32,317.  Thus, only if a change will substantially alter the

---

[7] As EPA has explained:

[T]o calculate whether a physical or operational change "increases" emissions, EPA regulations require it to find an increase in actual emissions. . . .  Where the emissions unit has not "begun normal operations," EPA regulations recognize that future actual emissions are difficult to predict and employ future "potential" emissions as a proxy. . . . The linchpin under the current regulations for predicting future emissions after a modification is thus whether the unit has "begun normal operations."

57 Fed. Reg. at 32,317; *see also Docket* #169, Exhibit 1(Colo. Code Regs. § 1001-2) at 72 ("net emissions increase") and 57 ("actual emissions"); *Docket* #169, Exhibit 2 (Colo. Code Regs. § 1001-5) at 177 and 192-93.

"normal operations" of a source and render future emissions unpredictable is the source required to substitute a projection of future actual emissions with a projection of future potential-to-emit.

Federal courts reluctantly allow the government to apply the actual-to-potential test to facilities with established pre-change operations, but only after assessing whether the change materially alters the source. For example, in *Wisconsin Electric Power Co. v. Reilly*, 893 F.2d 901, 917 (7th Cir. 1990) ("*WEPCO*"), the Seventh Circuit examined the facility's operating history and the changes at issue, and rejected the government's invocation of the actual-to-potential test without taking into consideration the facility's "past operating conditions." In *Puerto Rican Cement Co. v. EPA,* the First Circuit held that EPA was reasonable in using the actual-to-potential test to predict the net emissions increase that would be caused by a material alteration of a cement plant. In that case, unlike the circumstances in this case, a six-kiln cement facility planned to combine two "wet" cement-making kilns to form a new, single "dry" cement-making kiln. 889 F.2d 292, 293 (1st Cir. 1989). The First Circuit expressly recognized, however, that the "actual-to-potential" test might not be appropriate for all factual circumstances:

> One can imagine circumstances that might test the reasonableness of EPA's regulation. An electricity company, for example, might wish to replace a peak load generator – one that operates only a few days per year – with a new peak load generator that the firm could, but almost certainly will not, operate every day. . . . Whatever the arguments about the "irrationality" of EPA's interpretation in such circumstances, however, those circumstances are not present here.

*Id.* at 297-98. In other words, the court made clear that it was not enough to simply evaluate whether any change had been made. Likewise, in *United States v. Murphy Oil USA, Inc.*, the court examined "each set of changes" and concluded that they were:

> [S]ignificant enough to make the post-construction unit effectively a new unit that had not begun normal operations at the start of construction. For example, in 1988, defendant installed a larger combustion chamber in the sulfur recovery unit and in 1991, defendant increased the sulfur pit and the heat exchange surface of the waste heat boiler and added deeper sulfur seal legs, among other things. In each case, the post-improvement unit was different enough from the pre-

> improvement unit that the post-improvement unit could not be said to have begun
> normal operations before the improvements were made.

143 F. Supp. 2d 1054, 1105.

The government seeks to bypass this necessary factual inquiry and instead rely almost exclusively on the mere fact that the facility undertook allegedly non-exempt physical changes.[8] The government may find this approach expedient, but it is unlawful and would render the "begun normal operations" language mere surplusage. The government cannot simply ignore the plain language of the regulation, and nor should the Court. *See Time Warner Entm't Co. v. Everest Midwest Licensee L.L.C.*, 381 F.3d 1039, 1053 (10th Cir. 2004). EPA easily could have drafted the regulations to apply the potential-to-emit test to all non-exempt changes, but it did not. It cannot now excise a critical element of the regulations for its own convenience. *See Via Christi Reg'l Med. Ctr. v. Leavitt*, 509 F.3d 1259, 1273 (10th Cir. 2007). This Court owes no deference to an agency's interpretation of its own regulation that is "unreasonable, plainly erroneous, or inconsistent with the regulation's plain meaning." *Id. at* 1272-73 (quoting *Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732, 746 (10th Cir. 2006)).

Moreover, the government's argument conflicts with both *WEPCO* and *Alabama Power Co. v. Costle,* 636 F.2d 323 (D.C. Cir. 1979). Contrary to the government's assertion, *WEPCO* did not merely carve out an exception for "like-kind" replacements, but instead expressly rejected the government's application of the potential-to-emit test where the source had an established operating history. 893 F.2d at 917; *see also United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829, 863 (affirming that "any use of the actual to potential to emit test is not legally supportable" where "[i]t is clear that [the source] was operational at the time the activities were proposed"); *Nat'l Parks Conservation Ass'n, Inc. v. Tenn. Valley Auth.*, 618 F. Supp. 2d 815, 830

---

[8] This Court has not yet determined whether the alleged modifications are exempt. Thus, even under the government's interpretation, the dispute over the relevant test for measuring emissions caused by the alleged changes should not be decided at this preliminary stage.

(E.D. Tenn. 2009).  Moreover, the Seventh Circuit's *WEPCO* analysis relied heavily on *Alabama Power's* holding that the NSR requirements apply to *actual emissions*, and not some worst-case potential uncontrolled emissions.[9]  *See, e.g., Ala. Power*, 636 F.2d at 353; *see also WEPCO*, 893 F.2d at 918 ("The broad holding of *Alabama Power* is that potential to emit does not refer to the maximum emissions that can be generated by a source hypothesizing the worst conceivable operation.") (quoting *United States v. Louisiana-Pacific Corp.*, 682 F. Supp. 1141, 1158 (D. Colo. 1988)).  Thus, *WEPCO* requires that where a source's prior established operations provide the basis for making a realistic assessment of the source's post-change emissions, it is inappropriate to use "potential emissions" as a surrogate for "actual emissions."  893 F.2d at 918; *see also* 57 Fed. Reg. at 32,317 (describing "potential" emissions as a "proxy" for actual emissions when "the emissions unit has not 'begun normal operations'" and "future actual emissions are difficult to predict").

None of the cases cited by the government support its position that the potential-to-emit test applies automatically whenever a source makes a physical or operational change regardless of its effect on normal operations.  As discussed above, the courts in both *Puerto Rican Cement*

---

[9] In fact, EPA's promulgation of the definitions "net emissions increase" and "actual emissions" (including the "begun normal operations" clause) was an effort to follow *Alabama Power*'s lead in emphasizing "actual emissions":

> In its December 1979 opinion [*Alabama Power*], however, the court used an entirely different set of terms to describe "modification."  Instead of using "potential to emit," it used language which, like the section 111(a)(4) definition, suggest changes in actual emissions. . . .  Following the lead of the court, EPA has also shifted the focus of its regulatory definitions from "potential to emit" to "actual emissions."  For both PSD and nonattainment purposes, a "major modification" is now any significant "net emissions increase" at a major stationary source that results from certain changes.  "Net emissions increase" is, in turn, roughly any net increase in "actual emissions."

45 Fed. Reg. 52,676, 52,700 (Aug. 7, 1980).  The Colorado SIP incorporates the federal regulatory language.

and *Murphy Oil* engaged in a factual determination that the change was sufficiently significant such that the source had not "begun normal operations" prior to the change. In *Sierra Club v. Morgan*, No. 07-C-251-S, 2007 WL 3287850 (W.D. Wis. Nov. 7, 2007), the court conducted a project-by-project factual analysis to determine whether each was a "like-kind" replacement such that the unit had "begun normal operations" prior to the change. 2007 WL 3287850, at *18-19.[10]

As discussed in the next section, the evidence in this case contradicts the government's assertions and shows that the Lyons facility had commenced normal operations at all times relevant to this case. Thus, the government's Motion must be denied.

> **b.   Ample evidence demonstrates that the Lyons facility had commenced normal operations**

As supported by the case law discussed above, whether CEMEX reasonably believed that none of the alleged changes altered the "normal operations" of the Lyons facility presents a factual question. The key inquiry is whether the projects so significantly altered operations at the Lyons facility as to prevent a reasonable assessment of post-project operations and future actual emissions. Here, the Lyons Plant Manager and Production Manager at the time of the projects, as well as CEMEX's PSD permitting expert, will testify that none of the changes materially altered the normal (pre-project) operation of the facility.[11] They will also testify that it was reasonable for CEMEX to make predictions of actual NOx emissions after these projects were implemented, and specifically that NOx emissions would not increase.[12] This evidence supports

---

[10] *Morgan* has been criticized for applying circular reasoning that the Seventh Circuit rejected in *WEPCO*. *See Nat'l Parks*, 618 F. Supp. 2d at 829-30.

[11] *Declaration of John W. Lohr, III* ("Lohr Declaration"), attached hereto as Exhibit A, ¶¶ 11, 12, 14, 15, 16, 20; *Declaration of Royce D. Smith* ("Smith Declaration"), attached hereto as Exhibit B, ¶¶ 8, 10, 12, 14, 18; *Declaration of John E. Hofmann* ("Hofmann Declaration"), attached hereto as Exhibit C, ¶¶ 14, 16, 17.

[12] Lohr Declaration, Exhibit A ¶¶ 11, 12, 14, 15, 16, 17; Smith Declaration, Exhibit B, ¶¶ 10, 12, 13, 17, 18; Hofmann Declaration, Exhibit C ¶¶ 14, 16, 17, 21.

CEMEX's reasonable conclusions at that time, and clearly demonstrates that summary judgment on the issue is not appropriate.

In addition, there are genuine issues of material fact as to whether the projects identified in the government's Motion should be aggregated into one project or analyzed separately. EPA has adopted inconsistent positions with respect to the changes it alleges constitute the major modification at issue here, but in its current Motion seems to argue that there was only one project for purposes of determining whether the facility commenced normal operations.[13] CEMEX believes the changes identified in the government's Motion should be evaluated as three distinct projects: (1) the combustion chamber refractory improvement; (2) the use of oxygen enrichment and the raw mill and finish mill changes (collectively referred to as the "Lyons Expansion Project" or "LEP"); and (3) the booster fan.[14]

### (1)  Combustion chamber

The government does not cite *any* evidence to support the assertion that the combustion chamber improvement altered the normal operations of the Lyons facility. The combustion chamber refractory improvement involved only a relatively minor change to the internal geometry of the combustion chamber.[15] The parties dispute several facts related to the extent to which this change affected the facility's operations, such as the air flow capacity of the pyroprocessing system[16] and overall fuel efficiency.[17] Although CEMEX believes that changes

---

[13] As discussed below, these factual issues should also preclude granting the government's Motion.

[14] *See* Hofmann Declaration, Exhibit C ¶¶ 12, 13, 14, 16, 17, 18.

[15] Smith Declaration, Exhibit B ¶ 10.

[16] *Compare Excerpt from the deposition of Walter Greer*, August 9, 2011, attached hereto as Exhibit D, at 226:21-227:3 (". . . there should be no effect on the amount of gas pulled through the system as a result of this change to the calciner."), *with* Smith Declaration, Exhibit B ¶ 10 ("This change would have . . . reduced air flow through the pyroprocessing system."), *and Excerpt from the deposition of Gerald Young*, July 27, 2011, attached hereto as Exhibit E, at 63:21-64:10 ("Q. Do you believe that the change to the refractory wall had any noticeable effect (Continued…)

to some of these parameters occurred and had beneficial impacts on NOx emissions,[18] according to CEMEX's PSD permitting expert, this did not rise to the level of altering the normal operations of the kiln:

> Q. So it would be your position that the modification to the combustion chamber, the internal geometry of the combustion chamber was not a change that rose to a magnitude that would cause one to believe that normal operations had not commenced?
>
> A. And again, not to confuse the issue with the fact that I believe that the changes had a beneficial effect in terms of reducing NOx, but in terms of the broad scope of what normal operations is, I feel that that was held in place in a sense, that there was no change in the operating characteristics on the whole for that unit.[19]

CEMEX's Plant Manager and Production Manager similarly will testify that the combustion chamber project did not alter the normal operations of the Lyons facility or hamper their ability to reasonably forecast post-project performance and that the projects would not result in an increase in emissions.[20] This evidence contradicts the government's conclusory statements that the facility had not commenced normal operations and establishes a material dispute of fact that precludes summary judgment.

---

on the total volume of gases flowing through the Lyons pyroprocessing system? A. . . . the volume decreases.").

[17] *Compare Excerpt from the deposition of Joan Phyllis Fox,* August 11-13, attached hereto as Exhibit F ("Fox Deposition"), at 371:14-372:1 ("Q. . . . You note here that CEMEX's experts characterize the changes at the kiln as efficiency improvements. Do you see that? A. Yes. Q. . . . Do you disagree that these changes were efficiency improvements? A. I do. Q. And for what reason? A. I believe that's laid out in detail in my report. But to summarize, I compiled and itemized the efficiency data, and that analysis does not show any improvements in efficiency."), *with* Lohr Declaration, Exhibit A ¶¶ 11, 12, *and* Smith Declaration, Exhibit B ¶ 9, *and* Hofmann Declaration, Exhibit C ¶ 14.

[18] Lohr Declaration, Exhibit A ¶¶ 11, 12; Smith Declaration, Exhibit B ¶ 9, 10; Hofmann Declaration, Exhibit C ¶ 14.

[19] *Excerpt from the deposition of John Hofmann*, August 11-12, 2011, attached hereto as Exhibit G ("Hofmann Deposition"), at 453:10-21.

[20] Lohr Declaration, Exhibit A ¶¶ 11, 12; Smith Declaration, Exhibit B ¶ 10.

(2)    **Lyons Expansion Project**

The only evidence the government cites in support of its contention that the Lyons

Expansion Project, particularly oxygen enrichment, altered the normal operations of the facility

is the following statement from one of CEMEX's oxygen enrichment patents:

> [The] invention and its embodiments includes an apparatus and a method for
> improving combustion in a cement kiln system . . . [and] includes introducing
> oxygen into the precalciner of a cement kiln system.

*Docket* #169 at 11 (citing Exhibit 7).  Based solely on this statement and without providing any

analysis of how the change allegedly "altered the underlying design and functionality of the

Facility," the government summarily concludes that the "modified facility did not begin 'normal

operations' until after the modification was completed."  *Docket* #169 at 11.  However, the mere

fact that a project is new or patented does not reveal anything about its potential impact on the

overall operations of a facility.  In fact, the very basis for CEMEX's patent is that it was able to

improve the existing combustion process in a way that *did not alter* the existing operations like

previous attempts at using oxygen in cement kilns.

As CEMEX discussed in its patent cited by the government, oxygen enrichment had

previously been attempted by cement companies in the *main rotary kiln*.[21]  That approach had

several "drawbacks" because it exacerbated the already high flame temperatures in the kiln,

which would "adversely impact refractory life" and "promote[] increased NOx formation."[22]

---

[21] The pyroprocessing system at the Lyons facility had two primary components: (1) a
vertical structure called a preheater or precalciner that contained a combustion chamber in which
raw materials are initially processed at relatively low temperatures; and (2) a horizontal rotary
kiln in the which the materials are further processed at relatively higher temperatures.  The vast
majority of NOx is formed in the main rotary kiln due to the high temperatures there, whereas
the precalciner can actually destroy NOx.  Hofmann Deposition, Exhibit G at 230:20-231:8 ("Q.
Okay. In opinion 1, you state 'Relative to the rotary kiln, [the]precalciner produces very small
amounts of NOx, and under certain configurations (such as the one employed at the Lyons
plant), have the capability of destroying NOx formed in the rotary kiln and reducing overall NOx
emissions from the manufacturing process.'  Is that your opinion? . . . A.  Yes.").

[22] *Docket* #169, Exhibit 7 at CMXLYO00628921.

- 16 -

CEMEX's patented approach was *different*.  First, instead of *injecting* oxygen into the main rotary kiln, CEMEX *enriched* an existing air stream that was already supplying ambient air (and oxygen) to the pyroprocessing system.[23]  Second, CEMEX developed a method to enrich the air feeding into the combustion chamber in the *vertical precalciner* section of the pyroprocessing system, *not in the horizontal main rotary kiln*.  As CEMEX explained in its patent:

> Some reports have also indicated technical concerns arising from oxygen enrichment in the *kiln*, such as refractory life, burning zone shift and coating stability. . . . By contrast, so far as is known, nobody has attempted oxygen enrichment of combustion in the *precalciner*.[24]

Notably, the patent also explained why CEMEX's process was unlikely to increase NOx emissions: "Oxygen enrichment in the precalciner has a reduced risk to refractory life or to increased NOx formation, mainly due to the low temperature combustion."[25]

The innovative thrust of CEMEX's patent was that it did not significantly alter the normal operations of the pyroprocessing system, and instead only improved the current operation of the precalciner system by enriching an existing air stream with additional oxygen.  According to CEMEX's combustion and PSD permitting experts, as well as the Plant Manager and Production Manager at that time, the facility had a reasonable basis to conclude that oxygen

---

[23] CEMEX's combustion expert, Dr. Kevin Davis, explained the distinction:

A. . . . And it's probably good to clarify, oxygen injection versus oxygen enhancement.  You can direct – you can directly inject oxygen into the combustion system or you can inject oxygen into an airstream upstream of the combustion to enhance, in other words, increase the oxygen above the 21 percent that you'd see in the air.  Q.  And so the – the system that we see at Lyons is an enhancement or enrichment system?  A.  It's an enhancement or enrichment system.

*Excerpt from the deposition of Kevin Davis,* July 21-22, 2011, attached hereto as Exhibit H ("Davis Deposition"), at 60:16-25.

[24] *Docket* #169, Exhibit 7 at CMXLYO00628921 (emphasis added).

[25] *Docket* #169, Exhibit 7 at CMXLYO00628921.

enrichment in the precalciner would not increase NOx emissions.[26]  Other changes that were

allegedly part of the Lyons Expansion Project, such as changes to the raw mill and finish mill

systems, did not affect kiln operations or NOx emissions.[27]  These facts clearly establish that a

genuine dispute exists regarding the normal operations of the facility and bar summary judgment.

(3)   <strong>Booster fan</strong>

The final project potentially within the scope of the alleged modification in the

government's Motion is the addition of a booster fan in 2000.[28]  Again, the government has failed

to cite any evidence supporting its assertion that this change altered the normal operations of the

Lyons facility.  In contrast, CEMEX's former Plant Manager, former Production Manager, and

its PSD permitting expert all will testify that this project did not alter the normal (pre-project)

operations of the facility.[29]  They will explain that the booster fan improved the existing flame

characteristics and helped stabilize the kiln in a way that would reduce NOx emissions, but that it

did not materially alter the normal operations of the facility.[30]

None of these projects, individually or collectively, materially altered the Lyons facility.[31]

At all times relevant to this matter, the Lyons facility remained a single-stage

preheater/precalciner kiln.[32]  The government did not and cannot cite anything to the contrary.

---

[26] Davis Deposition, Exhibit H, at 86:13-87:8; Hofmann Declaration, Exhibit C ¶ 16; Lohr Declaration, Exhibit A ¶ 14; Smith Declaration, Exhibit B ¶ 12.

[27] Lohr Declaration, Exhibit A ¶ 15; Smith Declaration, Exhibit B ¶¶ 12, 13; Hofmann Declaration, Exhibit C ¶ 16.

[28] The Amended Complaint only alleged PSD violations with respect to changes made at the facility between 1997 and 1999.

[29] Lohr Declaration, Exhibit A ¶ 16; Smith Declaration, Exhibit B ¶ 14; Hofmann Declaration, Exhibit C ¶ 17.

[30] *See, e.g.*, Smith Declaration, Exhibit B ¶ 14.

[31] Lohr Declaration, Exhibit A ¶¶ 11, 12, 14, 15, 16, 20; Smith Declaration, Exhibit B ¶¶ 8, 10, 12, 14, 18; Hofmann Declaration, Exhibit C ¶¶ 14, 16, 17.

[32] Lohr Declaration, Exhibit A ¶ 11; Smith Declaration, Exhibit B ¶ 18.

Unlike the change at issue in *Puerto Rican Cement* in which a new "dry" kiln was created from two existing "wet" kilns, *see* 889 F.2d at 293, the changes CEMEX implemented were designed to enhance the existing operations of the kiln.  CEMEX's personnel with direct responsibility, oversight, and experience with the system and the projects were comfortable predicting the impact of each change on actual emissions, and CEMEX's PSD permitting expert will testify that those predictions were reasonable.[33]  This evidence demonstrates that there are genuine issues of material fact that preclude summary judgment.

> **3.    There are disputed issues of material fact relevant to defining the scope of the alleged modification that further preclude summary judgment**

Additional questions of fact arise from the government's failure to define the changes allegedly part of the major modification that forms the basis of this enforcement action.  Nor has it ever defined which projects should be aggregated.  The aggregation issue is a critical input to the inquiry of whether the Lyons facility had commenced normal operations and cannot be presumed away as the government improperly asks the Court to do in resolving its Motion.

The government's description of the alleged changes has constantly shifted over the course of this case.  In its initial Complaint, the government alleged that CEMEX undertook "*one or more* major modifications" at the Lyons Facility "[b]eginning in 1997, and ending some time in 1999." *Docket* #1 at 12 ¶ 57 (emphasis added).  The government vaguely alleged that the relevant changes included "upgrading the Raw Mill System, the Kiln System, the Finish Mill System and the Oxygen Plant" but did not specify any particular changes to those systems, or whether they should be aggregated for PSD applicability purposes.[34]  *Id*. at 12-13 ¶ 57.  When the government amended its Complaint, it replaced numerous references to "modifications" with the

---

[33] Lohr Declaration, Exhibit A ¶¶ 7, 11, 12, 14, 15, 16, 17; Smith Declaration, Exhibit B ¶¶ 8, 10, 12, 17, 18; Hofmann Declaration, Exhibit C ¶¶ 14, 16, 17, 21.

[34] Although the Amended Complaint refers only to changes made between 1997 and 1999, the government's Motion refers to a booster fan project that occurred in 2000 as part of the alleged major modification.

singular "modification" without any explanation for the change, and again stayed silent as to whether the projects at issue must be aggregated.[35]  The government's instant Motion appears to identify six changes that constitute an alleged (and singular) modification: (1) combustion chamber refractory change, (2) use of oxygen enrichment, (3) addition of a raw mill air compressor, (4) increase in raw mill transport line size, (5) replacement of finish mill separator, and (6) addition of a booster fan.  *Docket* #169 at 7-8.  The necessary implication, therefore, is that the government is asking this Court to treat these changes as a single change, or "aggregated" change, for the purpose of deciding whether CEMEX had in fact begun normal operations.  *See id.* at 1, 2.[36]

The problem with this approach is that it puts the cart before the horse.  If the government wants this Court to treat all of the changes identified in its Motion as a single change for PSD enforcement purposes, the government must prove the factual basis for that aggregation.  The government has not alleged any facts to meet that burden.  Until it does, the Court is in no position to determine whether the facility had commenced normal operation because it cannot assess whether the amorphous "modification" changed the facility's operations.

---

[35] *Compare* Complaint (**#1**) ¶¶ 16, 53, 57, 58, 59, 65, and 67 (referring to "modifications"), *with* Amended Complaint (**#16**) ¶¶ 16, 53, 57, 58, 59, 65, and 67 (referring to "modification").

[36] The government's Motion did not identify the ID fan motor replacement in 1997 as one of the relevant projects in the scope of the alleged modification.  *Docket* #169 at 7-8.  CEMEX contends that this project was exempt from PSD review under the exception for routine, repair, and replacement activities.  Hofmann Deposition, Exhibit G at 259:8-21 ("Q. Typically, would a change of this nature, in your opinion, be exempt or nonexempt?  A. . . .  [T]here is a significant possibility that this change would simply satisfy the routine maintenance and repair provisions under 40 CFR 5221"); *Docket* #169, Exhibit 2 (Colo. Code Regs. § 1001-5) at 188.  The ID fan motor was replaced after it suffered an emergency failure, and accordingly it could not have been planned or aggregated with any of the other projects.  Lohr Declaration, Exhibit A at ¶ 13; Smith Declaration, Exhibit B at ¶ 11; Hofmann Declaration, Exhibit C at ¶ 15.  The replacement motor did not alter the way the facility operated.  *Id.*

### a.   Project aggregation involves a highly fact-intensive inquiry

Project aggregation is a function of EPA enforcement policy.[37]  EPA has stated in several policy statements that if a project has been split into multiple smaller projects for the purpose of circumventing PSD requirements, those projects should be aggregated into a single project that is subject to PSD enforcement.[38]

The factors EPA uses for aggregation are: (1) whether the facility filed multiple minor source or minor modification permit applications at or near the same time that relate to the same process or unit at a facility; (2) whether the facility treated the projects as a single project for purposes of financing, including whether individual projects are economically viable without the other projects; (3) whether public reports to consumers, stockholders, and the government project operation or production levels higher than permitted levels; (4) statements made by company representatives to EPA or to state or local permitting agencies regarding plans for operation; and (5) whether the projects had an "intrinsic relationship."[39]  Each of these criteria requires a review of the facts underlying the projects.[40]

The changes identified in the government's Motion have been addressed extensively in both fact and expert discovery, and the parties continue to dispute various factual issues relevant

---

[37] The definition of "major modification" in the Colorado SIP applies to "any" physical or operational change, not to a combination of changes.  *Docket* #169, Exhibit 1 (Colo. Code Regs. § 1001-2) at 96; *Docket* #169, Exhibit 2 (Colo. Code Regs. § 1001-5) at 188.  The government does not cite to any Colorado SIP or Clean Air Act provision requiring the aggregation of legitimately distinct projects for PSD applicability purposes, for there are none.

[38] *See, e.g., U.S. EPA, Memorandum from John Rasnic (Stationary Source Compliance Division Director) to George Czerniak (Air Force Branch Chief, Region V), Applicability of New Source Review Circumvention Guidance to 3M – Maplewood, Minnesota*, June 17, 1993, attached hereto as Exhibit I, at 2.

[39] Exhibit I at 3-4.

[40] *See U.S. EPA, Memorandum from Terrell E. Hunt (Air Enforcement Division, Office of Enforcement and Compliance Monitoring) and John S. Seitz (Stationary Source Compliance Division, Office of Air Quality Planning and Standards), Guidance on Limiting Potential to Emit in New Source Permitting*, June 13, 1989, attached hereto as Exhibit J, at 14 ("EPA's determination that a purportedly federally enforceable construction permit is a sham is made based on an evaluation of specific facts and evidence in each individual case.").

to a determination of whether the changes should be aggregated into a single project for PSD applicability purposes. The government's pending Motion, however, surreptitiously omitted any discussion of project aggregation and provided no legal or factual basis for aggregating any of the alleged changes. Instead, the government improperly assumes that the several different physical or operational changes that occurred between 1997 and 2000 at the Lyons facility should be considered a single project or "modification" for determining PSD applicability. *See Docket* #169 at 1 (referring to "the modification at the Lyons Facility that is at issue in this case"); *First Amended Complaint* (**#16**) at 13 (referring to "this modification"); *id.* at 14 (referring to "the modification"). This is impermissible: "the decision to aggregate activities is highly case-specific and requires consideration of factors that are difficult to fully characterize with a bright-line test." 74 Fed. Reg. 27,376, 27,378 (Jan. 15, 2009).[41]

Notwithstanding EPA's own admonition, it now asks this Court to ignore that factual inquiry and presume that the projects should be aggregated. It is no wonder the government would take that position, because any rationale inquiry into aggregation in this case will demonstrate that several of the projects should not be aggregated, as discussed below, and would prevent this Court from granting this motion.

### b. There are disputed issues of fact as to whether all of the projects identified in the government's Motion must be aggregated

The evidence shows that not all of the projects identified in its Motion must be aggregated for PSD purposes. Instead, the evidence supports CEMEX position that the combustion chamber and booster fan projects were separate and should not be aggregated with the Lyons Expansion Project (the use of oxygen enrichment and the raw mill and finish mill changes). Below we discuss why that is the case.

---

[41] Although the Rule in which this statement was made has been stayed, *see* 75 Fed. Reg. 27,643 (May 18, 2010), this statement reflects EPA's general position regarding aggregation decisions, and not just the application of the standards set forth in that Rule.

(1)     **The combustion chamber refractory improvement was an independent project that addressed a longstanding problem unrelated to the other changes**

The government's Motion does not identify any factual basis for aggregating the combustion chamber improvement with the LEP or booster fan project.  Based on EPA's deposition testimony, it appears the government's aggregation theory is based solely on the assertion that CEMEX improved the combustion chamber to increase production, and as a result the project should be aggregated with other changes that had the same purpose.[42]  However, a much broader set of facts are relevant to the aggregation issue than simply whether two changes had a common goal of increasing production and were undertaken in a certain time period.[43]

CEMEX's primary purpose for the combustion chamber improvement was *not* to increase production, but rather to mitigate the historic burnover issue and thereby reduce the potential damage to downstream systems and increase fuel efficiency.[44]  Nor was the combustion chamber improvement planned in conjunction with any other project for the purpose of increasing the overall productive capacity of the Lyons facility.[45]  CEMEX's Fed. R. Civ. P. 30(b)(6) deponent testified that the combustion chamber and the oxygen enrichment "were entirely independent projects."[46]  CEMEX's PSD permitting expert further testified that this would be an insufficient basis to aggregate it with other changes:

---

[42] *Excerpt from the Fed. R. Civ. P. 30(b)(6) deposition of EPA (Emilio Llamozas)*, December 10, 2010, attached hereto as Exhibit K ("Llamozas Deposition"), at 45:24-46:8 ("Q. . . . Does the United States assert that all of these activities constituted a single modification?  A. Realizing that these projects should be aggregated.  Q.  Based upon what?  A.  Based on the close proximity in time period of the modifications, and the goal that the modifications had of increasing clinker production at the kiln.").

[43] *See*, *e.g.,* Exhibit I at 2 (identifying five objective criteria indicating the need for aggregation for PSD enforcement purposes).

[44] Lohr Declaration, Exhibit A ¶ 12; Smith Declaration, Exhibit B ¶¶ 9, 10; Hofmann Declaration, Exhibit C ¶ 14.

[45] Lohr Declaration, Exhibit A ¶¶ 8, 9; Smith Declaration, Exhibit B ¶¶ 9, 10, 15, 16.

[46] *Excerpt from the Fed. R. Civ. P. 30(b)(6) deposition of CEMEX, Inc. (Stephen Goodrich)*, December 9, 2010, attached hereto as Exhibit L, at 53:17-18.

A.   There are, in any manufacturing operation, projects that have overlapping goals. That doesn't mean necessarily that every single project that happens to have an overlapping goal is, therefore, all one and the same project. That's simply not how the rule should be interpreted, if that's what you're getting at.

. . .

Q.  Well, did you, in your aggregation exercise, include the calciner?

A.  With the Lyons expansion project?

Q.  Yeah.

A.  I did not, because I felt that the primary driver of that project, which is listed in table 5-4 on page 5-22, was to eliminate the burnover problem. It happens to have an overlapping goal of potentially increasing production, gaining fuel efficiency, all the things we discussed yesterday.[47]

Moreover, the timing of the combustion chamber improvement and the subsequent use of oxygen was nothing more than a coincidence.[48]  CEMEX had been working for many years to resolve the burnover issue.[49]  The fact that CEMEX did not commission a company, Fuel Combustion Technology, to study this issue until 1996 and did not implement its recommendations until early 1997 was the result of the natural progression of attempts to correct the issue.[50]  It was entirely unrelated to CEMEX's decision to undertake other projects around the same time period.[51]

CEMEX's PSD permitting expert, Mr. Hofmann, provided detailed testimony on the factual basis for his opinion that the combustion chamber improvement should not be aggregated with the Lyons Expansion Project:

---

[47] Hofmann Deposition, Exhibit G at 382:14-20, 383:2-11.

[48] Lohr Declaration, Exhibit A ¶ 8; Smith Declaration, Exhibit B ¶¶ 10, 15.

[49] Lohr Declaration, Exhibit A ¶ 12; Smith Declaration, Exhibit B ¶¶ 9, 10.

[50] Smith Declaration, Exhibit B ¶ 10.

[51] Lohr Declaration, Exhibit A ¶¶ 8, 12; Smith Declaration, Exhibit B ¶¶ 9, 10, 15.

[T]he overlap seemed to be nonexistent between those two changes.   My recollection was that the company that performed the engineering studies, I believe it was FCT, to modify the walls of the calciner, they simply were looking at the physical dimensions of the unit in an attempt to solve the problem and did not look at oxygen as being a part of the solution.

. . .

Because the records seem to indicate that they had a burnover problem they were trying to solve for a period of time, at least a year prior to when they actually made the fix. And when I see a lot of information at a site that says hey, we've got this problem, we need to fix it, and those same documents make absolutely no mention of oxygen or any of these other things going on, to me, that's a pretty definitive indication that, indeed, this was a stand-alone fix to an existing problem that had apparently been an issue for quite some time.[52]

When the other factors set out in EPA's aggregation guidance memorandum are considered, it is even clearer that this project should not be aggregated.  For example, CEMEX did not intentionally split the combustion chamber improvement from any other change to circumvent the PSD program.[53]  The combustion chamber project was independently economically justified, based on costs savings associated with reducing downstream repairs caused by burnover.[54]  Mitigating burnover also reduced costs by increasing fuel efficiency.[55]

Another factor considered by EPA for aggregation is whether two changes are technically dependent.[56]  Here, none of the other changes alleged by the government were technically

---

[52] Hofmann Deposition, Exhibit G at 91:17-92:2, 94:14-95:2;  *id. at* 88:14-18 ("Q. . . . [D]id you exclude from your definition of 'Lyons expansion project' the modification of the calciner?  A. I believe I did, yes.").

[53] Lohr Declaration, Exhibit A ¶ 8; Smith Declaration, Exhibit B ¶¶ 10, 15; Hofmann Declaration, Exhibit C ¶ 18.

[54] Lohr Declaration, Exhibit A ¶ 10; Smith Declaration, Exhibit B ¶¶ 9, 16; Hofmann Declaration, Exhibit C ¶ 18.

[55] Lohr Declaration, Exhibit A ¶ 12; Smith Declaration, Exhibit B ¶ 9; Hofmann Declaration, Exhibit C ¶ 14.

[56] Exhibit I at 4.

dependent on the combustion chamber improvement.[57]  CEMEX's PSD expert Mr. Hofmann

explained why:

> Because the regulation and the guidance thereof looks at the technical relationship
> only in the narrow sense that one project requires the other one to be effective or
> to be worthwhile from an economic sense. And in reviewing the material I
> reviewed for this report, it looked very clear that this change in the geometry of
> the internals of the calciner was it stood alone, it had stand-alone effectiveness.[58]

In summary, the facts will demonstrate the combustion chamber project was independent

of the Lyons Expansion Project and the booster fan, and thus should not be aggregated with

those other projects for PSD applicability purposes.

### (2)    The booster fan project is unrelated to the Lyons Expansion Project and occurred after that project was completed

The government's Motion fails to provide any factual or legal basis to aggregate the

booster fan with any other change at the Lyons facility.  It appears that the basis for EPA's

aggregation of this project is the same as it is for the other changes: since the booster fan was

allegedly intended to increase production it should automatically be aggregated with other

projects that allegedly had the same purpose.[59]  CEMEX anticipates that the government will also

point to the fact that the booster fan was included in early planning documentation for the Lyons

Expansion Project and thus had some technical or economic dependence with the other

components of the LEP.[60]  CEMEX disputes each of these potential factual bases for aggregation

---

[57] Lohr Declaration, Exhibit A ¶ 9; Smith Declaration, Exhibit B ¶ 16; Hofmann Declaration, Exhibit C ¶ 18.

[58] Hofmann Deposition, Exhibit G at 98:21-99:7.

[59] Llamozas Deposition, Exhibit K at 45:24-46:8; Fox Deposition, Exhibit F at 482:15-18 ("Q.  The annulus boost fan.  Why is that included?  A.  The annulus boost fan is included because it increased clinker production and NOx emissions.").

[60] Fox Deposition, Exhibit F at 482:19-23 ("Q.  And what was the basis for that conclusion?  A.  The basis was, first, it [was] specifically identified in the AFE for the Lyons capacity increase project"); *see also id.* at 723:1-5 ("Q.  You say further down on page 28 that 'The annulus boost fan should be aggregated with other subject projects as it was always officially part of the LEP.'  Do you see that statement?  A.  Yes.").

and contends that a comprehensive assessment of this change demonstrates that it should not be aggregated.

The primary goal of the booster fan was *not* to increase clinker production, but rather to address an issue with the kiln flame that historically had resulted in unstable kiln operations, clinker quality problems, and potential safety issues.[61]  Adding a booster fan would improve the flame, which in turn stabilized kiln operations, improved clinker quality, and mitigated the potential risk of catastrophic damage.[62]  Due to these beneficial effects, the booster fan was independently economically justified.[63]

None of the other projects depended on the booster fan from a technical standpoint.[64]  The fact that the booster fan project was being contemplated around the same time that the Lyons Expansion Project was formulated is again simply a coincidence.[65]  As further proof of its technical and economic independence, the Lyons facility dropped the booster fan from the LEP planning documentation.  CEMEX's PSD permitting expert recognized this as an important fact that weighed against aggregation.[66]  Further, CEMEX did not split this project from the LEP to

---

[61] Lohr Declaration, Exhibit A ¶ 16; Smith Declaration, Exhibit B ¶ 14; Hofmann Declaration, Exhibit C ¶ 17.

[62] *Id.*

[63] Lohr Declaration, Exhibit A ¶¶ 10, 16; Smith Declaration, Exhibit B ¶ 16; Hofmann Declaration, Exhibit C ¶ 18.

[64] Lohr Declaration, Exhibit A ¶¶ 8, 9; Smith Declaration, Exhibit B ¶ 16; Hofmann Declaration, Exhibit C ¶ 18.

[65] Lohr Declaration, Exhibit A ¶¶ 8, 9; Smith Declaration, Exhibit B ¶¶ 14, 15; Hofmann Declaration, Exhibit C ¶ 18.

[66] Hofmann Deposition, Exhibit G at 376:3-9 ("Q. . . . Why, then, did you choose not to include this when you aggregated the projects that you examined in your expert report?  A. Because it would appear when the key elements of the Lyons expansion project were being installed, the boost fan was not a part of that list of projects.").

circumvent PSD permitting.[67]  The booster fan was not installed until well after the LEP was complete.[68]

CEMEX's PSD permitting expert explained at his deposition that the fact that the booster fan was implemented after the LEP undermines aggregation:

> And in fact, it supports the fact that all the other Lyons expansion elements were capable of standing alone, both technically and economically, because they did it. They went ahead and did it and started operating, including the, I would imagine, very expensive oxygen plant before they had any final indication that the annulus boost fan was going to be installed or even was going to be appropriately operational.
>
> . . .
>
> The projects were independent. That's the key, if you're talking about aggregation. They're substantially independent. That's the only criteria at the end of the day that needs to be evaluated in terms of project aggregation, and it's extremely clear in the record that the projects that were completed in the 1998/rough 1999 time frame were able to stand alone both economically and technically with or without the booster fan installation in 2000.[69]

In summary, the government asks this Court to resolve a complicated mixed question of law and fact to determine what test should apply to predicting future emission increases.  That determination rests first on whether any of the projects at issue had altered the normal operations of the Lyons facility, a determination the government would have this Court presume despite numerous contrary facts.  But even before the Court can resolve the normal operations inquiry, it has to know the scope of the project (or projects) at issue.  The government conveniently ignores that inquiry in hopes of glossing over the numerous disputes of fact that would further doom its

---

[67] Lohr Declaration, Exhibit A ¶ 8; Smith Declaration, Exhibit B ¶¶ 14, 15; Hofmann Declaration, Exhibit C ¶ 18.

[68] Smith Declaration, Exhibit B ¶ 14.

[69] Hofmann Deposition, Exhibit G at 379:7-15, 380:7-16; *see also id. at* 377:2-4 ("A.  I think there's a number of reasons why, even if the boost fan had been installed earlier, it could be identified as a separate project.").

Motion.  This Court cannot resolve the issues presented by the government's Motion because there are simply too many factual predicates in the way.  Any conclusion the Court reaches here prematurely may be undone by a future determination regarding those predicate facts.  As such, the government's Motion must be denied.

**B.     Resolution of the government's Motion will not eliminate the relevance of post-project actual emissions data**

The government asserts that granting its Motion will "simplify the scope of evidence presented at trial" because it will eliminate the need for actual post-project emissions data and related expert testimony.  *Docket* #169 at 2.  The government is incorrect.  Regardless of whether actual post-project emissions data are relevant to the single narrow question raised in the government's Motion (*i.e.*, the appropriate emissions increase test), the data are certainly relevant to answering the separate fundamental question of whether CEMEX was reasonable in predicting that none of the projects at issue in this case were causally linked to emissions increases.  *See Allegheny Energy,* 2008 WL 4960090, at *7.

One of the core factual disputes in this case involves the government's theory that there is a simple linear relationship between clinker production and NOx emissions.  Based on that theory, the government claims that CEMEX should have known that increasing production would automatically increase NOx emissions, resulting in the need for PSD permitting.  CEMEX fundamentally disagrees with that contention.

CEMEX will demonstrate that the relationship between clinker production and NOx emissions is not linear.[70]  NOx emissions from cement kilns are significantly influenced by

---

[70] Lohr Declaration, Exhibit A ¶ 18; Hofmann Declaration, Exhibit C ¶ 20;  Davis Deposition, Exhibit H at 308:10-13 ("The emissions factor is just multiplying a constant times the clinker production.  And the relationship between the NOx at the other end of that equation and the clinker is weak.").

multiple variables, only one of which is the rate of production.[71]  Predicting NOx emissions involves a complex understanding of the cement manufacturing process, and the specific engineering design and operational parameters of each individual facility.[72]  This is true both before and after the projects the government has targeted in this enforcement action were implemented.  The government's overly simplistic view of the relationship between cement production and NOx emissions ignores this reality.

One way to test the government's simplistic theory is to use actual emissions data.  Here, post-project data show that the government is simply wrong in asserting that because the alleged projects increased production, they necessarily must have increased actual emissions.[73]  The post-project emissions data show that the government's linear relationship theory is wrong.[74]

The post-project emissions data are also highly relevant to whether the projects at issue actually *caused* emissions to increase.  Causation is a necessary element of the government's PSD claim.  As EPA explains:  "[PSD] will not apply unless EPA finds that there is a causal link between the proposed change and any post-change increase in emissions."  57 Fed. Reg. at 32,326;[75] *see also id.* (explaining that subjecting "any post-change emissions increase, regardless

---

[71] Hofmann Declaration, Exhibit C ¶ 20; Davis Deposition, Exhibit H at 94:21-23 (". . . there are a number of factors that can fairly strongly impact NOx emissions in both directions."); *id.* at 306:3-308:7.

[72] Hofmann Declaration, Exhibit C ¶ 20; Davis Deposition, Exhibit H at 306:3-308:13.

[73] As discussed in Section A.3 above, it is not clear what emissions data actually qualify as "post-project" because it is not clear what project or projects the government is referring to.  To argue that post-project emissions data is not relevant presumes the factual dispute regarding the projects at issue and whether they should be aggregated has been resolved.  As that is a highly contested issue, blanket statements regarding the irrelevance of "post-project" emissions data are highly misleading.

[74] Lohr Declaration, Exhibit A ¶¶ 11, 12, 14, 15, 16, 17, 18; Smith Declaration, Exhibit B ¶¶ 10, 12, 13, 17, 18; Hofmann Declaration, Exhibit C ¶¶ 14, 16, 17, 19, 21.

[75] EPA promulgated its 1992 Final Rule to, among other things, "provide further clarification of the existing regulatory requirement that only those increases in emissions that actually result from the physical change or change in the method of operation can be considered in determining whether the proposed change subjects the utility to NSR requirements."  57 Fed. Reg. at 32,315.

of its origin," to NSR would "ignore the relevant statutory and regulatory modification provisions"); 67 Fed. Reg. 80,186, 80,203 (Dec. 31, 2002) ("Both the statute and the implementing regulations indicate that there should be a causal link between the proposed change and any post-change increase in emissions . . . ."). This principle is virtually uncontested in federal courts. *See New York v. EPA*, 413 F.3d 3, 32-33 (D.C. Cir. 2005) (upholding EPA's 2002 demand growth exclusion rule and noting that the environmental petitioners "never challenge EPA's interpretation of the statutory definition of modification . . . as requiring a 'causal link'") (internal citations omitted); *see also Allegheny Energy*, 2008 WL 4960090, at *6 ("Because the definition of 'major modification' contains a causation element, utilities may exclude from their emissions projection 'that portion of increased rate of utilization, if any, due to factors unrelated to the physical or operational change,' such as demand growth.") (citing 57 Fed. Reg. at 32,326); *Morgan*, 2007 WL 3287850, at *17 n.7.

This "causation" element, moreover, necessarily *precedes* any inquiry into the appropriate test for measuring predicted emissions increases (the limited subject of the government's Motion). A facility cannot know which emissions to forecast if it does not know which emissions are *caused* by the project. Further, if a facility determines that a project will *not* cause an increase in emissions, it has no need to forecast the magnitude of the non-existent increase. CEMEX's PSD permitting expert explained the logic of this sequence:

> Q. So is it your opinion that the changes made to the calciner reduced the emissions rate -- or reduced the rate at which NOx was formed in the pyroprocessing system?
>
> A. Directionally and overall, yes.
>
> Q. Do you have any opinion as to the magnitude of that change?
>
> A. That would be difficult to quantify, particularly if you try to isolate the effect of the change itself.

> Q. If it's difficult to quantify, then how do you know whether, in the aggregate, there is a PSD issue?
>
> A. Because if the direction is down, which I feel pretty certain of, you can't have an emissions increase.[76]

As Mr. Hofmann explained, if there is no causation, there is no need to reach the question of whether the change altered the normal operations of the facility:

> Q.  With respect to the use of oxygen enrichment, would you have considered that a situation where the use of oxygen enrichment would not constitute normal operations?
>
> A.  I think the oxygen enrichment work and project can actually be viewed in actually a different category all together.
>
> Q.  What category would that be?
>
> A.  From a regulatory point of view.  I think that on that one, again based on the information that the plant had before it, there may not have been, and I believe there is not, any sort of causal relationship between the project and the level of emissions.
>
> Q.  So you would kind of stop right there because you wouldn't look at it as a modification?
>
> A.  I think that that is something that is an affirmative way, an appropriate way of viewing that project.  As a consultant, as I said earlier, I would have recommended that the client discuss that with the state regulatory authorities, which is what happened in this case.[77]

Even the government's PSD permitting expert agrees that if a change is determined not to cause an increase in emissions, then PSD is not triggered and consequently there is no need to determine the appropriate test for predicting the net emissions increase.[78]

---

[76] Hofmann Deposition, Exhibit G at 192:14-193:7; *see also id.* at 75:19-21 ("Q.  So you would ask yourself if there was an element of causality? Is that what you're saying?  A.  Yeah, essentially, that's correct.").

[77] Hofmann Deposition, Exhibit G at 458:17-459:16.

[78] Fox Deposition, Exhibit F at 49:7-62:22 (testifying that even where a facility would otherwise fail the actual-to-potential test, PSD is not triggered absent causation).

The government acknowledges that causation is a required element of its claim and that it is "presently disputed and thus *not appropriate for summary judgment.*"  *Docket* #169 at 8 (emphasis added).  This dispute necessarily implicates actual post-project emissions data and related expert testimony for two reasons.  First, the post-project data will support the conclusion that CEMEX's prediction of the emissions consequences of the projects was reasonable.[79]  Second, as discussed above, post-project emissions data are relevant to rebutting the government's theory that there is a linear relationship between increased production and increased emissions.  Because this theory is one of the government's bases for arguing that CEMEX should have predicted the projects would cause an increase in emissions, the integrity of this theory, and thus the post-project emissions data, are critical here.

This Court will need to resolve the issue of causation regardless of whether the Government's motion is granted.  The post-change actual emissions data therefore will remain relevant in this case.  Accordingly, a resolution of the government's Motion will not simplify or reduce the evidence necessary at future proceedings.[80]

---

[79] CEMEX does not argue that the post-project emissions data can be used to calculate the facility's pre-project predicted actual emissions increase.  *See Ohio Edison*, 276 F. Supp. 2d at 865, 884-85 ("[E]ven though actual data exists as to the emissions resulting from the eleven projects, the law does not permit an after-the-fact analysis of the effect of a plant modification, which otherwise was required by law to obtain a preconstruction permit. . . .  [A]ctual emissions data, while interesting, is not dispositive of the matter to be resolved.").  Instead, the post-project actual emissions data in this case will support the reasonableness of CEMEX's pre-project predictions and decisions, and will rebut any argument that the projects in fact caused any emissions increase.  *See Allegheny Energy,* 2008 WL 4960090, at *7 (noting that actual-post project emissions data may support findings on the reasonableness of defendant's actions and predictions at the time it made the decision not to obtain a preconstruction permit).

[80] "Motions for partial summary judgment on some, but not all, legal theories arising from a single factual scenario are not favored unless . . . if granted, the scope of evidence to be presented at trial will be significantly reduced."  MSK Civ. Practice Standard V.I.3.3.b.; *see also Chorbajian v. Pan Am. World Airways, Inc.,* 19 F.R.D. 321, 321 (S.D.N.Y. 1956) (there is no "gainful result in piecemeal adjudication").

**CONCLUSION**

The government's Motion for Partial Summary Judgment should be denied because there are genuine issues of material fact regarding whether the Lyons plant had commenced normal operations at the time the projects at issue in this case were implemented.  This question is highly fact dependent, and heavily disputed.  CEMEX will present ample evidence at trial that the facility had in fact begun normal operations with respect to the projects at issue.

Nor would granting this Motion reduce the complexity of this case or trial.  The government's argument that post-modification actual emissions data would be irrelevant should the Court grant this Motion fails.  Actual post-project emissions data are highly relevant to the threshold causation element in the PSD inquiry and to the government's linear relationship theory.  They are thus relevant regardless of which PSD applicability test applies in this case.  Accordingly, CEMEX respectfully asks this Court to deny the government's Motion.

Dated:  December 23, 2011                     Respectfully submitted,


                                        By:  /s/ Chet M. Thompson
                                             Chet M. Thompson
                                             Crowell & Moring LLP
                                             1001 Pennsylvania Ave., NW
                                             Washington, DC  20004
                                             Telephone:  (202) 624-2655
                                             Facsimile:  (202) 628-5116
                                             E-mail:  cthompson@crowell.com
                                             Attorney for Defendant CEMEX, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 23, 2011, true and correct copies of the foregoing CEMEX, INC.'S RESPONSE IN OPPOSITION TO UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT was served electronically upon the following persons:

John N. Moscato
John.Moscato@usdoj.gov, courtney.przybylski@usdoj.gov,
stephanie.taylor@usdoj.gov

James D. Freeman
james.freeman2@usdoj.gov, stephanie.taylor@usdoj.gov

Leigh Rende
leigh.rende@usdoj.gov

Chet M. Thompson
cthompson@crowell.com

Richard E. Schwartz
rschwartz@crowell.com

David Patrick Ross
dross@crowell.com

Derek A. Hahn
dhahn@crowell.com, csolorio@crowell.com

Hugh Q. Gottschalk
gottschalk@wtolaw.com, hart@wtolaw.com, gottesfeld@wtolaw.com

Jessica Scott
scott@wtotrial.com, farina@wtotrial.com

*/s/ Chet M. Thompson by Paula Hagar*
Chet M. Thompson
Crowell & Moring LLP
1001 Pennsylvania Ave., NW
Washington, DC  20004
Telephone:  (202) 624-2655
Facsimile:  (202) 628-5116
E-mail:  cthompson@crowell.com

*Attorney for Defendant CEMEX, Inc.*