**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 09-cv-00019-MSK-MEH

UNITED STATES OF AMERICA

                        Plaintiff,

      v.

CEMEX, INC.,

                        Defendant.

---

**UNITED STATES' REPLY IN SUPPORT OF**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

## INTRODUCTION

The United States Environmental Protection Agency's ("EPA") Prevention of Significant Deterioration ("PSD") regulations require certain sources undertaking a modification to estimate the maximum amount of emissions that could result by comparing the unit's pre-change actual emissions to its post-change "potential to emit." This so-called "actual-to-potential" test is a cornerstone of the permitting system established under the PSD regulations, and has been articulated in numerous EPA interpretive statements over the years. CEMEX, however, mischaracterizes the United States' motion for partial summary judgment which seeks to establish the actual-to-potential test as the appropriate measure of emissions increases in this case as an "end run" around the Clean Air Act that attempts to "excise a critical element of the regulations." CEMEX, Inc.'s Response in Opposition to United States' Motion for Partial Summary Judgment (Doc. No. 174) ("Response") at 1, 11. It is, in fact, CEMEX that attempts to avoid the reasonable and well established interpretation of the Clean Air Act and its regulations.

## SUMMARY OF ARGUMENT

The PSD regulations define the appropriate emissions test as a comparison of "actual emissions."  The regulations define "actual emissions" "[f]or any emissions unit that has not begun normal operations" as "the potential to emit of the unit."  40 C.F.R. § 52.21(b)(21)(iv). EPA interprets this definition to mean that changes to a unit that are not routine or otherwise exempt are of such significance that pre-change emissions cannot be relied upon to project post-change emissions.  For these units, "normal operations" are deemed not to have begun until after the change.  EPA has consistently interpreted the regulations to presume that such units will operate year-round at full capacity, i.e., the unit's full emissions potential.  A source may overcome this presumption by agreeing to an enforceable restriction prior to construction that will limit its potential to emit to a level that does not exceed PSD significance thresholds.  As a result, for a modification that is not routine or otherwise exempt, the post-change potential to emit is the relevant point of comparison for determining whether the modification will result in a significant net increase in pollution within the meaning of the PSD regulations.

CEMEX's contention that this presumption is inconsistent with EPA's "long-standing interpretation of its own PSD regulations [ ] and case law," Response at 2, is wrong.  EPA has articulated this presumption in numerous Federal Register notices and other guidance documents. CEMEX may choose to ignore EPA's interpretive statements in its brief, but it cannot contend they do not exist.  Nor can it deny that case law supports EPA's interpretation.  In *Puerto Rican Cement Co. v. EPA*, the leading case considering the appropriate test for determining whether an emissions increase exists for the purposes of determining PSD applicability, the First Circuit found EPA's application of the "potential to emit" test to modified units to be reasonable.  The court recognized that when calculating the amount of an increase attributable to a modification,

that "amount will generally be the potential to emit of the new or modified unit." *Puerto Rican Cement Co. v. EPA*, 889 F.2d 292, 297 (1st Cir. 1989) (quoting 45 Fed. Reg. 52,676 at 52,677 (August 7, 1980)).  This Court, like the court in *Puerto Rican Cement*, should defer to EPA's longstanding interpretation of its regulations.

Courts have assessed the significance of contested changes in several PSD cases. CEMEX attempts to morph this discussion into what it characterizes as a "controlling question": whether a change "significantly alters" or "materially alters" operations of the facility.  Response at 2.  CEMEX further argues that the relative significance of the changes is a fact-intensive analysis. *Id.*  As noted above, this is not the correct legal analysis.  When a source proposes to institute non-routine or otherwise non-exempt changes[1] at an emissions unit, the controlling regulations deem the emissions unit not to have "begun normal operations" until after the change.  As such, non-exempt changes are deemed to be sufficiently significant to trigger the actual-to-potential test.

Even if an assessment of the significance of the changes was required to determine whether an emissions unit had "begun normal operations," here CEMEX knew production capacity would increase following the implementation of the 1997-2000 projects.  While CEMEX now insists that any increase in production was not the "primary purpose" of the projects, Response at 23, 24, 27, the suggestion that the capacity increase was just a happy coincidence is revisionist history.  The contemporaneous record contains numerous, undisputed analyses of the impact the changes would have on the Lyons facility's capacity to produce

---

[1] The PSD regulations exempt certain changes from the definition of "major modification," including routine maintenance, repair and replacement, use of an alternative fuel or raw material in certain circumstances, changes in facility ownership, and certain pollution control projects. 40 C.F.R. § 52.21(b)(2)(iii).

clinker.  While CEMEX's employees and experts now cloak the projects in benign-sounding

terms – "enhancements" or "efficiency projects" – CEMEX cannot dispute that, at the time these

changes were made, it anticipated and intended that the projects would increase capacity.

Moreover, CEMEX admits that the rate of production is one of the variables that "significantly

influence" NOx emissions.  Response at 29-30.  Thus, there is ample undisputed evidence that

the 1997-2000 projects were significant and material.  It is thus wholly appropriate to require

CEMEX to presume that the Lyons facility had "not begun normal operations" for the purpose of

analyzing the impact of the changes on the kiln's emissions before implementing the projects: at

higher production levels the actual emissions prior to the changes would not accurately represent

post change emissions.

## I.   THE LYONS FACILITY HAD NOT BEGUN NORMAL OPERATIONS PRIOR TO THE CHANGES AT ISSUE IN THIS CASE

### A.   EPA Regulations Require a Source to Compare a Unit's Maximum Potential Emissions to the Unit's Pre-Change Actual Emissions if it Undertakes a Modification that Is Not Exempt from PSD Requirements

EPA's 1980 PSD regulations define a net emission increase, in relevant part, as "[t]he

increase in actual emissions from a particular physical change or change in the method of

operation."  40 C.F.R. § 52.21(b)(3)(i)(a).[2]  For emissions units that have "not begun normal

operations," the regulations require that "actual emissions shall equal the *potential to emit* of the

unit."  40 C.F.R. § 52.21(b)(21)(iv) (emphasis added).  To determine whether a modification

---

[2] The provisions of the Colorado State Implementation Plan ("SIP") govern this case.  However, the PSD provisions in the Colorado SIP during the relevant time period track the federal PSD regulations.  In its opening brief, the United States cited to both federal and state PSD provisions. *See* United States' Motion for Partial Summary Judgment (Doc. No. 169) ("U.S. Motion") at 3-6. This brief cites to the federal PSD regulations, as its focus is on EPA's interpretation of those regulations.

would result in a significant emissions increase, the preamble to the 1980 regulations provides that the source must first quantify the "amount of the proposed emissions increase."  45 Fed. Reg. at 52,677.  Significantly, EPA recognized that "[t]his amount will generally be the potential to emit of the new or modified unit."  *Id*.  Thus, at the time the regulation was adopted, EPA made clear that a modified unit's potential to emit would be the point of comparison for determining whether there would be an emissions increase.

In a 1996 rulemaking, EPA stated that "when an emissions unit (other than an electric utility steam generating unit) 'has not begun normal operations,' actual emissions equal the PTE [potential to emit] of the unit."  61 Fed. Reg. 38,250 at 38,254 (July 23, 1996).  EPA affirmed that it interprets this provision as creating an "initial presumption that because the changed unit 'has not begun normal operations' following the change, it will operate at its full capacity year round, i.e. at its full potential."  *Id*.  EPA reiterated this interpretation of the definition of actual emissions two years later:

> [C]hanges to a unit at a major stationary source that are non-routine or not subject to one of the other major source NSR exemptions are deemed to be of such significance that pre-change emissions for the affected units should not be relied on in projecting post-change emissions.  For such units, "normal operations" are deemed not to have begun following the change, and are treated like new units. Put another way, the regulatory provision for units which have "not begun normal operations" reflects an initial presumption that a unit that has undergone a non-routine physical or operational change will operate at its full capacity year-round.

63 Fed. Reg. 39,857 at 39,858 (July 24, 1998).  EPA further stated:

> The NSR regulations contain only two applicability tests for modified units.  One of these, the actual-to-future-actual approach, is limited to electric utility steam generating units.  *See, e.g.*, 40 CFR [§] 51.165(a)(1)(xii)(E).  The other alternative is the actual-to-potential methodology, applicable when the source has "not begun normal operations."  This approach applies to all changes at major sources that are not otherwise excluded from being considered a physical or operational change, such as routine maintenance, repair, and replacement.  Under the current rules,

therefore, *it is improper for a non-utility source to employ anything but an actual-to-potential test for examining physical or operational changes.*

*Id.* at 39,859, n.4 (emphasis added). *See also* Jan. 1999 EPA Enforcement Alert, at 3 (attached as Exhibit 11) (stating "changes to a unit at a major stationary source that are non-routine or not subject to one of the other major source NSR exemptions are deemed to be of such significance that 'normal operations' of the modified unit have not begun and, therefore, post-change emissions should equal the modified unit's potential to emit."); 2000 Detroit Edison Applicability Determination at 18, n.14 (attached as Exhibit 12) ("Under current regulations, changes to a unit that are not routine nor subject to one of the other NSR exemptions are considered to be of such significance that pre-change emissions should not be relied on in projecting post-change emissions. For such units, 'normal operations' refers to operations after the change, and are deemed not to have begun. The regulations initially presume that such units will operate year-round at full capacity, but a source owner is free to overcome the presumption by agreeing to limit its potential to emit to any level desired through enforceable restrictions on operations or the use of pollution controls.").[3]

---

[3] Contrary to CEMEX's suggestion that EPA's interpretation of "[begun] normal operations deprives it of any meaning," Response at 8, the 1998 notice that reiterated EPA's interpretation as to units with non-exempt changes also recognized that units at a source can be deemed to have begun normal operations if they are not undergoing, or otherwise affected by, a physical or operational change. 63 Fed. Reg. at 39,858. Rather than applying an actual to potential to emit estimate of the emissions increase, these units in effect "fall out of the applicability calculus." *Id.* For example, if a source has four units, two with physical changes and two unchanged and unaffected by the changes, the latter two units are deemed to have begun normal operations and do not need to compare actual emissions before the changes to the other units to the potential to emit of the unchanged and unaffected units to determine if the source has a net significant emission increase.

The Supreme Court has recognized that an agency's interpretation of its own regulations is controlling unless "plainly erroneous or inconsistent with the regulation."  *Auer v. Robbins*, 519 U.S. 454, 461 (1997).  The Tenth Circuit has similarly afforded "great deference" to agency guidance documents that interpret the agency's own regulations.  *See Newton v. FAA,* 457 F.3d 1133, 1136 (10th Cir. 2006).  *See also HRI, Inc. v. EPA*, 198 F.3d 1224, 1241 (10th Cir. 2000) ("[i]n addition to this deference to an agency's construction of statutes, we also owe deference to its construction of its own regulations").  This Court should similarly defer to EPA's longstanding interpretation of its own regulations since it is neither plainly erroneous nor inconsistent with the regulation.

> **i.**     **The United States' position is consistent with the leading cases that have interpreted 40 C.F.R. § 52.21(b)(21)(iv).**

In *Puerto Rican Cement*, the First Circuit assessed whether EPA lawfully interpreted the PSD regulations when it determined that the proposed modified kiln was an emissions unit which had "not begun normal operations."  889 F.2d at 296-300.  In doing so, the *Puerto Rican Cement* court analyzed whether EPA's application of the actual-to-potential test was a proper interpretation of the PSD regulations.  *Id*. at 296.  To make this determination, the court considered EPA's PSD regulations and the written materials explaining them, specifically the 1980 preamble to the final rule.  *Id*.  The court found that "EPA's application of its regulation to the facts of this case complies with the expressed intent of the regulation's writers as well."  *Id*. at 297.  *Puerto Rican Cement* thus confirmed EPA's interpretation of the PSD regulations, holding that a modified facility has not begun normal operations and that the actual-to-potential test was therefore appropriate.  *Id*. at 297-99.

In *Sierra Club v. Morgan,* No. 07-C-251-S, 2007 WL 3287850 (W.D. Wis. Nov. 7, 2007), the court assessed whether the actual-to-potential test applied to five changes at a source. *Id*. at *17.  The court held that, because three of the five changes were not exempted from the PSD regulations as a routine replacement, maintenance, or repair, those three changes were "presumed to be sufficiently significant to support a finding that normal operations had not begun" and that, as a result, the "actual to potential" test applies. *Id*. at *19-20.  The *Sierra Club* court based this finding on EPA's interpretation of the definition of actual emissions set forth in the federal register.  *Id*. at *18 (citing to 63 Fed. Reg. at 39,859).

CEMEX questions the consistency of the United States' interpretation of the phrase "has not begun normal operations."  Yet, the publication of EPA's interpretation of 40 C.F.R. § 52.21(b)(21)(iv) in the 1996 and 1998 Federal Register notices and the 1999 Enforcement Alert demonstrate that EPA has consistently interpreted these PSD provisions and that EPA's interpretation does not contradict the regulations.  As discussed above, this consistency has also been recognized by the courts.

> **ii.     A source may only overcome the presumption that it will operate at its maximum potential emissions rate before beginning construction of the modification.**

A source that intends to make a change that is not exempt from PSD requirements may overcome the presumption that it will operate at its maximum potential emission rate by "agreeing to limit its [potential to emit], through the use of federally enforceable restrictions, to pre-modification actual emissions levels (plus an amount that is less than 'significant')."  61 Fed. Reg. at 38,254.  *See also* 63 Fed. Reg. at 39,858; *Sierra Club v. Morgan,* 2007 WL 3287850, at *19.  The effect of this approach is to ensure that any preconstruction emissions increase calculation is based either on a source's potential to emit, or on legally and practicably

enforceable terms and conditions already in place or put in place as part of the modifications planning and permitting process to assure the accuracy of projecting emissions at less than the emissions unit's maximum capacity.  It also ensures that the source's actual emissions will not increase by more than a significant amount, if any, above baseline levels following the change. 61 Fed. Reg. at 38,254. *See also* 63 Fed. Reg. at 39,858.

Because PSD consists of "pre-construction" requirements, the time for a source to assert that an emissions unit it proposes to modify will not operate at its maximum potential emissions after the change is before the source undertakes the modification.  It is well established that the PSD program requires an owner or operator to determine whether a preconstruction permit is necessary for a project before construction begins.  *See United States v. Cinergy Corp.*, 384 F. Supp. 2d 1272, 1275 (S.D. Ind. 2005) (citing to *United States v. S. Ind. Gas & Elec. Co.*, No. IP 99-1692-C-M/F, 2002 WL 1629817, at *3 (S.D. Ind. July 18, 2002)), *aff'd*, 458 F.3d 705 (7th Cir. 2006), *cert. denied*, 549 U.S. 1338 (2007); *United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829, 865 (S.D. Ohio 2003).  If a source does not challenge the presumption before construction by obtaining an enforceable emissions limitation, the presumption applies.  Here, CEMEX made changes to the Lyons facility that were not exempt from PSD requirements but did not obtain a limit on its potential to emit in advance of construction through the use of enforceable restrictions.  As a result, CEMEX failed to overcome the presumption that it would operate at its maximum potential emissions, so the presumption applies.

### iii.    At the time CEMEX began construction of the 1997-2000 projects, the actual-to-future-actual test only applied to electric utility steam generating units.

CEMEX argues that the "actual-to-future-actual" test should be used in this case, not the actual-to-potential test.  Response at 9-10.  CEMEX relies upon cases and EPA statements

interpreting the actual-to-future-actual test as they apply to electric utilities.  However, as

provided in the federal regulations in effect at the time CEMEX undertook the 1997-2000

changes, the actual-to-future-actual test was limited to electric utility steam generating units.[4]  40

C.F.R. § 51.165(a)(1)(xii)(E) (1996).  These authorities are therefore not applicable to this case.

*See United States v. Murphy Oil USA, Inc.*, 143 F. Supp. 2d 1054, 1104 (W.D. Wis. 2001)

(stating that "both the ruling in *Reilly* [*WEPCO*] and [EPA's] comments in the Federal Register

relate to electric utility steam generating units.  They cannot be applied directly to defendant's

sulfur recovery unit."). CEMEX's attempt to persuade this Court to adopt a test that was not

available to CEMEX at the time of the changes should be rebuffed.

**B.**    **CEMEX's 1997-2000 Projects Were Not Exempt from the PSD
         Requirements**

As discussed above, if a source makes a change to an emission unit that is not exempt

from PSD requirements, then the source must calculate its post-change emissions using the unit's

maximum potential emissions.  The actual-to-potential test thus applies to determine whether the

PSD pre-construction permitting requirements are triggered.  61 Fed. Reg. at 38,254; 63 Fed.

Reg. at 39,858.  CEMEX does not contend that the 1997-2000 projects meet any of the

exemptions set forth in 40 C.F.R. § 52.21(b)(2)(iii).  Therefore, because CEMEX's 1997-2000

projects were not exempt from PSD requirements, there is no genuine issue regarding the fact

that the source had no operating history reflecting the unit's "actual" emissions post-change.  As

---

[4] The actual-to-future-actual test was expanded to apply to non-electric utility steam generating
units in the federal regulations in 2002 as part as a comprehensive revision to the regulations
known as "NSR Reform."  67 Fed. Reg. 80,186 (Dec. 31, 2002).  However, these revisions have
not yet been approved into the Colorado SIP.  Consequently, even to the present day, the
Colorado SIP does not provide for the actual to future-actual test except for electric utilities.

a result, the presumption that the unit will operate at its maximum potential emissions rate after completion of the 1997-2000 projects applies.

## II.  EVEN IF CEMEX'S "SUFFICIENTLY SIGNIFICANT" TEST APPLIES, THE CHANGES AT ISSUE IN THIS CASE WERE SUFFICIENTLY SIGNIFICANT TO SUPPORT A FINDING THAT NORMAL OPERATIONS HAD NOT BEGUN PRIOR TO THEIR COMPLETION

CEMEX contends that the test for determining whether a facility has "not begun normal operation" prior to a change is whether the change "materially" or "significantly" alters operations of the facility.  Response at 13.   While some of the PSD cases do discuss the "significance" – or in one case lack of significance – of the changes at issue, this is not the test.  EPA's long-standing interpretation of its regulations is that, pursuant to 40 C.F.R. § 52.21(b)(21)(iv), a facility's actual emissions are its potential emissions when it proposes to undertake non-routine, non-exempt changes because the emissions unit has not begun normal operations in its changed state – pre-change emissions simply are not indicative of post-change emissions.

In reviewing CEMEX's position, an analysis of the case law is instructive.  The case law CEMEX has cited undermines its contention that the changes at the Lyons facility were not material or significant.  In particular, the cases do not support CEMEX's argument that efficiency projects or projects that the "facility reasonably believes . . . will not cause an emissions increase" do not trigger PSD obligations.  Response at 4.  More importantly, CEMEX tacitly admits that the changes at the facility, on their own terms, were quite significant.

### A.   The Case Law CEMEX Cites Does Not Support Its Argument

In *Puerto Rican Cement*, the court considered a modification that converted a wet kiln to a dry kiln and combined that kiln with another kiln.  889 F.2d at 293.  The modified kiln would

11

be considerably more efficient than the prior operations, emitting less air pollution than the two older kilns combined at any given level of production.  *Id.*  However, the production capacity of the modified single kiln could exceed the production capacity of the two prior kilns, and it had the potential to emit more pollution when operated at higher capacity levels.  *Id.*  The court found EPA's determination that the facility had not begun normal operations – and thus EPA's application of the actual-to-potential emissions test – to be reasonable.  *Id.* at 297.  The court noted that "a firm's decision to introduce new, more efficient machinery may lead the firm to decide to *increase the level of production*, with the result that, despite the new machinery, overall emissions will increase."  *Id.*  *Puerto Rican Cement* thus stands for the proposition that a facility must use the unit's maximum potential emissions where the facility institutes a change that allows an increase in production, even if the change improves efficiency at any given level of production.

Instead of examining *Puerto Rican Cement*'s analysis of so-called efficiency projects, which have clear parallels to the changes at issue at the Lyons facility, CEMEX focuses on an example the court gave – involving the replacement of a peak load generator at a utility with another peak load generator – that the court said "might test the reasonableness of EPA's regulation."  *See* Response at 10 (citing *Puerto Rican Cement*, 889 F.2d at 297-98).  CEMEX concludes that this means "the court made clear that it was not enough to simply evaluate whether any change had been made."  *Id.*  That is an overstatement; in fact, the court expressly stated that "those circumstances are not present here" and declined to reach the issue.  *Puerto Rican Cement*, 889 F.2d at 298.

CEMEX's reliance on *United States v. Murphy Oil USA, Inc.*, Response at 10-11, is somewhat perplexing in that  the court ruled – on summary judgment – that changes made to

12

"increase the capacity" of a refinery's sulfur recovery unit and other "functional changes" were sufficient to support a finding that the modified refinery had not "begun normal operations."  143 F. Supp. 2d at 1104.  The specific changes at issue in *Murphy Oil* included the installation of a larger combustion chamber in the sulfur recovery unit and an increase in the sulfur pit capacity, an increase in the heat exchange surface area, and the addition of deeper sulfur seal legs.  *Id*. at 1105.  While CEMEX is correct that the court did not *expressly* deem that any change other than a routine or otherwise exempt change would not have "begun normal operations," the court, nonetheless, found that  "[d]efendant did not simply replace old parts with equivalent new ones" and that the changes were variously "sufficiently significant", "significant enough", and "different enough", such that the post-construction unit was a new unit that had not begun normal operations at the start of construction.  *Id*. at 1104-05.  The court concluded by stating that EPA's interpretation of the PSD regulations to require an actual-to-potential test under the circumstances was not unreasonable.  *Id*. at 1105.

CEMEX puts great weight on *Wisconsin Elec. Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990) ("WEPCO").  In this case, the Seventh Circuit created an exception to the actual-to-potential test for "like kind replacements" undertaken at electric utilities.  The WEPCO court found that a modification that merely replaces components of an emitting unit that have deteriorated over time with identical, albeit new, components does not support a finding that the facility must use the unit's maximum potential emissions after the change.  *WEPCO* at 905-06, 917.  CEMEX does not contend that the projects it instituted in this case were "like kind replacements."  Indeed, CEMEX admits that it made physical changes to the combustion chamber that altered its aerodynamics, *see infra* Section II.B.; constructed an oxygen plant, *see* Response Exhibit 1, Lohr Declaration at 3, ¶14; and added an annulus boost fan, *see id*., at 4,

¶16.  Like the modifications in *Murphy Oil*, the CEMEX projects are not the like-kind replacements addressed in *WEPCO*.  *See Murphy Oil*, 143 F. Supp. 2d at 1104-05 (distinguishing *WEPCO* and applying the actual-to-potential test to changes that went beyond like kind replacements).  Because of this, CEMEX did not have an "established" operating history prior to the changes on which to assess their impact on emissions.

CEMEX cites *United States v. Cinergy Corp.*, 458 F.3d 705, 709 (2006), and *Pa. Dep't of Envtl. Prot. v. Allegheny Energy, Inc.*, No. 02:05cv885, 2008 WL 4960090, at *7 (W.D. Pa. Nov. 18, 2008), for the proposition that a facility need only develop a "reasonable estimate" of additional emissions attributable to a project when determining whether the project will cause a net significant increase triggering PSD.  *See* Response at 6.  But the facilities at issue in those two cases were electric generating units which apply an actual-to-projected-actual emissions PSD applicability test under 40 C.F.R. § 52.21(b)(21)(v) rather than an actual-to-potential emissions test under 40 C.F.R. § 52.21(b)(21)(iv).[5]  As the court in *Cinergy* noted, "[s]ince the regulation is concerned with the 'increase in *actual* emissions' rather than with a *potential* increase in emissions . . . the plant could not *automatically* be assumed to operate 24 hours a day after the modification was made."  *Cinergy*, 458 F.3d at 708 (citations omitted).  The "reasonable estimate" language that CEMEX quotes thus refers to the reasonableness of an electric utility's pre-construction assessment of its post-change actual emissions in the circumstance in which what the utility actually emits is at issue.  As a result, neither *Cinergy* nor *Allegheny Energy*

---

[5]  Even if the regulation discussed in *Cinergy* and *Allegheny Energy* were relevant to the instant case, the PSD provisions for electric utilities at issue in those cases was misconstrued in those decisions.  Like its arguments concerning aggregation, CEMEX is attempting to divert this Court's focus from the relevant regulations by referencing an inapplicable PSD concept that is not at issue here.

14

provides guidance on whether a modified non-electric generating unit has begun normal operations.

CEMEX's misunderstanding of *Cinergy* and *Allegheny Energy* leads it to incorrectly articulate the standard of proof.  CEMEX contends that the United States must "prove . . . that CEMEX was unreasonable when it determined that the proposed projects would not cause a significant net increase in NOx emissions."  Response at 7.  CEMEX re-states this standard at least four times in its brief, in various forms.  *See* Response at 13, 14, 15, 29.  Yet the purported standard is based solely on CEMEX's interpretation of the dicta in *Cinergy* and *Allegheny Energy* referenced above.  *See* Response at 6.  As this dicta was not intended to apply to the definition of actual emissions applicable to non-electric generating units at issue in this case – 40 C.F.R. § 52.21(b)(21)(iv) – the standard of proof is incorrect.[6]

**B.      CEMEX Tacitly Admits That The Changes Were Significant**

Central to CEMEX's argument is the contention that the contested projects did not constitute a change to normal operations of the Lyons facility because "the facility remained a single-stage preheater/precalciner kiln" after the projects were completed.  Response at 18.  This statement, which is echoed in the declarations of plant personnel, is overbroad and disregards the

---

[6]   The other problem with CEMEX's articulation of the standard of proof is that it presupposes that CEMEX did, in fact, conduct an analysis that "determined that the proposed projects would not cause a significant net increase of NOx emissions."  The United States has sought these analyses in discovery, and the only one produced was an analysis from CEMEX's permitting consultant – McVehil-Monnett Associates – that showed a NOx emission increase of 368 tons per year, well above the significance level for PSD applicability.  *See* Excerpt of Deposition of Keith A. Baughes (July 30, 2010) at 97:7-24 and Deposition Exhibit 44 (Letter from Keith Baughes to John Lohr, March 12, 1998, CMXLYO00038872-73) (both attached as Exhibit 13).  The apparent absence of contemporaneous documentation supporting CEMEX's claim that "it determined that the proposed projects would not cause a significant net increase of NOx emissions," *see* Response at 7, suggests that this claim is either a post-hoc analysis or a chimera.

requirements of the regulations.  CEMEX in effect suggests that as long as a project does not

change the broad parameters of the facility – its single-stage preheater/precalciner configuration

– the project does not materially alter the facility.  This formulation assumes away changes that

can increase production capacity or otherwise alter the facility's emission profile, as long as its

basic configuration remains the same.  None of the cases CEMEX cites support this formulation.

In *Murphy Oil*, for example, the defendant refinery increased the capacity of the sulfur recovery

unit and made other "functional" changes to it.  143 F. Supp. 2d at 1104.  Under CEMEX's

formulation of the rule, the changes discussed in *Murphy Oil* would not impact the refinery's

"normal operations" because, as CEMEX reasons, it was a refinery with a sulfur recovery unit

before the modification; it was a refinery with a sulfur recovery unit after.  The *Murphy Oil* court

did not agree with this formulation.  143 F. Supp. 2d at 1104-05.  As discussed in Section II.A.

*supra*, the *Murphy Oil* court found that the modified unit was sufficiently different such that

normal operations had not begun before the improvements were made.  *Id*. at 1104-05.

CEMEX concedes that the projects it implemented "were designed to enhance the

existing operations of the kiln."  Response at 19.  While the "enhancements" may not have

changed the broad configuration of the kiln at the Lyons facility, CEMEX does not contend that

they were cosmetic changes or "like-kind" replacements.  Indeed, the declaration of plant

manager John Lohr states that the projects "amplified certain beneficial aspects of the Lyons

Facility's operations that would reduce NOx emissions such as improving fuel efficiency,

transferring thermal load from the kiln to the precalciner, and improving kiln stability."

Response, Exhibit A, Decl. of John W. Lohr, at 2, ¶11.  The changes to the combustion chamber

added refractory on the inside wall.  Excerpt of Deposition of John W. Lohr (October 11, 2010)

(attached as Exhibit 14), at 45:17-18.  The result was to "[c]hange the aerodynamics to

thoroughly mix the fuel and combustion air in the vessel so you would have combustion." *Id*. at 49:5-8. The change gave the calciner the potential to process more raw feed. *Id* at 53:22-24. Thus, CEMEX cannot contend that the calciner was the same unit that existed prior to the changes.

CEMEX's present contention that the 1997-2000 projects did not significantly impact production capacity is inconsistent with the record in this case. While CEMEX's Response is conspicuously silent on the impact the changes would have on production capacity – stating repeatedly that the "primary" purpose or goal of the projects was not to increase production, *see* Response at 23, 27 – CEMEX has admitted elsewhere that the projects were intended to have a significant impact on production. For example, CEMEX's reply brief in support of its motion for summary judgment stated that "CEMEX intended to increase its production from 500,000 to 700,000 tons per year by 1999 through multiple physical changes" and that "the facility realized some of its anticipated increase in cement production. . . ." Reply in Support of CEMEX, Inc.'s Motion for Summary Judgment (Doc. No. 165) ("CEMEX SJ Reply") at 54-55.[7] Mr. Lohr also discussed the impact of the projects on the capacity of the Lyons facility to produce clinker. Referencing Deposition Exhibit 201, Mr. Lohr acknowledged that the combustion chamber change increased clinker production by 2.9 tons per day, a 5.8% increase; the installation of the oxygen plant increased clinker production by 3.5 tons per hour, a 5.9% increase; and the

_____

[7]   CEMEX made these statements in support of its contention that it had notified the Colorado Department of Public Health and the Environment that it intended to increase production. *See* CEMEX SJ Reply at 50, 54-55. In that briefing, the parties disputed the timing and nature of CEMEX's disclosure. The issue here is CEMEX's understanding of the impact of the projects on its production capacity, not the timing or nature of the disclosure to CDPHE. The statements clearly indicate that CEMEX intended the projects to increase production by as much as 200,000 tons per year, a 40% increase. The Court should exercise its discretion to treat these statements as an admission. *Guidry v. Sheet Metal Workers Int'l Ass'n*, 10 F.3d 700, 716 (10th Cir. 1993).

installation of the annulus boost fan increased clinker production by 2 tons per hour, a 2.9%

increase.  *See* Exhibit 14, Lohr Dep. at 27:12-28:5, 36:23-37:9, 39:4-14, and Deposition Exhibit

201 (Lyons Clinker Production History, CMXLYO00045592).  These increases in clinker

production were not serendipitous.  Mr. Lohr acknowledged that the kiln had historically been a

bottleneck in the Lyons facility's ability to produce clinker.  *See* Exhibit 14, Lohr Dep. at

140:19-141:120 and Deposition Exhibit 214 (Memorandum from John Lohr to Dave Repasz and

Bruce Ballinger, Jan. 4, 1998, CEMEX_NEIC_00008526).  The changes to the combustion

chamber and the injection of oxygen eliminated the bottleneck at the facility, enabling

production to increase up to the capacity of the upstream and downstream systems (the raw feed

mill and finish mill).  *Id*.

The statements of the Lyons facility's plant manager, both in deposition and

contemporaneous documents, demonstrate that undertaking the changes at issue in this case

would increase the Lyons facility's capacity to make clinker.  While the extent of the impact of

the capacity increase on emissions may be disputed, CEMEX at least recognizes that "NOx

emissions from cement kilns are *significantly influenced* by multiple variables, only *one of which

is the rate of production*."  Response at 29-30 (emphasis added).  This admission that the rate of

production influences facility emissions is tacit recognition that the facility has not begun normal

operations within the meaning of the PSD regulations – the facility's historical actual emissions

simply do not and cannot reflect the increased production capacity.  It is also an admission that

the changes are significant even under CEMEX's "sufficiently significant" test.  CEMEX, of

course, contends that the "enhancements" made the Lyons facility more efficient.  To the extent

this is true, it is not relevant.  As the court noted in *Puerto Rican Cement*, "a firm's decision to

introduce new, more efficient machinery may lead the firm to decide to *increase the level of*

*production*, with the result that, despite the new machinery, overall emissions will increase." 889 F.2d at 297.

## III.   CEMEX'S CONTENTIONS REGARDING CAUSATION AND AGGREGATION DO NOT RAISE GENUINE ISSUES OF MATERIAL FACT

### A.   There Is a Causal Link Between CEMEX's 1997-2000 Projects and an Increase in Emissions

The PSD regulations define "major modification" as a physical change or change in the method of operation of a major stationary source that would "result in" a significant net increase of a pollutant.  40 C.F.R. § 52.21(b)(2)(i).  CEMEX argues that the United States must prove that the 1997-2000 projects resulted in increased NOx emissions – that a causal relationship exists. Response, at 3, 30.  CEMEX's interpretation of this provision is misguided.  As discussed in Section I *supra*, the PSD regulations require the use of the actual-to-potential test where a unit has not "begun normal operations."  Under those circumstances, the regulations presume that the unit will be used at its full design capacity following the change and, therefore, that the change in emissions, as determined by the actual-to-potential test (i.e. the difference between the unit's actual emissions before the change and its "potential to emit" after the change) "results from" the change.  61 Fed. Reg. at 38,254.  The PSD regulations thus presume that any increase in emissions determined by application of the actual-to-potential test was caused by the modification.  Thus, the requirement that a change "resulting in" an increase in emissions is satisfied.

### B.   A Determination That the Actual-to-Potential Test Applies is Not Dependent Upon a Determination that CEMEX's 1997-2000 Projects Be Aggregated.

CEMEX claims that the Court cannot assess whether the changes altered the normal operations of the facility until the Court makes a factual determination regarding whether the

components of the project should be "aggregated."  Response at 7, 19.  This is simply not the

case.  Whether or not activities should be grouped together or treated separately does not impact

the method for calculating the change in emissions from those activities.  As discussed in Section

I *supra*, because CEMEX's 1997-2000 projects were not exempt from PSD requirements,

CEMEX is deemed to have "not begun normal operations" prior to construction of each non-

exempt, non-routine project and there is a presumption that the unit will operate at full capacity

year round.   A judicial determination regarding aggregation is thus not required prior to

assessing whether the actual-to-potential test applies.

## CONCLUSION

For the foregoing reasons, the Court should grant the United States' motion for partial

summary judgment, and rule that the "actual-to-potential" emissions test is the applicable test to

measure emissions increases in this case.


Respectfully Submitted,

 */s/ John Moscato*
JOHN N. MOSCATO
JAMES D. FREEMAN
Senior Counsel
United States Department of Justice
Environmental Enforcement Section
999 18th Street, South Terrace - Suite 370
Denver, CO 80202
Telephone: (303) 844-1380
Email:  john.moscato@usdoj.gov

LEIGH P. RENDÉ
Trial Attorney
Environmental Enforcement Section
United States Department of Justice
Ben Franklin Station
P.O. Box 7611
Washington, DC 20044-7611

## CERTIFICATE OF SERVICE

I hereby certify that on January 20, 2012, true and correct copies of the foregoing United States of America's Reply in Support of Motion for Partial Summary Judgment (Doc. # 169) was filed electronically using the Court's ECF system and automatically served via email on counsel of record, identified below:

Chet M. Thompson
cthompson@crowell.com

Richard E. Schwartz
rschwartz@crowell.com

David Patrick Ross
dross@crowell.com

Derek A. Hahn
dhahn@crowell.com, csolorio@crowell.com

Hugh Q. Gottschalk
gottschalk@wtolaw.com, hart@wtolaw.com, gottesfeld@wtolaw.com

Jessica Scott
scott@wtotrial.com, farina@wtotrial.com

John N. Moscato
John.Moscato@usdoj.gov, courtney.przybylski@usdoj.gov, katherine.kribbett@usdoj.gov

James D. Freeman
james.freeman2@usdoj.gov

Leigh P. Rendé
leigh.rende@usdoj.gov

      */s/ John Moscato*          
John N. Moscato, Senior Counsel
U.S. Department of Justice
Environmental Enforcement Section
999 18th Street, South Terrace - Suite 370
Denver, CO 80202
Telephone: (303) 844-1380
Email: moscato.john@usdoj.gov