IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 09-cv-00019-MSK-MEH

UNITED STATES OF AMERICA,

Plaintiff,

v.

CEMEX, INC.,

Defendant.

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT**

---

**THIS MATTER** comes before the Court pursuant to Defendant Cemex, Inc.'s ("Cemex") Motion to for Summary Judgment **(#147)**, the Government's response **(#158)**, Cemex's reply **(#165)**, and the Government's surreply (**#173**). Having considered the same, the Court **FINDS** and **CONCLUDES** the following.

## I. Background

This is an action pursuant to the Clean Air Act ("CAA") and the State of Colorado's implementing regulations.

Cemex operates a cement manufacturing plant in Lyons, Colorado. Between 1997 and 1999, Cemex undertook modifications to that plant. The Government contends that Cemex failed to notify the U.S. Environmental Protection Agency ("EPA") of the modifications. According to the Government, when the modifications were complete and the plant returned to

operation, it began emitting pollutants at an increased rate. The EPA contends that it did not learn of the modifications – and thus, the ensuing increase in pollutants – until 2006.

The Government then commenced this action in January 2009, asserting a number of claims, two of which remain pending: Claims 1 and 2 of the First Amended Complaint (#**16**). Broadly stated, both claims are based on the Government's contention that Cemex failed to obtain a preconstruction permit required by the CAA before it undertook the modification, thereby failing to undergo certain analyses and determinations regarding appropriate emissions levels to be implemented with the modification. Both claims are also based on the Government's position that this failure amounts to a violation of the requirements of the CAA with respect to a separately issued operating permit because preconstruction standards and requirements are to be incorporated in the operating permit. The Government seeks both civil penalties for these violations pursuant to 42 U.S.C. § 7413(b), as well as injunctive relief. Cemex asserts as an affirmative defense that the relevant statute of limitation bars these claims to the extent to the extent monetary penalties are requested, and, alternatively, that the claims are barred by the doctrine of laches to the extent equitable relief is requested.

In the motion for summary judgment, Cemex seeks judicial determination of several legal and factual issues regarding the viability of the claims and defenses: (1) that, as a question of law, accrual of a cause of action for violation of the preconstruction permit and other requirements occurs upon completion of the construction or modification, and the failure to comply with the preconstruction provisions of the CAA does not amount to a "continuing violation" for the purposes of the statute of limitation; (2) if the statute of limitation bars any aspect of the claims, that, as an issue of fact, the Government is not entitled to equitable tolling

for its failure to bring an enforcement action within the appropriate time period; and (3) that, as a question of law, the failure to obtain a preconstruction permit does not amount to a violation of the operating permit requirements.

## II. Standard of Review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

When the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a

genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

When the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

At issue here, however, are not solely evidentiary matters but also questions about the law that governs the claims. "Statutory interpretation is a matter of law appropriate for resolution on summary judgment." *Thomas v. Metro Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011). In interpreting a statute, a court begins with the plain language of the statute; the words should be read in their context and with a view to the overall statutory scheme. *Wright v. Fed. Bureau of Prisons*, 451 F.3d 1231, 1234 (10th Cir. 2006) (citation omitted). If the statutory language is clear, the analysis ends and the plain meaning must be applied. *Thomas*, 631 F.3d at 1161. However, if the language is ambiguous, the court may look beyond the plain text and examine legislative intent and overall statutory construction to resolve the ambiguity. *Id*.

**III. Framework of CAA and Colorado Implementing Regulations**

The Clean Air Act's goals are accomplished through a partnership of federal authorities,

led by the EPA, and state regulatory agencies. The EPA sets air concentration limits for various pollutants, and each state is charged with developing a regulatory regime called a "State Implementation Plan" ("SIP") to meet those standards. *See generally National Parks Conservation Ass'n. v. Tennessee Valley Authority*, 480 F.3d 410, 412-13 (6th Cir. 2007) ("*TVA 6th Cir.*") (discussing statutory and regulatory framework). The SIP must be approved by the EPA. 42 U.S.C. § 7410. Colorado's SIP[1], in the form relevant to these proceedings, was approved by the EPA in 1997.[2]

Pursuant to the portion of the CAA at issue here, when a polluter wishes to construct or modify a facility that will produce regulated pollutants, it must obtain a state-issued "preconstruction permit" – either a "Prevention of Significant Deterioration" ("PSD") permit, or a "Non-attainment New Source Review" ("NNSR") permit.[3] *TVA 6th Cir.* at 412-13 & n. 1.

---

[1]Colorado's SIP is set forth in the Colorado Code of Regulations as 5 CCR 1001-5, also called the Colorado Air Quality Control Commission ("CAQCC") Regulation No. 3. It was promulgated by the Colorado Department of Public Health and Environment ("CDPHE"). *See Public Service Co. of Colorado v. U.S. E.P.A.*, 225 F.3d 1144, 1145 (10th Cir. 2000).

[2]According to the Government, the EPA compiles the various SIP provisions every three years. Response, #158, at 1 n. 2. The parties agree that the regulations from the 1995 compilation and the 1998 compilation are pertinent here, since the modifications overlapped both periods, but have not identified any significant differences between the two versions for the purposes of the motion for summary judgment. Therefore, the 1998 compilation of the Colorado SIP are generally cited here, unless there is a specific reason to consider the 1995 compilation.

[3]Claim 1 of the First Amended Complaint is premised on Cemex's failure to obtain a PSD permit, and Claim 2 is premised on the failure to obtain an NNSR permit. A PSD permit is required for a modification that will affect a facility's output of a specific pollutant for which the surrounding area has attained compliance with EPA-established limitations (*i.e.* an "attainment area") for ambient air concentrations of that pollutant. An NNSR permit is required if the modification will affect the facility's output of a specific pollutant for which the surrounding area is <u>not</u> in compliance with EPA limitations (*i.e.* a "non-attainment area").

Here, the area surrounding the Cemex plant is an "attainment area" for nitrogen oxide pollution, but a "non-attainment area" for particulate pollution. Because the Cemex plant emits both kinds of pollution, it would be required to obtain both a PSD and an NNSR permit before

During the PSD permitting process, state authorities examine EPA standards on the applicable pollutants, determine and direct an appropriate emissions limit for each pollutant, and provide for ongoing monitoring of the facility. *Id.* The Act contemplates that, following construction, polluters will apply for and obtain a state-issued and state-supervised "Title V" permit, sometimes referred to as an "operating permit." 42 U.S.C. § 7661a(a).

The history of the CAA provides some context for this two-regime arrangement. The statute as it evolved amounts to a congressional compromise, balancing the interests related to reducing pollution with the economic concerns that would result from immediate imposition of strict standards on the industry. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 847 (1984). As a result, the CAA imposes less stringent regulations on existing regulated facilities, which are essentially "grandfathered" into less exacting standards, while newer facilities, or those making major changes, are required to implement measures to reduce pollution emissions. *See United States v. Cynergy Corp.*, 458 F.3d 705, 709 (6th Cir. 2006) (noting that CAA treats old plants more leniently than new ones, but with the expectation that old plants will wear out and be replaced with new facilities that will be subject to the more stringent requirements). Thus, as discussed below, the preconstruction permitting regime contains measures to ensure that the new facilities or modifications will comply with the stricter standards. Title V was enacted in 1990 to require "each covered facility to obtain a comprehensive operating permit setting forth all CAA standards applicable to that facility." *Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008, 1012 (8th Cir. 2010).

---

undergoing modifications. Both programs are subsumed in a single preconstruction regime under the Colorado regulations.

**A. Preconstruction Requirements (PSD and NNSR Programs)**

Claim One of the First Amended Complaint contends that Cemex violated the PSD requirements of the CAA. Under this regime, "[n]o major emitting facility on which construction is commenced after August 7, 1977, may be constructed in any area to which this part applies unless" the certain conditions are satisfied, including that a permit has been issued setting forth emission limitations required by the program. 42 U.S.C. § 7475(a)(1). In addition, the proposed facility must be subject to "the best available control technology for each [regulated] pollutant." 42 U.S.C. § 7475(a)(4). "Best available control technology" as referred to in the statute is not a particular type of technology; rather, it is defined as an "emission limitation based on the maximum degree of reduction of each pollutant subject to regulation . . . which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable" for that particular facility. 42 U.S.C. § 7479(3). The permit, therefore, contains a determination of a particular emission standard for each pollutant that is appropriate for that facility or modification given its location and other circumstances. *See United States v. Marine Shale Processors*, 81 F.3d 1329, 1356 (5th Cir. 1996) ("Preconstruction permits result from a review process that occurs before construction of or major modification to a stationary source. At this stage, the permitting authority must determine whether the proposed construction or modification would violate a state's emissions control strategy or interfere with the attainment or maintenance of CAA air quality standards.").

Claim Two asserts that Cemex violated another preconstruction permit program, the NNSR program. 42 U.S.C. §§ 7501-7515. Under this program, states are required to implement

plans incorporating construction and operating permit regimes; among other things, the NNSR program must include a requirement that any source subject to this program undergoing a "major modification" comply with the lowest achievable emission rate ("LAER"). 42 U.S.C. § 7503(a)(2). The specific requirements of the PSD and NNSR programs are set forth in the applicable SIP. *See* 5 CCR 1001-5, Part B.

**B. Operating Requirements (Title V)**

Under the CAA, "it shall be unlawful for any person to violate any requirement of a permit issued under this subchapter, or to operate [a regulated source] . . . except in compliance with a permit issued by a permitting authority under this subchapter." 42 U.S.C. § 7661a(a). In general, operating permits are to include "enforceable emission limitations and standards, a schedule of compliance, a requirement that the permittee submit to the permitting authority, no less often than every 6 months, the results of any required monitoring, and such other conditions as are necessary to assure compliance with applicable requirements[4] of this chapter, including the requirements of the applicable implementation plan." 42 U.S.C. § 7661c(a).

"Title V permits do not generally impose any new emission limits, but are intended to incorporate into a single document all of the Clean Air Act requirements applicable to a particular facility" and to provide for monitoring and other compliance measures. *United States v. EME Homer City Generation L.P.*, __ F. Supp. 2d ___, Case No. 2: 11-cv-19, 2011 WL 4859993 at *8 (W.D. Pa., Oct. 12, 2011); 42 U.S.C. §§ 7661c(a), (b). Operating permits "focus on a source's current emissions, even if the source has not recently undergone construction or

---

[4]"Applicable requirement" is a defined term, and includes "[a]ny term or condition of any preconstruction permits." 40 C.F.R. § 70.2.

major modification." *Marine Shale Processors*, 81 F.3d at 1356.

Detailed procedures and requirements are set forth in Colorado's SIP. In the permit application, an applicant must include extensive emissions-related information, including a description of all emissions of regulated air pollutants, the amount, details about fuels and production, air pollution control equipment and monitoring devices, and other related data. 5 CCR 1001-5, Part C, III.C.3. The statute and regulations make clear that it is the applicant who has the responsibility of identifying which requirements apply to the operating permit and information needed to determine compliance with those requirements. 40 C.F.R. § 70.5(c); 5 CCR 1001-5, Part C, III.C.4.

**C. Cemex's Actions**[5]

From 1997-2000, Cemex undertook an expansion and significant modification of its facility. It appears that only changes to the kiln system are at issue here, which occurred in 1997 and thereafter. The details of the modifications are highly technical and need not be described for the purposes of the motion. However, greatly abbreviated, the Government presents evidence that these changes increased the kiln's production and resulted in significant increases in emissions of certain pollutants.[6]

Cemex applied for and obtained five construction permits on September 11, 1998. However, the permits only addressed increases in particulate matter with respect to other parts of the expansion project; these permits did not identify or address changes made to the kiln system.

---

[5]The facts presented here are construed in the light most favorable to the Government, the nonmoving party.

[6]The Court assumes without deciding for the purposes of the motion that the changes would have required compliance with the PSD and NNSR programs.

In 2000, Cemex received a Title V operating permit.

Cemex was advised by an outside consultant that it should obtain a PSD permit for the changes to the kiln but that Cemex did not wish to because of the likely resulting delay. Cemex did not disclose the modifications to the kiln system to the Colorado authorities during the preconstruction or operating permit process; indeed, Cemex represented that it did not intend to make such changes until a later date. The changes made were internal to the kiln and would not have been visible or obvious to an inspector. In November 1997, Cemex disclosed that it was “experimenting” with one change, the use of liquid oxygen; however, Cemex ultimately began using liquid oxygen on a regular basis without disclosing this to the permitting authorities and despite being told by state authorities that such regular use would require a separate permit. Similarly, in an April 13, 1998 permit application for one part of the facility, Cemex affirmatively stated that “no increase in kiln capacity is sought” and, in a letter dated April 1998, that “There have been no equipment changes or changes in the method of operation other than those that have already been permitted.” Inspectors typically asked whether there had been any changes since the last inspection, but Cemex never disclosed the kiln changes in response to such questions.

The Colorado agencies relied on the representation that no changes had or would occur to the kiln system or in production levels in issuing the construction permits, and thereafter the operating permit, and setting levels and standards. In response, Cemex provides evidence showing that if the permitting authorities had launched an investigation of the Cemex plant, similar to the one undertaken in 2006, they could have discovered the violations at issue. In addition, documents existed that would have revealed to the permitting authorities that Cemex’s

production had increased from 1996 levels in 2000 such that the Government should have had inquiry notice of PSD and NNSR violations.

## IV. Analysis

### A. Statute of Limitation and Equitable Tolling

Cemex moves for summary judgment on both remaining claims to the extent that the Government seeks civil penalties[7] for alleged violations of the PSD or NNSR preconstruction requirements on the grounds that they are time-barred. Cemex's motion is predicated on the expiration of the applicable statute of limitation.

Based on the allegations in Complaint and the Amended Complaint, Cemex must demonstrate that when the Complaint in this action was filed the statutory period for its filing had expired. *Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1041 n. 4 (10th Cir. 1980). If this is established, then to proceed with the action, the Government must come forward with facts, that if true, would toll the statute of limitation. *Id.*

The parties agree that the applicable statute of limitation for these claims is the federal statute of limitation governing actions "for the enforcement of any civil fine, penalty, or forfeiture," 28 U.S.C. § 2462. It bars assertions of claims brought more than five years after they first accrued. It is undisputed that the plant modifications were complete no later than 2000 and that this litigation was commenced in 2009.

If the Government's cause of action for violation of the preconstruction requirements, as enforced through the permit regime, accrued upon completion of the modifications, then the

---

[7]Under the CAA, the EPA is authorized to bring civil actions and may "assess and recover a civil penalty of not more than $25,000 per day for each violation." 42 U.S.C.A. § 7413(b).

claims are time-barred in their entirety.[8] If, however, the failure to comply with the preconstruction requirements of the PSD and NNSR programs, including the requirement to obtain a permit and to apply specific technology and emissions limitations, amounts to an ongoing or repeated violation of the CAA,[9] then the statute of limitation would not be a complete bar, but the violations of concern would be limited to those occurring within the 5 years preceding the filing of the Complaint.[10]

As was noted in the Court's prior Opinion and Order Denying Motion to Dismiss (**#89**), there is a decided split of authority on the legal question of whether a violation of the PSD (or NNSR) program occurs when a facility is constructed/modified or continues each day that the facility operates without coming into compliance. The majority of decisions have taken the former position. *See, e.g., Otter Tail*, *supra,* 615 F.3d at 1014 (holding that PSD requirements

---

[8]Cemex cites *United States v. Louisiana-Pacific Corp.*, 682 F.Supp. 1122, 1130 (D.Colo. 1987) for the proposition that as PSD permit violation "occurs when the actual construction is commenced, and not at some later point in time." However, *Louisiana-Pacific* is of limited applicability as it does not address statute of limitation issues and arises under a PSD regime before the enactment of Title V's operating permit provisions. Because the regulations applicable to the issues here involve both construction and operating permit regimes, which are significantly entwined, this language from *Louisiana-Pacific* does not resolve the question of whether PSD obligations continue after completion of construction. Moreover, as noted by the Government, a later decision in the same case contemplates that PSD violations could be ongoing. *See United States v. Louisiana-Pacific Corp.*, 682 F. Supp. 1141, 1166 (D. Colo. 1988).

[9]This analysis is related to a second issue– whether the requirements applicable to construction permits are ongoing because they are thereafter incorporated in the operating permit regime, such that failure to comply with the preconstruction permit requirements also results in a violation of the Title V section of the CAA. As noted in the previous order, the Government's position is that Cemex's operating permit is incomplete or defective because it "does not contain all of the restrictions and limitations that it should." Order (#**89**) at 7, n. 4.

[10]However, it would limit the Government to penalties relating only to alleged continuing violations occurring within the five years previous to the commencement of the lawsuit.

"are conditions of construction, not operation" and, therefore, that operating a facility without complying with preconstruction requirements is not itself a violation of the PSD program); *National Parks & Conservation Ass'n. v. Tennessee Valley Authority*, 503 F.3d 1316, 1322-23 (11th Cir. 2007) ("*TVA 11th Cir.*") *and cases cited therein* ("violations of preconstruction permitting requirements occur at the time of construction, not on a continuing basis"); *see also United States v. Amren Missouri*, Case No. 4:11 CV 77 RWS, 2012 WL 262655 (E.D. Mo., Jan. 27, 2012) (interpreting Missouri SIP); *United States v. EME Homer City Generation L.P.*, __ F. Supp. 2d ___, Case No. 2: 11-cv-19, 2011 WL 4859993 (W.D. Pa., Oct. 12, 2011). A minority of opinions have analyzed the CAA and applicable SIPs and concluded that compliance with the PSD program is an ongoing obligation, even after completion of the construction or modification. *See TVA 6th Cir.*, *supra*; *Sierra Club v. Dairyland Power Cooperative*, Case No. 10-cv-303-bbc, 2010 WL 4294622 (W.D. Wis. October 22, 2010); *Sierra Club v. Portland General Electric Co.*, 663 F. Supp. 2d 983 (D. Or. 2009).

The Tenth Circuit has not addressed the question. However, it recognizes several doctrines that are helpful in resolving the question without resort to statutory construction. First, in the tort context, the Tenth Circuit recognizes the concept of a "continuing wrong," which applies where a tort involves a continuing or repeated injury and where the conduct of the tortfeasor fraudulently conceals or otherwise prevents discovery of the wrongful conduct. *Tiberi v. Cigna Corp*., 89 F.3d 1423, 1430-31 (10th Cir. 1996). In such a case, the cause of action accrues at, and limitations begin to run from, the date of the last injury. *Id*. at 1430. Given that the CAA is a statute intended to prevent emission of air pollution, the continued emission of pollutants that would otherwise be limited had the source complied with the PSD and NNSR

programs could be considered a repeated injury.

In addition, the doctrine of equitable tolling applies to extend accrual of a claim for statute of limitation purposes under where the defendant has taken affirmative acts to conceal its wrongdoing. *Aldrich, supra,* 627 F.2d at 1042 (noting that the Supreme Court has declared that equitable tolling principles are "read into every federal statute of limitation," subject to express contrary Congressional intent) (citing *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946)). However, "to prove that the statute of limitations was tolled by a defendant's fraudulent concealment, a plaintiff must show that his ignorance of his cause of action was not the result of his lack of diligence, but was due to affirmative acts or active deception by the Defendant to conceal the facts giving rise to the claim." *Indus. Constr. Corp. v. U.S. Bur. of Reclamation,* 15 F.3d 963, 969 (10th Cir. 1994).

Under either of these doctrines, the statute of limitations would not be a complete bar even if a cause of action for violation of preconstruction permit requirements accrued when the construction/modification was complete. If Cemex affirmatively concealed its wrongdoing, the statute of limitation would be tolled.[11]

---

[11]Cemex asserts that the Government cannot rely on equitable tolling because it did not adequately plead elements of "fraudulent concealment" in its Complaint and that Cemex has been prejudiced thereby. This is unavailing, as the concealment issue is not a claim but rather a rebuttal to Cemex's own statute of limitation defense. Cemex has not provided any authority to show that the Government must plead an anticipatory rebuttal to an affirmative defense. Moreover, Cemex has shown no prejudice, as the Government has made clear since early in this case that it intended to invoke equitable tolling. *See* **#38.**

In the alternative, Cemex contends that the Government cannot rely on a concealment argument because Cemex only allegedly concealed its violations from the state permitting authorities, not the Government. Given the framework of the CAA and the relationship between the state and federal authorities in this regard, this is a distinction without a difference. The agencies work in partnership and the state's permitting and enforcement authority remains under the supervision of the Government. Statements to the state authorities can clearly be imputed to

With regard to the tolling concept, it is worth noting that the CAA and associated state and federal regulations require owners and operators of facilities to voluntarily submit information in order to ensure compliance.[12] The Government's evidence shows that Cemex failed to "self-report" its changes to the kiln, despite advice that these changes triggered PSD compliance, and also affirmatively represented to the permitting authorities that no changes had been made to the facility other than what was described in the other permits. Cemex also indicated that it did not intend to modify the kiln until after the other work on the facility's expansion was complete, thereby inducing the permitting authorities to allow the other changes to go ahead without factoring in the effects of the kiln changes. Changes to the kiln could not be detected absent investigation because they were internal.

This evidence is sufficient to raise a factual issue as to whether Cemex concealed its wrongdoing, which could lead to a determination that the statute of limitation is tolled. Accordingly, Cemex is not entitled to summary judgment based on application of the statute of limitations.

---

the Government under the circumstances. Accordingly, the equitable tolling argument is examined on the merits.

[12]Harm from the emission of pollutants is different from other types of injuries in that the injury is not personalized or directed at a particular plaintiff; rather, a defendant's wrongful conduct amounts to incremental contribution to the total quantity of air pollutants in a particular area. Investigating all possible sources of pollutants is not feasible. Therefore, as both parties acknowledge, the permitting regime puts the burden on sources of pollutants to "self-report" events that trigger PSD and NNSR obligations. What follows is a cooperative process whereby information is exchanged and monitoring and compliance provisions are formulated and given force by being incorporated in the construction permit (and, thereafter, the operating permit).

**B. Failure to Comply with Construction Requirements as a Violation of Operating Permit**

Cemex also moves to for summary judgment to the extent that claims are based on Title V because: (1) there is no cause of action under Title V for operating a facility pursuant to an allegedly deficient/incomplete operating permit, *i.e.*, the Government cannot assert a PSD claim as a derivative claim under Title V; and (2) Cemex is entitled to the benefits of the CAA's and the Colorado SIP's "permit shield."[13]

**1. Cause of Action for Deficient or Incomplete Operating Permit**

It is undisputed that Cemex obtained operating permits issued pursuant to Title V. The Government does not contend that Cemex has violated the emissions standards set forth in those permits. Rather, as the Court noted in its order (# **89**) on Cemex's motion to dismiss, the Government's theory is that the failure to go through the preconstruction permitting process means that the Title V operating permit is not "proper" because it does not contain the standards that should apply.

Title V of the CAA states that "it shall be unlawful for any person to violate any requirement of a permit issued under this subchapter [Title V], or to operate [a regulated source] . . . except in compliance with a permit issued by a permitting authority under this subchapter." 42 U.S.C. § 7661a(a). This provision also states that "Nothing in this subsection shall be construed to alter the applicable requirements of this chapter that a permit be obtained before construction or modification." *Id*. This language is unambiguous.

[13]This is a provision of Title V which states that "[c]ompliance with a permit issued in accordance with this subchapter shall be deemed compliance with section 7661a [prohibiting operation of a source without an operating permit] of this title." 42 U.S.C. § 7661c(f). A more detailed permit shield is contained in the Colorado SIP.

The first section of this provision refers to the requirements of or compliance with "a permit issued" pursuant to Title V. The statute narrowly defines violations of Title V as the failure to comply with the requirements of a permit or to operate a source without such a permit. The permit issued to Cemex is identified and there is no evidence that Cemex violated any of its requirements or failed to comply with its provisions. *See, e.g.*, *EME Homer City*, 2011 WL 4859993 at *16.

The second section makes clear that an operating permit does not relieve a source of responsibility to comply with other programs involving construction/modification permitting. The Court understands this to mean that the requirements of the various programs are enforced separately, although the preconstruction/modification requirements do not necessarily disappear upon the receipt of an operating permit.[14] The Court sees no possible interpretation of this language that would permit a cause of action for the failure to obtain a "proper" operating permit.[15] Therefore, Cemex is entitled to summary judgment on the claims to the extent they are premised on a theory that Cemex violated Title V by operating its facility without a complete or proper operating permit.

**2. Scope of Permit Shield**

Alternatively, Cemex argues that even if a cause of action under Title V exists, the claim is barred by the so-called "permit shields" contained in the CAA and the Colorado SIP. Because

---

[14]The Court makes no determination regarding whether such obligations (such as best available control technology) are ongoing or freestanding in the absence of a preconstruction permit application and analysis.

[15]Nonetheless, this does not mean that the Government is without recourse to address alleged deficiencies in Cemex's operating permit application, as federal regulations provide a process to reopen and revise standards for such permits. 40 C.F.R. § 70.7(f).

the Court has concluded that the Government's theory does not state a claim for a violation of Title V, it need not address whether the permit shield would otherwise bar the claim.

**IT IS THEREFORE ORDERED**

1. Defendant Cemex, Inc.'s ("Cemex") Motion to for Summary Judgment **(#147)** is **GRANTED IN PART AND DENIED IN PART**. The motion is granted to the extent that Claims One and Two are based on Title V of the CAA. The motion is otherwise denied.

2. The parties shall, within 10 days of the issuance of this order, contact chambers to set this matter for a Final Pretrial Conference and a Trial.

Dated this 30th day of March, 2012

**BY THE COURT:**

Marcia S. Krieger

Marcia S. Krieger
United States District Judge