**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger**

Civil Action No. 09-cv-00019-MSK-MEH

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

v.

**CEMEX, INC.,**

        **Defendant.**

_____

**OPINION AND ORDER DENYING
MOTION FOR PARTIAL SUMMARY JUDGMENT AND SUSTAINING OBJECTION
TO ORDER OF THE MAGISTRATE JUDGE**
_____

**THIS MATTER** comes before the Court pursuant to the Government's Objections **(#156)** to the Magistrate Judge's August 11, 2011 Order and Defendant CEMEX, Inc.'s ("CEMEX") response **(# 157)**; and the Government's Motion for Partial Summary Judgment **(#169)**, CEMEX's response **(#174)**, and the Government's reply **(#175)**.

## FACTS

The Court has discussed the relevant facts and regulatory environment relevant to this action in some detail in its Opinion and Order **(# 178)** of March 30, 2012, and to the extent necessary, that discussion is incorporated herein.

In summary, and as elaborated upon below as appropriate to the Court's analysis, CEMEX operates a cement manufacturing plant in Lyons, Colorado. Between 1997 and 1999, CEMEX undertook modifications to that plant that both increased its operating output and

increased the amount of air pollutants it produced.  The Clean Air Act required CEMEX to obtain a "pre-construction permit" prior to undertaking the modifications.  42 U.S.C. § 7475(a).  Such a permit would have imposed upon CEMEX the obligation to employ the "best available control technology" to limit any increase in regulated pollutants.

## ISSUES PRESENTED

The claims asserted by the Government require it to prove, among other things, that CEMEX's modifications to the plant resulted in an increase in actual emissions of regulated pollutants.

There are two general methods by which it is determined whether a modification has resulted in an increase in actual emissions (and to quantify such increase): the "actual-to-future-actual" test, in which historic emissions rates are compared against predictions as to what future expected actual emissions rates following modifications; and the "actual-to-potential" test, in which historic actual emissions are compared against the maximum potential emissions that could occur following modifications.  The "actual-to-potential" test is applied when the modifications are substantial enough to declare that "normal operations" of the facility (as modified) cannot be said to have already "begun."

Here, the Government moves for partial summary judgment **(# 169)** on an extremely limited question: whether CEMEX's modifications to the plant were such that it did not "begin normal operations" prior to the modifications, such that application of the "actual-to-potential" test is warranted.

Separately, the Court addresses the Government's Objections **(# 156)** to an Order by the Magistrate Judge that directed the parties to split the costs of making certain rebuttal expert

disclosures.

## ANALYSIS

### A. Government's summary judgment motion

#### 1. Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a

genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

2. Regulatory environment

Because the question presented by the Government's summary judgment motion is a relatively narrow one, the Court will not indulge in an extensive discussion of the complex regulatory environment that implements the Clean Air Act, nor will the Court recite all of the elements of the Government's claims. It is sufficient to note, for purposes of this decision, that the Government's motion is directed at the element of the Government's claims that require it to prove that CEMEX's proposed modifications to its plant would result in a increase in actual emissions. 42 U.S.C. § 7411(a)(4)

This requires consideration of the question of how to measure future "actual emissions."

There are two different methods of measuring what would have been a facility's future[1] "actual emissions" after the modification occurred. This calculation is then be compared to historical actual emissions rates to determine the magnitude of any increase anticipated by the modification.

First, one may examine (future) emissions "using actual operating hours, production rates, and the types of material stored or combusted during the selected time period" (*i.e.* "future actual emissions"). 5 CCR 1001-5, Part A, I.B.8. Second, where it is impossible or impractical to predict future **actual** emissions rates, one may assume that the modified facility will typically run at its full potential, and thus, future emissions equate to the facility's **potential** emissions, that is "the maximum capacity of a stationary source to emit a pollutant under its physical and operational design" (*i.e.* "potential emissions"). 5 CCR 1001-5, Part A, I.B.37.

The decision as to which formula to apply turns on the question of whether the facility has (or has not) "begun normal operations" as of a specified date: future actual emissions are used if the facility is deemed to have begun normal operations, and potential emissions are used if the facility has not. 5 CCR 1001-5, Part A, II.A.1.a, c.

The phrase "begun normal operations" is not defined in either federal or state regulations. However, the EPA has explained its interpretation of the phrase "normal operations" as follows:

> changes to a unit . . . that are non-routine or not subject to [other]

---

[1] The ultimate question presented in this case is whether CEMEX was required to obtain a preconstruction permit prior to undertaking its 1997-1999 modifications. The parties appear to agree that this question must be answered according to the circumstances as they existed in 1997. At that point in time, with the modifications yet to be constructed, calculation of "future" emissions necessary carried with it a certain predictive element. The Court is cognizant that the ensuing discussion is inconsistent, if not downright confusing, in its use of past-, present-, and future-tense verbs, but such is the nature of a temporally-dislocated discussion of this sort.

> exemptions are deemed to be of such significance that pre-change
> emissions for the affected units should not be relied on it
> projecting post-change emissions. For such units, "normal
> operations" are deemed not to have begun following the change,
> and are treated like new units. Put another way, the regulatory
> provision for units which have "not begun normal operations"
> reflects an initial presumption that a unit that has undergone a non-
> routine physical or operational change will operate at its full
> capacity year-round. A source owner or operator may rebut the
> presumption that the unit will operate at its full potential by
> agreeing to limit its PTE through enforceable restrictions that limit
> the unit's ability to emit more than their pre-modification actual
> emissions (plus an amount that is less than significant).

63 Fed. Reg. 39857-01, 39858 (Jul. 24, 1998). Thus, the EPA's interpretation places the concepts of "normal operations" and "non-routine" modifications in juxtaposition, such that a non-routine modification gives rise to the presumption that the facility has "not begun normal operations" for purposes of determining emission increases.

This, in turn, leads to the question of the meaning of the term "non-routine." Again, such term is not expressly defined, but EPA regulations and caselaw give some indication as to how it should be interpreted. In Clean Air Act regulations, the EPA provides that the phrase "routine maintenance, repair and replacement, includes, but is not limited to, the replacement of any component of a process unit with an identical or functionally equivalent component(s), and maintenance and repair activities that are part of the replacement activity." 40 C.F.R. § 52.21(cc). In *New York v. EPA*, 443 F.3d 880, 883-84 (2d Cir. 2006), the court examined that regulation, noting that the EPA "has for over two decades defined the [routine maintenance, repair and replacement] exclusion [from certain emissions review procedures] as limited to *de minimis* circumstances." And in *Wisconsin Elec. Power Co. v. Reilly*, 893 F.2d 901, 910 (7th Cir. 1990), the court explained that "to determine whether proposed work at a facility is routine, EPA

makes a case-by-case determination by weighing the nature, extent, purpose, frequency, and cost of the work, as well as other relevant factors, to arrive at a common-sense finding." Collectively, these authorities suggest that "routine" modifications are those which, for example, involve no functional modification to a component, or modifications that are *de minimis* in their effects. *See also U.S. v. Ohio Edison Co.*, 276 F.Supp.2d 829, 834 (S.D.Oh. 2003) ("Routine maintenance, repair and replacement occurs regularly, involves no permanent improvements, is typically limited in expense, is usually performed in large plants by in-house employees, and is treated for accounting purposes as an expense").

### 3. Application

The Government has not offered an extensive factual discussion regarding the nature, purpose, or extent of CEMEX's modifications, but what little evidence the parties have presented on that point makes clear that the changes were something more than mere replacement of machinery with functional equivalents or *de minimis* changes to operations. CEMEX's own evidence, including affidavits from its employees, makes clear that the modifications involved: (i) "improvement" to the combustion chamber in order to "improve . . . performance, mitigate burnover, and improve fuel efficiency"; (ii) "construction of an onsite oxygen plant" that "enabled the Lyons facility to increase clinker production"; and (iii) addition of a booster fan to "improve the stability of the kiln flame and operation, and to improve clinker quality," among others. No reasonable factfinder could conclude that modifications of these types (whether taken individually or as aggregated components of a single project) could be considered merely "routine" adjustments to the Lyons facility. Rather, each of them were undertaken to achieve improvements or increases in the facility's operations, not simply to

constitute "routine maintenance" of current plant operations.  Under these circumstances, the Court finds no genuine dispute of fact as to the narrow issue on which the Government seeks summary judgment: the modifications were not "routine," and therefore, not a continuation of the plant's "normal operations."  This, in turn, establishes that the plant had not "begun normal operations" until the modification was completed, and thus, calculation of any emissions increase must be made using the "potential emissions" formula.

CEMEX argues that this case is similar to *Reilly, supra.*, and that the Court should be guided by that decision.  In *Reilly,* the operator of a coal-fired, steam-generating electric power plant undertook a "life extension" project, designed to renovate aging equipment to allow it to remain "capable of generating at its designed capability" beyond its original lifespan. 893 F.2d at 906.  The operator inquired of the EPA whether the proposed renovations would require a preconstruction permit, and the EPA concluded that they would.  The operator, believing that determination to be erroneous, sought a judicial declaration that no permit was required.  It argued that "Congress did not intend for simple equipment replacement to constitute" a modification requiring permitting.  893 F.2d at 908.  The 7th Circuit disagreed, finding a Congressional intent to exempt existing facilities from the Act's requirements, but a concomitant obligation for operators to include new pollution-control technology upon making modifications to those existing facilities.  *Id.* at 908-10.  It also concluded that the EPA correctly rejected the operator's argument that its modifications fell within the "routine . . . maintenance" exception, insofar as cost, magnitude, duration, and purpose of the expansion were all factors properly considered by the EPA as indicating that the project was not merely "routine."  *Id.* at 910-14.  In this regard, then, *Reilly* more closely supports the **Government's** position, rather than

CEMEX's.

CEMEX appears to rely on *Reilly* for a different proposition. After the discussion above, the court turned to the question of whether the EPA's "method of measuring emissions is arbitrary and capricious." *Id.* at 910. It noted that the EPA had concluded that the as-modified facility had not "begun normal operations," and thus, was subject to the "actual-to-potential emissions" formula for determining whether the modification would result in increased emissions. The 7th Circuit expressed discomfort with the EPA's assumption that a modified facility would run at its maximum potential, even if the absence of evidence that it had not done so in the past or anticipated doing so in the future. *Id.* at 916-17. The court also considered other authority that also suggested that potential emissions be based on **intended** future operation levels, rather than **maximum possible** operational levels. *Id.* at 917, *citing Alabama Power Co. v. Costle*, 636 F.2d 323, 353 (D.C.Cir.1979) (EPA must "take[ ] into account the anticipated functioning of the air pollution control equipment designed into the facility" when calculating the facility's potential to pollute). Although conceding that "we certainly do not suggest that the EPA may never subject replaced units to the potential to emit concept under its regulations" (assuming it did so through proper notice-and-comment procedures), the 7th Circuit ultimately held that "the EPA's reliance on an assumed continuous operation as a basis for finding an emissions increase is not properly supported" under the then-existing regulations.

CEMEX's invocation of this aspect of *Reilly* is premature in this case. Read most favorably to CEMEX, *Reilly* does not stand for the proposition that it is inappropriate for the EPA to consider potential emissions when assessing the possibility that modifications to a facility will result in increased pollution; rather, *Reilly* simply suggests that measuring that

9

"potential" does not necessarily entail simply adopting the maximum possible emissions, without regard for the intended level of operation of the modified facility. In other words, *Reilly* takes issue with the **manner** in which potential emissions are calculated or the facts that are used in calculating that "potential."

At this juncture, the Court is not being asked to calculate the "potential" emissions of CEMEX as of 1997, nor could the Court make such a determination on the submitted record. That determination will have to await trial, at which time the parties can more comprehensively address how the Court should calculate CEMEX's post-modification "potential" emissions (*i.e.* whether it should be based on maximum operational levels, intended operational levels, historical operational levels, and whether a variety of factors should or should not be included in that calculation).

Because a trial will be required, the Government's motion for summary judgment is **DENIED**. However, the Court finds based on the undisputed facts that the modifications made by CEMEX were not "routine" and that the facility cannot be said to have "begun normal operations" – as that phrase is used in the regulations – at the time the modifications were undertaken, such that any increase in the plant's emissions level will be determined by an "actual-to-potential emissions" formula. These facts are deemed established for purposes at trial. Precisely how that formula is applied and what facts are used in calculating that increase are questions that are not properly before the Court at this stage and must await presentation of evidence and argument at trial.

### C. Government's Objections

The remaining matter to be resolved is the Government's Objections to the Magistrate

Judge's Order. On August 11, 2011, the Magistrate Judge granted in part and denied in part **(#152)** a motion by CEMEX seeking to strike certain rebuttal reports issued by the Government's experts. CEMEX argued that the reports exceeded the scope of proper rebuttal, adding in new opinions, theories, and evidence not previously addressed.

The Magistrate Judge's written order did not make any particular findings with regard to CEMEX's contentions. He noted that "it is permissible to include new experts or new information in a rebuttal report, as long as the purpose of such inclusion is 'intended solely to contradict or rebut evidence on the same subject matter identified by another party'," but made no further determination as to whether the Government's rebuttal reports did or did not meet this standard. Instead, the Magistrate Judge immediately began a new paragraph, announcing that he was "persuaded by [CEMEX's] claim of prejudice, in that it now believes its ability to defend itself against the material raised in the rebuttal expert reports at issue is compromised." As a remedy, he permitted CEMEX the opportunity "to submit limited surrebuttal reports" to "counter the assertions raised by [the Government's rebuttal]."

The Magistrate Judge then issued the portion of the Order that leads to the instant Objections. In the interests of completeness, the Court sets forth the relevant passage in full:

> Considering the scope and gravity of the rebuttal reports, the Court finds that equity dictates cost-sharing of the surrebuttal reports. Plaintiff and Defendant shall split the costs evenly. The court emphasizes that the surrebuttal reports must conform to the standard governing rebuttal reports.

The Government objects to the Magistrate Judge's direction that it bear half the costs of CEMEX obtaining surrebuttal reports. It contends that the cost-sharing requirement "upsets [the] balance" that would otherwise exist – each party would pay the costs of two reports: its

own original report and its own rebuttal/surrebuttal report – and further, that the Government "has not ability to control the costs of the sur-rebuttal reports," essentially giving CEMEX a "blank check."

Objections to a non-dispositive order of a Magistrate Judge are evaluated under Fed. R. Civ. P. 72(a). Such rulings will be reversed only if they are "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); *Hutchinson v. Pfeil*, 105 F.3d 562, 566 (10th Cir. 1997); *Ariza v. U.S. West Communications, Inc.*, 167 F.R.D. 131, 133 (D. Colo. 1996). Accordingly, the Plaintiff's Objections will be overruled unless the Court finds that the Magistrate Judge abused his discretion or, if after viewing the record as a whole, the Court is left with a "definite and firm conviction that a mistake has been made." *Ariza,* 167 F.R.D. at 133, *citing Ocelot Oil Corp. v. Sparrow Indus.,* 847 F.2d 1458, 1464 (10th Cir.1988).

This Court finds that the Magistrate Judge is vested with broad discretion to manage discovery and enforce the Scheduling Order, as well as to impose sanctions for violations of parties' obligations with regard to those mattes. Fed. R. Civ. P. 16(f); Fed. R. Civ. P. 37. However, the imposition of sanctions under either rule is permitted only upon a finding that a party has **failed to comply** with a rule or order. Rule 16(f)(1)(C), (2); Rule 37(b). Thus, it is an abuse of discretion by the Magistrate Judge to award costs or impose sanctions without first making a finding that the party against whom the award is made has actually violated the rule or order. The August 11, 2011 Order makes no finding that the Government violated the Scheduling Order or some provision of Rule 26(b) in issuing its rebuttal reports (much less identify what provision was violated and in what particular way); it merely finds that CEMEX suffered some "prejudice" as a result of the contents of those reports. But "prejudice,"

untethered to any particular violation of a rule or order, is meaningless: even a timely and properly-disclosed expert report will presumably "prejudice" the other side.  A finding that CEMEX was "prejudiced" by disclosures in the Government's rebuttal is simply a finding that CEMEX should be given an opportunity to respond to those disclosures; it does not necessarily imply that the Government engaged in any wrongdoing in making the rebuttal.

Thus, the Court finds that because the Magistrate Judge's Order makes no finding that the Government's rebuttal violated any rule or order or was otherwise improper in any specific respect, the Magistrate Judge's decision to nevertheless award partial costs to CEMEX and against the Government was an abuse of discretion.  Accordingly, the Court sustains the Government's Objections and vacates that portion of the Magistrate Judge's Order.

## CONCLUSION

For the foregoing reasons, the Governments' Motion for Partial Summary Judgment **(#169)** is **DENIED**, but the Court finds no genuine dispute that CEMEX's modifications were not "routine," and thus, that the facility had not "begun normal operations" at the relevant time, such that assessment of any emissions increase resulting from the modification should consider the modified facility's "potential emissions,".  These facts shall be deemed established for purposes of trial. The Court **SUSTAINS** the Government's Objections **(# 156)** to the Magistrate

...

Judge's August 11, 2011 Order **(# 152)** and **VACATES** that portion of the Order that directs cost-sharing.  The parties shall, within 10 days of the issuance of this order, contact chambers to set this matter for a Final Pretrial Conference and a Trial.

Dated this 24th day of September, 2012

**BY THE COURT:**

*/s/ Marcia S. Krieger*

Marcia S. Krieger
United States District Judge