**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger**

**Civil Action No. 09-cv-00019-MSK-MEH**

**UNITED STATES OF AMERICA**

                **Plaintiff,**

    **v.**

**CEMEX, INC.,**

                **Defendant.**

---

**PLAINTIFF UNITED STATES OF AMERICA'S MOTION IN LIMINE TO EXCLUDE
CERTAIN TESTIMONY OF GERALD L. YOUNG**

---

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 4

I.   STANDARDS UNDER FED. R. EVID 702 ........................................................... 5

   A.   The Court's Function as Gatekeeper ............................................................... 5

   B.   Two-Part Test for Admissibility Under Fed. R. Evid. 702 ............................. 6

      1.   The Opinion Must Be Based Upon Sufficient Facts and Data .................. 6

      2.   Application of Methodology to Facts ...................................................... 7

II. SPECIFIC PORTIONS OF MR. YOUNG'S EXPERT OPINION TO BE EXCLUDED ...... 10

   A.   Young Opinion, Expert Report, Section 1.3, Paragraph 1 ............................. 10

   B.   Young Opinion, Expert Report, Section 4.1.1 ............................................. 11

   C.   Sur-Rebuttal Expert Report, Page 7 ............................................................ 12

III.  ARGUMENT ................................................................................................. 13

   A.   The Reduction in the Calciner Static Pressure Drop Is Speculative and Does Not Have the System Consequences Mr. Young Identified ....................................................... 13

   B.   The Evidence Contradicts Mr. Young's Assumption that the Degree of Calcination Increased ........................................................................................................... 18

   C.   The Evidence Contradicts Mr. Young's Assumption That the Fuel Balance Between the Calciner and Kiln Changed. ........................................................................................ 22

   D.   Mr. Young's Conclusion that the Modifications Resulted in Decreased $NO_x$ Emission is Built on a Series of Flawed Assumptions and Should Be Excluded ......................................... 24

   E.   Mr. Young's Assumption That Kiln Feed Temperature Increased During the Oxygen Enrichment Portion Is Speculative ........................................................................................ 25

CONCLUSION ................................................................................................. 27

## <u>LIST OF EXHIBITS</u>

Exhibit 1:      Expert Report of Gerald L. Young, May 10, 2011

Exhibit 2:      <u>Case Study of Physical Modeling at Southdown's Lyons Plant,</u>
                CMXLYO00402635

Exhibit 3:      <u>Southwestern Portland Cement: General Information About the Source,</u>
                CMXLYO00038852

Exhibit 4:      Deposition of Gerald Young, July 27, 2011

Exhibit 5:      Deposition of Kevin Davis, PhD, July 21, 2011

Exhibit 6:      Herman Tseng & John Lohr, *Oxygen Enrichment*, Cement Technology,
                CMXLYO00045538

Exhibit 7:      <u>Lyons Plant Pyroprocess Training Manual</u>, CMXLYO00186916

Exhibit 8:      <u>Project Outline for Oxygen Enrichment Test at Lyons – March 1997,</u>
                CMXLYO00612385

Exhibit 9:      Deposition of Stephen Goodrich, December 9, 2010

Exhibit 10:     <u>Lyons Clinker Production, Kiln Sensitivities and Limits</u>, CMXLYO00182757

Exhibit 11:     Sur-Rebuttal Expert Report of Gerald L. Young, October 11, 2011

## **INTRODUCTION**

Defendant produced the Expert Report of Gerald L. Young, its cement manufacturing expert, on May 10, 2011.[1]  A significant part of Mr. Young's opinion rests on the consequences he attributes to the March 1997 modification CEMEX made to the pyroprocessing system's calciner.  The calciner functions as a preheating vessel that begins the process of calcifying raw feed; that process is completed in the kiln.  Mr. Young opines that the calciner modification had the following impact on the pyroprocessing system:  it restricted air flow throughout the pyroprocessing system; it reduced overall fuel consumption in the pyroprocessing system; it resulted in an increased degree of calcination in the feed entering the kiln from the calciner; and it shifted the allocation of fuel burned from the kiln to the calciner.  Extrapolating from these sub-opinions, Mr. Young concludes that less fuel $NO_x$ was formed in the calciner and less thermal $NO_x$ was formed in the kiln thereby reducing total emission of $NO_x$ into the atmosphere. Defendant later produced the Sur-Rebuttal Expert Report of Gerald L. Young on October 11, 2011.[2]  In his sur-rebuttal, based on his sub-opinion that oxygen injected into the calciner increased the temperature of feed entering the kiln from the calciner, Mr. Young ultimately opined that the work load shifted from the kiln to the calciner, thereby reducing total emission of $NO_x$ into the atmosphere.[3]

---

[1] *See* Exhibit 1, Expert Report of Gerald L. Young, May 10, 2011.

[2] *See* Exhibit 11, Sur-Rebuttal Expert Report of Gerald L. Young, October 11, 2011.

[3] *Id*. at 7.

Each of the above sub-opinions expressed by Mr. Young is in fact an assumption. Each of those assumptions is unsupported by facts and data. Each of those assumptions is in fact contradicted by facts and data readily available to Mr. Young. Many of these assumptions are also undermined by Mr. Young's own deposition testimony and the testimony of CEMEX's combustion expert, Dr. Kevin Davis. Where, as here, expert opinions rest on flawed assumptions, the analytical gap between facts and assumptions and between the assumptions and the opinions they support becomes too great. As such, the opinions are unreliable and should be excluded under Fed. R. Evid. 702.

## I.        STANDARDS UNDER FED. R. EVID 702

### A.        The Court's Function as Gatekeeper

In *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993), "the Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony…." Fed. R. Evid. 702 2000 advisory committee's notes. In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999), the Court "clarified that this gatekeeper function applies to all expert testimony…." *Id.*

The Tenth Circuit has explained the district court's gatekeeper function as follows:

> To determine whether an expert opinion is admissible, the district court performs a two-step analysis. First, the court must determine whether the expert is qualified by "knowledge, skill, experience, training, or education" to render an opinion. *See* Fed. R. Evid. 702. Second, if the expert is sufficiently qualified, the court must determine whether the expert's opinion is reliable under the principles set forth in *Daubert*.

*103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006).

5

B.      Two-Part Test for Admissibility Under Fed. R. Evid. 702

"The foundational requirements for admission of expert opinions are set forth in [Rule] 702…." *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1220 (D. Colo. 2008).  "In the 10th Circuit, the Rule 702 analysis has two steps: first, the Court determines whether the expert is qualified to render the proffered opinion, and second, the Court examines whether the opinion itself is reliable*." Id.* at 1221 (citing *103 Investors I, L.P.*, 470 F.3d at 990).  The second step, reliability, has "three specific requirements: (i) a showing that the method or principle used by the witness is reliable; (ii) a showing that the witness used sufficient facts and data as required by the method or principle; and (iii) a showing that the witness properly applied the method or principle to the collected facts and data." *Crabbe*, 556 F. Supp. 2d at 1221.  "The proponent of the expert testimony bears the burden of proving the foundational requirements of Rule 702 by a preponderance of the evidence." *Id.* at 1220.  "[A]ny inadequacy in the proof on any of Rule 702's elements renders the entire affected opinion inadmissible." *Id.* at 1221 (citing *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 782 (10th Cir. 1999)).  Two of the criteria identified in *Crabbe* are particularly relevant to the analysis of Mr. Young's opinions.

1.   The Opinion Must Be Based Upon Sufficient Facts and Data

Expert testimony must be "based on sufficient facts or data." Fed. R. Evid. 702.  In the Tenth Circuit, sufficiency is about the quantum of data relied upon, not its quality. *Crabbe*, 556 F. Supp. 2d at 1223.  "[T]he inquiry examines only whether the witness obtained the amount of data that the methodology itself demands." *Id.*  The expert may have relied on inaccurate facts, but such reliance is "a matter of credibility susceptible to cross-examination at trial" and not

grounds for exclusion under Rule 702.  *Hertz v. Luzenac Am., Inc.*, 2011 WL 1480523, at *7 (D.

Colo. Apr. 19, 2011); *see also Crabbe*, 556 F. Supp. 2d at 1223.

Under Rule 702, expert opinion should be excluded if the expert has not considered the

facts that an expert in the field would properly consider before rendering an opinion. *See Lantec,*

*Inc. v. Novell, Inc.*, 306 F.3d 1003, 1025 (10th Cir. 2002) (affirming the district court's exclusion

of an economic expert on the ground that the expert "did not employ in the courtroom the same

level of intellectual rigor that characterizes an expert in the field of economics and industrial

organization", and used unreliable data and had not conducted or cited relevant surveys); *see*

*also Bailey v. Allgas, Inc.*, 148 F. Supp. 2d 1222, 1237 (N.D. Ala. 2000) (excluding an

economist's proposed testimony where the proponent of the testimony had "not cited any

authority permitting an economist to create a geographic market without considering the

locations, pricing practices, and transportation costs of other competitors.").  Similarly, expert

opinion may be rejected if the expert is not familiar with the facts necessary to render a proper

opinion.  *Noel v. Martin*, 21 Fed. Appx. 828, 835 (10th Cir. 2001) (holding that a district court

had properly excluded a proposed expert where, among other things, the expert was unfamiliar

with certain key facts).  As demonstrated below, Mr. Young's "opinions" are in fact assumptions

which lack a basis in fact and evidence a lack of familiarity with key information critical to the

reliability of his opinion.

## 2. Application of Methodology to Facts

While rigor, reliance on pertinent authority, and a grasp of controlling facts are hallmarks

of reliability, experts are allowed, within reason, to base testimony on assumptions.  While

assumptions may be proper, however, "[i]t is axiomatic that an expert, no matter how good his

7

credentials, is not permitted to speculate." *Goebel v. Denver and Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000).  As the Court observed in *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997):

> [C]onclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  <u>A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered</u>.

(emphasis added); *see also Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 885 (10th Cir. 2005) (upholding the district court's rejection of testimony from an expert "unable to articulate why his view did not comport with the 'body of the evidence'...."); *see also Fanning v. Sitton Motor Lines, Inc.*, 2010 WL 4261476, *7 (D. Kan. 2010) ("[T]o satisfy the strictures of Daubert, an expert may not base his or her testimony upon assumptions that are not supported by the evidence." (citing *Truck Ins. Exch. v. MagneTek, Inc*., 360 F.3d 1206, 1213 (10th Cir. 2004))). Thus, assumptions advanced by an expert must be evaluated not only in light of the norms of that expert's discipline but in the context of the available evidence.

Where an expert's methodology is dependent upon assumptions that are outcome-determinative, under Rule 702 the expert's failure to fact check those assumptions is grounds to exclude the expert opinion.

> The accuracy of the assumption is not at issue for Rule 702 purposes, but the importance of the assumption may be.  Depending on the case, the <u>assumed fact may be so critical to the methodology that the witness' failure to ascertain the *actual* fact would render the application of the facts to the methodology unreliable; in such circumstances, the opinion would fail under Rule 702.</u>

*Crabbe*, 556 F. Supp. 2d at 1224 (emphasis added); *see also Atlantic-Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1164 – 67 (10th Cir. 2000) (affirming the district court's exclusion of an economist where the district court had ruled that it was "not going to permit [the economist] to make assumptions and projections and hypotheticals that conflict with the actual data."); *see also Elcock v. Kmart Corp.*, 233 F.3d 734, 756 (3rd Cir. 2000) (ruling that a district court abused its discretion in allowing an economist to testify where the economist's model "relied on several empirical assumptions that were not supported by the record."); *see also United States v. Swanquist*, 161 F.3d 1064, 1074 (7th Cir. 1998) (affirming a district court's exclusion of the testimony of an accountant where the accountant's opinion would have rested on a set of facts contrary to the evidence and "clearly was intended to throw smoke in the jurors' eyes."); *see also Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2004) ("Although it is not always a straightforward exercise to disaggregate method and conclusion, when the conclusion simply does not follow from the data, a district court is free to determine that an impermissible analytical gap exists between premises and conclusion."); *see also Shaw by Strain v. Strackhouse*, 920 F.2d 1135, 1142 (3rd Cir. 1990) (Trial court properly disregarded plaintiff's expert conclusions that rested on an assumption that was contrary to facts in the record).  Further, the failure to clarify assumptions as such or disguising them as facts in and of itself constitutes grounds for inadmissibility.  *See Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1080 n.4 (10th Cir. 2006) ("Expert testimony that fails to make clear that certain facts the expert describes as true are merely assumed . . . may not assist the trier of fact at all and, instead, may simply result in confusion.").

Here Mr. Young's assumed facts are so critical to his analytical methodology that his failure to ascertain the actual facts render the application of the facts to the methodology unreliable. For this reason, the opinions Mr. Young derives from those assumptions should be excluded under F.R.E. 702.

## II. SPECIFIC PORTIONS OF MR. YOUNG'S EXPERT OPINION TO BE EXCLUDED

Mr. Young's Expert Report, Exhibit 1, Section 1.3, Paragraph 1 at pp. 5 - 7 and Section 4.1.1 at pp. 35 – 36 sets forth numerous opinions Mr. Young proposes to state at trial.[4]

A.   Young Opinion, Expert Report, Section 1.3, Paragraph 1

Mr. Young's Opinion 1 begins with the general statement:

> During 1997, CEMEX made two efficiency improvements to their one-stage preheater, calciner pyroprocessing system. One improvement was made to the calciner internal geometry in order to reduce "burnover." The improvements to the calciner internal geometry were made in the spring of 1997 and reduced the cross sectional area of the calciner to increase turbulence for better air-fuel mixing.[5]

Opinion 1 then sets forth numerous "expert opinions" discussing the supposed consequences of the calciner modification:

> Reducing the cross section and increasing turbulence would cause the static pressure drop across the calciner to increase. At a given ID fan power consumption (amp load), this would reduce the volume of air that the fan can pull through the system and accordingly reduce the total amount of fuel that could be consumed in the pyroprocess. This would cause an overall decrease in fuel NOx emissions as well as a decrease in thermal NOx emissions in the kiln. Moreover,

---

[4] *See* Parties' Joint Motion Under Fed. R. Evid. 702 Regarding Opinions Of Defendant's Experts Mr. Hofmann And Mr Young, Doc. No. 176, at pp 1 - 2 (Young "Opinion 1") and at p.3 (Young "Opinion 3").

[5] Exhibit 1, Expert Report of Gerald L. Young, May 10, 2011, at 5.

> to the extent CEMEX was able to shift its fuel split in favor of the calciner after this improvement, any such shift would have further decreased thermal NOx formation in the kiln.  Improved calcination in the calciner would also have lowered the thermal load on the kiln and further reduced thermal NOx. . . . CEMEX also began using oxygen enrichment (OE) in the calciner to improve combustion conditions and to increase clinker production.[6]

B.    Young Opinion, Expert Report, Section 4.1.1

In this section of his report, Mr. Young reiterates and expands upon the opinions

summarized in Section 1.3, Paragraph 1 of his report:

> The FCT [Fuel Combustion Technologies] efficiency improvements to the calciner, which were installed in the spring of 1997, reduced the cross section of the calciner to increase turbulence for better air-fuel mixing.  Reducing the cross section and increasing turbulence would cause the static pressure drop across the calciner to increase.  At a given ID fan power consumption (amp load), this would reduce the volume of air that the fan can move through the system.   In the case where an ID fan is 'amped out' the air flow would be reduced when the static pressure of the system increases.[7]
> . . .
>
> FCT stated that '[m]odifying the internal profile will reduce the volume of the calciner which may affect the potential production capacity of the calciner.  FCT also stated that CEMEX should '[c]onsult with the Fuller Company with respect to production rate implications from calciner modifications.'  Based on these two precautionary statements, FCT was likely aware that their suggested efficiency improvement would increase the static pressure and reduce the air flow rate through the calciner.[8]
> . . .
>
> However, the total amount of fuel that could be burned in the overall pyroprocessing system would have been reduced because of the reduction in air flow due to the static pressure increase across the calciner.[9]

---

[6] *Id.*

[7] *Id.* at 35 – 36 (emphasis added) (footnotes omitted).

[8] *Id.* at 36 (emphasis added) (footnotes omitted).

[9] *Id.* (emphasis added).

. . .

It would be reasonable to conclude that <u>this improvement to the calciner would decrease overall NOx emissions</u> for several reasons:

- Because the total fuel that could be consumed by the pyroprocessing system was reduced, overall fuel NOx emissions would decrease.
- With less fuel being burned in the rotary kiln, thermal NOx would decrease.
- To the extent this improvement allowed fuel to be shifted from the kiln to the calciner, even further reductions in thermal NOx generated in the kiln would result.
- Improved combustion conditions in the calciner would have resulted in a higher degree of calcination, reducing the heat (fuel) requirements in the rotary kiln and thereby reducing thermal NOx formation.

In summary, while the calciner combustion chamber improvement was implemented primarily to minimize 'burnover,' it also improved combustion efficiency in the calciner and resulted in reduced CO and NOx emissions from the facility.[10]

C.     Sur-Rebuttal Expert Report, Page 7

At page 7 of his Sur-Rebuttal Report Mr. Young states:

With additional oxygen available in the calciner, more fuel can be burned there, which reduces the thermal load on the rotary kiln.  Further support for this can be seen by observing the kiln feed temperature parameter (TI 550) during the 1997 test.  Kiln feed temperature measures the temperature of the feed exiting the cyclone and entering the kiln feed hood. This generally reflects the relative thermal heat transfer that occurred in the calciner. <u>The increased kiln feed temperature during the oxygen enrichment portion of the test indicates that CEMEX successfully increased the portion of thermal load on the calciner.</u>[11]

Mr. Young presents the assumptions set forth in Section II. A. – C above as if they were

fact.  Mr. Young's failure to distinguish assumptions from facts in both Sections 1.3 and 4.11

_____

[10] *Id*. (footnotes omitted).

[11] Exhibit 11, Sur-Rebuttal Expert Report of Gerald L. Young, October 11, 2011, at 7 (emphasis added) (footnotes omitted).

would alone constitute grounds for inadmissibility under F.R.E. 702.  *Champagne Metals*, 458

F.3d at 1080 n.4.  More critically, as explained below, the quantum of data underlying these

assumptions is nil and each assumption is contradicted by multiple sources.  As such, the gap

between Mr. Young's assumptions and his ultimate opinions is much too great to be considered

reliable and therefore these opinions should be excluded.  Fed. R. Evid. 702.

## III.  ARGUMENT

A.      The Reduction in the Calciner Static Pressure Drop Is Speculative and Does Not
        Have the System Consequences Mr. Young Identified

Mr. Young describes the effect of the 1997 calciner modification as follows:

The improvements to the calciner internal geometry were made in the
spring of 1997 and reduced the cross sectional area of the calciner to
increase turbulence for better air-fuel mixing.  Reducing the cross section
and increasing turbulence would cause the static pressure drop across the
calciner to increase.  At a given ID fan power consumption (amp load),
this would reduce the volume of air that the fan can pull through the
system and accordingly reduce the total amount of fuel that could be
consumed in the pyroprocess.[12]

. . .

Reducing the cross section and increasing turbulence would cause the
static pressure drop across the calciner to increase.  At a given ID fan
power consumption (amp load), this would reduce the volume of air that
the fan can move through the system.  In the case where an ID fan is
"amped out" the air flow would be reduced when the static pressure of the
system increases.[13]
. . .

---

[12] Exhibit 1, Expert Report of Gerald L. Young, May 10, 2011, at 5 (emphasis added).

[13] *Id.* at 35 – 36 (emphasis added) (footnotes omitted).

> [T]he total amount of fuel that could be burned in the overall pyroprocessing system would have been reduced because of the reduction in air flow due to the static pressure increase across the calciner.[14]

Summarized more plainly, in this portion of his opinion Mr. Young postulates that the calciner modification reduced air flow through the pyroprocessing system, resulting in a reduced ability throughout the system to burn fuel.  As discussed below, this assumption goes too far.

The only contemporaneous evidence Mr. Young identifies in his Report[15] to support his assumption that the calciner modification caused reduced air flow throughout the pyroprocessing system is an article entitled Case Study of Physical Modeling at Southdown's Lyons Plant,[16] The article, Case Study of Physical Modeling at Southdown's Lyons Plant, in fact contradicts Mr. Young's assumptions.

In 1996 FCT was hired by CEMEX to study the calciner and make recommendations to reduce the "burnover" problem.  In formulating possible solutions, FCT recommended altering the internal configuration of the calciner.  In connection with that undertaking, FCT examined the very issue Mr. Young raises in his report and concluded that the calciner modification would only have a negligible impact on air flow.

> At that time there was some skepticism as well as some worry that the parallel insert would restrict air flow.  FCT agreed to study the model further to predict the potential for increased pressure drop resulting from

---

[14] *Id*. at 36. (emphasis added).

[15] *Id.* at 35 n.29.

[16] Exhibit 2, Case Study of Physical Modeling at Southdown's Lyons Plant, CMXLYO00402635.

the insert.  <u>When that study indicated negligible restriction we started
making plans to follow their recommendations</u>.[17]

When asked if he looked for data pre- and post- calciner modification to confirm his

assumption that the calciner reduced system-wide air flow, Mr. Young stated, "when I wrote

that in the summary of opinions and discussed it in the text of the report, <u>I was not looking for

data to support the fact that the static pressure increased</u>."[18]  When asked whether he had found

anything to contradict FCT's characterization of the restriction as "negligible," Mr. Young

stated that he had not found anything to contradict FCT's conclusion.[19]

CEMEX's own "combustion" expert, Dr. Kevin Davis, when asked about the impact of

the calciner change of the movement of gases through the pyroprocessing system, contradicted

Mr. Young's entire thesis by opining that "<u>it would be surprising if that pressure drop were even

noticeable on the scale of the system</u>...."[20]  When asked whether or not he agreed with Dr.

Davis's conclusion that it would be surprising if that pressure drop was even noticeable system-

wide, Mr. Young replied:

> I don't believe that I either agree or disagree. . . . The magnitude of that increase, I
> am not able to determine.  So whether it was noticeable on the pyroprocessing
> system or not, I don't have an opinion.[21]

---

[17] *Id.* at CMXLYO00402637.

[18] Exhibit 4, Deposition of Gerald Young, July 27, 2011, at Tr. 56: 11 – 21 (emphasis added).

[19] *Id.* at Tr. 59: 9 – 12, 61:10 – 16 (On page 61, when asked whether he had any reason to
disagree with the conclusion in the FCT report Mr. Young replied, "I have no reason to disagree
with it, other than . . . the term 'negligible' is a very subjective term.").

[20] Exhibit 5, Deposition of Kevin Davis, PhD, July 21, 2011, at Tr. 218: 7 – 15, 220: 10 – 15
(emphasis added).

[21] Exhibit 4, Deposition of Gerald Young, July 27, 2011, at Tr. 63: 6 - 11.

Finally, Mr. Young's deposition testimony contradicts his own expert Report. Mr. Young's report assumes that the total amount of fuel that could be burned in the overall pyroprocessing system would have been reduced because of the reduction in air flow due to the calciner modification.[22] However, when asked whether he had determined to what extent air flow or fuel consumption had changed because of the calciner modification Mr. Young stated:

> I couldn't quantify what the pressure drop would have been. Although I know it was higher, I don't know by how much, which leads me to, I cannot quantify the effect on the airflow through the ID fan, which then I cannot quantify the amount of fuel – or have the effect on the amount of fuel.[23]

> I'm unable to quantify what it did to pressure drop or airflow, which also leads me to not being able to quantify what it did to the total fuel consumption.[24]

> [T]he information was not available, and – to quantify what that change produced, in the way of airflows or fuels or anything else, including NOx emissions . . . I was not able to quantify the effect of – on NOx emissions of that improvement in combustion.[25]

The foregoing makes clear that while Mr. Young assumed that the modification to the calciner would restrict the movement of air moving throughout the pyroprocessing system to such a degree that fuel consumption throughout the system would be reduced, he failed to ascertain whether in fact any of this actually occurred. For instance, when

---

[22] Exhibit 1, Expert Report of Gerald L. Young, May 10, 2011, at 36.

[23] Exhibit 4, Deposition of Gerald Young, July 27, 2011, at Tr. 73: 11 – 22 (emphasis added).

[24] *Id.* at Tr. 74: 16 – 18 (emphasis added).

[25] *Id.* at Tr. 75: 11 – 17 (emphasis added).

asked whether the calciner modification reduced fuel use[26] he admitted that he simply did

not know:

> Q.  After the change to the [calciner] refractory wall in 1997 . . . <u>do you
> know whether or not overall fuel usage increased, decreased, or remained
> the same</u>, specifically with respect to the calciner?
> A.  <u>I do not recollect that I saw that</u> . . . .
> Q.  <u>You have no opinion one way or the other</u>?
> A. No opinion one way or the other.[27]

> Q.   Your prior testimony indicated that you did not attempt to quantify the
> change on the total volume of gas flowing through the system.
> A.   That is correct.
> Q.   Okay.  Having not done that, how can you opine on the amount of –
> or the change in fuel use that would be attributable to the modification of
> the refractory wall?
> A.   <u>I didn't see anything about the quantity of fuel, or quantify the amount
> of fuel that was reduced</u>.[28]

Moreover, CEMEX's former plant Manager, Mr. Stephen Goodrich, in fact contradicted

this assertion.  When asked whether the <u>same</u> amount of fuel was being burned in the calciner

before and after the modification, Mr. Goodrich replied, "within the normal range, yes."[29]

With regard to Mr. Young's opinions on the effects of the calciner modification

on system air flow and fuel use, Mr. Young's own testimony acknowledges that his

assumptions are not supported by <u>any</u> data. Therefore, under F.R.E. Rule 702 this portion

of Mr. Young's opinion should be excluded.  Further, because Mr. Young's assumed

---

[26] Exhibit 1, Expert Report of Gerald L. Young, May 10, 2011, at 36 ("[T]he total amount of fuel
that could be burned in the overall pyroprocessing system would have been reduced….").

[27] Exhibit 4, Deposition of Gerald Young, July 27, 2011, at Tr. 85: 17 – 25 (emphasis added).

[28] *Id.* at Tr. 69: 11 – 20 (emphasis added).

[29] Exhibit 9, Deposition of Stephen Goodrich, December 9, 2010, at Tr. 56: 3 – 20.

facts were critical to both his methodology and ultimate opinion, his failure to ascertain the <u>actual</u> facts renders his methodology unreliable.  This is particularly so when the available facts contradict Mr. Young's fundamental assumptions.  Because the analytical gap between his assumptions and ultimate opinions as to the effects of the calciner modification on fuel use and airflow in the pyroprocessing system is simply too great, these opinions should be excluded under F.R.E. 702.  *Crabbe*, 556 F. Supp. 2d 1224.

      B.      <u>The Evidence Contradicts Mr. Young's Assumption that the Degree of Calcination Increased</u>

Mr. Young postulates that calciner modification resulted in a more complete processing of raw feed in the calciner ("improved calcination").  Because of this improved calcination, Mr. Young hypothesizes that the kiln could do less work, use less fuel, and produce less $NO_x$ emissions.

> Improved calcination in the calciner would also have lowered the thermal load on the kiln and further reduced thermal NOx.[30]
>
> . . .
>
> Improved combustion conditions in the calciner would have resulted in a higher degree of calcination, reducing the heat (fuel) requirements in the rotary kiln and thereby reducing thermal NOx formation.[31]

As demonstrated below, Mr. Young's assumption that, after the calciner was modified, feed entering the kiln was more completely calcinated is speculation which in fact is contradicted by numerous sources.  Because this assumption is flawed, the opinion extrapolated from it, that the modification allowed the kiln to do less work, also must fail.

---

[30] Exhibit 1, Expert Report of Gerald L. Young, May 10, 2011, at 5.

[31] *Id.* at 36.

Mr. Young admits that he has no data to support his contention that, after the modification of the calciner, the kiln feed exiting the calciner and entering the kiln was more completely calcinated.

> Q. Have you seen any data from the period before and after deployment of oxygen and the modification to the refractory wall in 1997 that would quantify the degree of calcination of raw meal exiting the calciner? . . .
> A. I don't recall seeing quantification of the degree of calcination pre and post changes to the calciner. I don't recall seeing any information there.[32]
>
> . . .
>
> Q. Is it your – was there any change in – after the deployment of OE and the modification to the refractory wall, was there any change in the degree of calcination from material leaving the kiln, raw material leaving the kiln? . . .
> THE WITNESS: From the information that I reviewed, to the best of my knowledge, I don't believe I saw anything that specifically stated what the degree of calcination was, subject – or subsequent to those changes.[33]

When pressed further Young stated:

> Q. So it is your contention that the degree of calcination, after those two changes, increased, as opposed to could increase?
> A. I don't – I don't think I would say that the degree of calcination increased. The degree of calcination certainly could increase, but I'm not sure that it did, or at least I don't remember.[34]

CEMEX's own combustion expert, Dr. Kevin Davis, also acknowledged that he had not seen any data that would establish that feed calcination had increased.

---

[32] Exhibit 4, Deposition of Gerald Young, July 27, 2011, at Tr. 90: 4 – 11 (emphasis added).

[33] *Id.* at Tr. 88: 5 – 15 (emphasis added).

[34] *Id.* at Tr. 94: 15 – 21 (emphasis added).

I have – I have not seen data indicating that the fraction of the raw mix entering the calciner has – you know, the – the 70 percent calcination number within the calciner, <u>I have not seen data that that has increased above 70 percent.</u> [35]

Mr. Young's assumption that the modification of the calciner and deployment of oxygen enrichment resulted in an increase in calcination of feed entering the kiln is calculated is flatly contradicted by CEMEX's plant manager at the time, Mr. John Lohr, and CEMEX's in-house authority on oxygen enrichment, Herman Tseng.  In an article discussing oxygen enrichment published in a trade journal, Mr. Lohr and Mr. Tseng stated that "<u>the degree of precalcination of the hot meal to the kiln remained at 70-75 per cent.</u>"[36]  Data collected during a March 1997 oxygen enrichment test conducted by CEMEX further confirms that the degree of calcination remained within the historic 70 – 75% average.  That data shows that while the degree of calcination during the test varied from 63.57 to 77.31 percent, the average calcination over the duration of the test period was 71.94%,[37] well within the historic 60 – 75% average identified by Messrs. Tseng and Lohr.[38]

Mr. Young extrapolated the conclusion that the heat requirements on the kiln would be reduced, decreasing thermal $NO_x$ formation, from the flawed assumption that modification to the

---

[35] Exhibit 5, Deposition of Kevin Davis, PhD, July 21, 2011, at Tr. 137: 9 – 19 (emphasis added).

[36] Exhibit 6, Herman Tseng & John Lohr, *Oxygen Enrichment*, Cement Technology, CMXLYO00045538 at 39 (emphasis added).

[37] Exhibit 8, <u>Project Outline for Oxygen Enrichment Test at Lyons – March 1997</u>, CMXLYO00612385 at 90.

[38] Exhibit 7, <u>Lyons Plant Pyroprocess Training</u>, CMXLYO00186916 at 19 (Confirms that the degree of calcination historically ranged between 60 – 75%).  .

combustion chamber and the use of oxygen enrichment increased the levels calcination of feed entering the kiln.[39]

Mr. Young's assumptions about changes in the degree of calcination are unsupported by any facts.  Mr. Young himself admits to not knowing whether the degree of feed calcination post-modification, changed from the pre-modification degree of feed calcination.  The absence of any data to support Mr. Young's assumptions alone should warrant exclusion of this opinion under Fed. R. Evid. 702.  Compounding this error is the fact that Mr. Young did not consider and account for the contrary evidence in the record that was available to him.   This lapse is critical.  Where assumptions conflict with the actual data the assumptions should be stricken.  *Atlantic-Richfield Co.*, 226 F.3d at 1164-67.   Finally, even if we were to assume some change in the degree of calcination as Mr. Young invites us to, Mr. Young's failure to quantify the degree of change leaves us without a basis to determine whether it was of sufficient magnitude to have the system-wide consequences he attributes to it.  As such, the analytical gap between the assumption that calcination increased and Mr. Young's opinion that heat (fuel) requirements in the rotary kiln were reduced to such a degree that thermal $NO_x$ formation in the kiln decreased is too far a leap.  For these reasons, this opinion should be excluded under Fed. R. Evid. 702.  *Bitler*, 400 F.3d at 1233 ("[W]hen the conclusion simply does not follow from the data, a district

---

[39] Exhibit 1, Expert Report of Gerald L. Young, May 10, 2011, at 36; Exhibit 4, Deposition of Gerald Young, July 27, 2011, at Tr. 91: 1 – 10 (Mr. Young acknowledged in his deposition, however, that "[i]f the feed entering the kiln from the calciner is at the same degree of calcination, then the amount of energy required in the rotary kiln should remain the same….").

court is free to determine that an impermissible analytical gap exists between premises and

conclusion.").

C.    The Evidence Contradicts Mr. Young's Assumption That the Fuel Balance
Between the Calciner and Kiln Changed.

Mr. Young opines that:

> [T]o the extent CEMEX was able to shift its fuel split in favor of the
> calciner after this improvement, any such shift would have further
> decreased thermal $NO_x$ formation in the kiln.[40]

He also states:

> To the extent this improvement allowed fuel to be shifted from the kiln to
> the calciner, even further reductions in thermal $NO_x$ generated in the kiln
> would result.[41]

Mr. Young's conditional assumption that the calciner modification and deployment of

oxygen enrichment may have altered the distribution of fuel between the calciner and kiln in any

significant and permanent way is unsupported by any factual reference.  Moreover, as discussed

below, a substantial body of facts contradicts Mr. Young's assumption that any real and

permanent change in the distribution of fuel between the calciner and kiln resulted from the

calciner modification.  Since the record shows there was no significant and permanent shift in the

allocation of fuel between the calciner and kiln, the opinion extrapolated from that assumption,

that less thermal $NO_x$ was generated in the kiln must also fail.

---

[40] Exhibit 1, Expert Report of Gerald L. Young, May 10, 2011, at 5.

[41] *Id.* at 36.

In the article by Messrs. Tseng and Lohr, the authors note that there is generally a "50:50 per cent fuel split between [the] main burner and calciner."[42]   A document titled "Lyons Clinker Production, Kiln Sensitivities and Limits" states, "<u>Historically, the optimum fuel split between the calciner and the kiln has been 55% calciner & 45% kiln</u>."[43]   CEMEX's plant manager, Mr. Goodrich, confirmed that the fuel split has remained consistent at 55% calciner and 45% kiln.[44]

Mr. Young admits that he did not know whether, prior to the calciner modification, the fuel split was ever at 55% calciner and 45% kiln.[45]   When asked whether in fact the modification of the calciner resulted in a permanent and consistent change in the historic range of fuel allocation between the calciner and kiln, Mr. Young stated:

> [I]t would have permitted them to have a permanent change.  Whether it was done consistently or not, I don't know for sure.[46]

He further stated:

> If the question is, 'Was the fuel split always 55 percent?' based on my experience at cement plants, no.  It is – the fuel split to a calciner varies, depending on operational considerations of the pyroprocessing system.[47]

---

[42] Exhibit 6, Herman Tseng & John Lohr, *Oxygen Enrichment*, Cement Technology, CMXLYO00045538 at 39.

[43] Exhibit 10, <u>Lyons Clinker Production, Kiln Sensitivities and Limits</u>, CMXLYO00182757 at 58 (emphasis added).

[44] Exhibit 9, Deposition of Stephen Goodrich, December 9, 2010, at Tr. 42: 9 – 12.

[45] Exhibit 4, Deposition of Gerald Young, July 27, 2011, at Tr. 78: 10 – 16.

[46] *Id.* at Tr. 79: 17 – 23.

[47] *Id.* at Tr. 83: 23 – 84: 2.

In sum, Mr. Young believes that, to the extent there was a shift in the fuel allocation between the calciner and kiln, "any such shift would have further decreased thermal $NO_x$ formation in the kiln."[48]   However, Mr. Young admits that he does not know what the fuel split was before the modifications or whether the fuel split changed on a consistent or permanent basis after the modifications.  The facts set forth above vitiate Mr. Young's supposition completely as it clearly appears that the fuel split, both historically and presently, remains at about 55% calciner, 45% kiln.

Here, the assumed facts, that a shift in the historical fuel split happened post-modification, are critical to Mr. Young's methodology.  However, it is clear that no basis for Mr. Young's underlying assumption exists.  Not only is the assumption without basis, but it is directly contradicted by the record.  Further, as the assumption is critical to his opinion that "any such shift would have further decreased thermal $NO_x$ formation in the kiln," that opinion too must fail.  Mr. Young's lack of data and his failure to ascertain the actual facts should be grounds to exclude this portion of his opinion under F.R.E. 702.  *Crabbe*, 556 F. Supp. 2d at 1224.


        D.      Mr. Young's Conclusion that the Modifications Resulted in Decreased $NO_x$
                Emission is Built on a Series of Flawed Assumptions and Should Be Excluded

Mr. Young's sub-opinions assume that the calciner modification resulted in decreased fuel consumption by the pyroprocessing system, reduced the fuel burned in the kiln, altered allocation of fuel between the calciner and kiln, reduced the flow of gases through the

---

[48] Exhibit 1, Expert Report of Gerald L. Young, May 10, 2011, at 5.

pyroprocessing system, and an increase in the degree of calcination in feed leaving the calciner

and entering the kiln.[49]  As discussed above, each of these assumptions is completely

unsupported and often contradicted by the available facts.  Because Mr. Young's opinion that the

calciner modification would "cause an overall decrease in fuel $NO_x$ emissions as well as a

decrease in thermal $NO_x$ emissions in the kiln"[50] is derived solely from these flawed

assumptions, it too must be rejected because of the impermissible analytical gap between

premises and conclusion.  *Bitler*, 400 F.3d at 1233.

E.  Mr. Young's Assumption That Kiln Feed Temperature Increased During the
Oxygen Enrichment Portion Is Speculative

After being deposed on his Report and reviewing the United States' expert rebuttal

reports, Mr. Young, in his Sur-Rebuttal Report engages in a transparent attempt to rehabilitate

his theory that CEMEX successfully increased the portion of thermal load on the calciner.   In his

Sur-Rebuttal Report Mr. Young asserts that:

> With additional oxygen available in the calciner, more fuel can be burned there,
> which reduces the thermal load on the rotary kiln.  .  .  .  The increased kiln feed
> temperature during the oxygen enrichment portion of the test indicates that
> CEMEX successfully increased the portion of thermal load on the calciner.[51]

Mr. Young supports his contention that a shift in the thermal load occurred solely on a supposed

increase in kiln feed temperature measured when oxygen was injected during the March 1997

---

[49] Exhibit 1, Expert Report of Gerald L. Young, May 10, 2011, at 35 – 36.

[50] *Id.* at 5.

[51] Exhibit 11, Sur-Rebuttal Expert Report of Gerald L. Young, October 11, 2011, at 7 (emphasis
added).

oxygen enrichment test.[52]  The problem with Mr. Young's contention is that typical kiln feed

temperature levels after the calciner modification, which preceded the oxygen enrichment test,

were in fact already higher than those measured during the test.

The information Mr. Young relies on shows that during the March 1997 oxygen

enrichment test, the temperature of feed exiting the calciner and entering the kiln ranged between

1391 degrees Fahrenheit (with oxygen off) to 1507 degrees Fahrenheit (with oxygen on). [53]

Observing the temperature difference between when oxygen was used and not used during the

test, Mr. Young surmises that the calciner was carrying more of the thermal load.   The article by

Tseng and Lohr, however, notes that, after the calciner was modified in 1980, feed was entering

the kiln at temperatures that were already above 850 degrees Celsius (1562 degrees

Fahrenheit).[54]  Therefore, prior to the March 1997 oxygen enrichment test, feed was in fact

entering the kiln at temperatures that were even higher than those measured when oxygen was

being injected during the March 1997 test.   Further calling into question Mr. Young's opinion is

the fact that, during the March 1997 test, the exit temperature of the gases leaving the calciner

ranged between 1518 degrees Fahrenheit and 1531 degrees Fahrenheit,[55]  well below the historic

---

[52] *Id.*; s*ee also* Exhibit 8, Project Outline for Oxygen Enrichment Test at Lyons – March 1997,
CMXLYO00612385 at 94 (cited in Exhibit 11, at 7 n.16).

[53] Exhibit 8, Project Outline for Oxygen Enrichment Test at Lyons – March 1997,
CMXLYO00612385 at 94 (Column TI – 550).

[54] Exhibit 6, Herman Tseng & John Lohr, *Oxygen Enrichment*, Cement Technology,
CMXLYO00045538 at 39.

[55] Exhibit 8, Project Outline for Oxygen Enrichment Test at Lyons – March 1997,
CMXLYO00612385 at 94 (Column TI – 575).

temperature range of the calciner's exit gases during normal operations (1550º F).[56]  Finally, as noted above, the average degree of calcination of feed leaving the calciner and entering the kiln measured during the March 1997 test remained within the historic range of calcination (70 – 75%).  *See* Section III.B., *supra,* at 19.  The fact that the average degree of calcination, even with oxygen enrichment, remained within the historic range contradicts Mr. Young's assumption that, with oxygen enrichment, the calciner did more of the "work".

As explained above, Mr. Young's opinion that oxygen enrichment reduced the thermal load on the rotary kiln[57] rests solely on an assumption which is contradicted by facts readily available to Mr. Young and must be rejected because of the impermissible analytical gap between premises and conclusion.  *Bitler*, 400 F.3d at 1233.

## CONCLUSION

For the foregoing reasons, Plaintiff requests that this Court not admit into evidence the expert testimony of Mr. Young specifically delineated in Section II of this brief.[58]

---

[56] *See* Exhibit 3, <u>Southwestern Portland Cement: General Information About the Source</u>, CMXLYO00038852 at 53 ("The precalciner has 2.5% oxygen [$O_2$] and a temperature of 1,550ºF.").

[57] *See* Exhibit 11, Sur-Rebuttal Expert Report of Gerald L. Young, October 11, 2011, at 7.

[58] Should the Court grant Plaintiff's motion, Plaintiff requests that the disposition make clear that any other expert opinion that rests solely on those portions of Mr. Young's testimony that are not admitted also be excluded.

## COMPLIANCE WITH D.C.COLO.LCivR 7.1

Pursuant to D.C.COLO.LCivR 7.1(A), counsel for Plaintiff conferred with counsel for Defendant regarding the relief requested in this motion.  Counsels are unable to amicably resolve the matter.  Counsel for CEMEX opposes this motion.

Respectfully Submitted,

January 4, 2013.

*/s/ John Moscato*
JOHN N. MOSCATO
Senior Counsel
U.S. Department of Justice
Environmental Enforcement Section
999 18th Street, South Terrace - Suite 370
Denver, CO 80202
Telephone: (303) 844-1380
Email:  john.moscato@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 4, 2013, the foregoing Plaintiff United States of America's Motion In Limine to Exclude Certain Testimony of Gerald L. Young was filed electronically using the Court's ECF system and automatically served on counsel of record, identified below:

Chet M. Thompson
cthompson@crowell.com

Richard E. Schwartz
rschwartz@crowell.com

David Patrick Ross
dross@crowell.com

Derek A. Hahn
dhahn@crowell.com, csolorio@crowell.com

Hugh Q. Gottschalk
gottschalk@wtolaw.com, hart@wtolaw.com, gottesfeld@wtolaw.com

Jessica Scott
scott@wtotrial.com, farina@wtotrial.com

John N. Moscato
John.Moscato@usdoj.gov, Jason.Obold@usdoj.gov, katherine.tribbett@usdoj.gov

James D. Freeman
james.freeman2@usdoj.gov

Leigh P. Rendé
leigh.rende@usdoj.gov

Linda S. Kato
Kato.Linda@epa.gov                  */s/ John N. Moscato*
                                    John N. Moscato, Senior Counsel
                                    U.S. Department of Justice
                                    Environmental Enforcement Section
                                    999 18th Street, South Terrace - Suite 370
                                    Denver, CO 80202
                                    Telephone: (303) 844-1380
                                    Email: john.moscato@usdoj.gov