**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 09-cv-00019-MSK-MEH

UNITED STATES OF AMERICA

                Plaintiff,

    v.

CEMEX, INC.,

                Defendant.

---

**UNITED STATES' MOTION *IN LIMINE* TO EXCLUDE
CERTAIN TESTIMONY OF JOHN E. HOFMANN PURSUANT TO
FEDERAL RULE OF EVIDENCE 402**

---

      Plaintiff United States of America hereby moves *in limine* for an Order precluding Mr. John E. Hofmann from testifying that the prevention of significant deterioration ("PSD") requirements of the Clean Air Act and its implementing regulations did not require CEMEX, Inc. ("CEMEX") to conduct a PSD review for the projects that CEMEX undertook at its Lyons, Colorado cement manufacturing facility (the "Lyons Plant") from 1997-2000 because there was no "causal relationship" between the projects and an increase in emissions and because CEMEX "reasonably believed" that PSD review was unnecessary.  The "causal relationship" and "reasonable belief" theories that Mr. Hofmann advances are contrary to the provisions of the 1980 PSD regulations for determining PSD applicability for "major modifications," and are thus incorrect as a matter of law.  As a result, they are not "of consequence in determining the action" and are therefore irrelevant under Federal Rule of Evidence 401 and not admissible under Rule 402.  These opinions also should be disregarded on the grounds that they constitute impermissible testimony on the governing law.

## LEGAL STANDARD

It is axiomatic that irrelevant evidence is not admissible.  Fed. R. Evid. 402.  The test for relevance is whether "(a) [the evidence] has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.  A determination of a fact's relevance thus requires a dual inquiry: "(1) whether the evidence is *probative* or factually relevant to the proposition asserted . . . , and (2) whether the proposition for which the evidence is offered is *properly* provable in the case . . . ."  *Sims v. Great American Life Ins. Co.*, 469 F.3d 870, 881 (10th Cir. 2006).

## BACKGROUND

The Clean Air Act provides that no "major emitting facility" may undertake a "modification" unless it has obtained a permit pursuant to the PSD program.  42 U.S.C. §§ 7475(a), 7479(2)(C).  A modification is "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted."  42 U.S.C. § 7411(a)(4).  Under EPA's 1980 PSD regulations, the requirement to obtain a PSD permit applies to new "major stationary sources" and "major modifications."  *See* 45 Fed. Reg. 52,675, 52,735 (1980).  *See also* 42 Fed. Reg. 57,480 (1977) ("Sources subject to PSD review will be those identified in the proposed definitions of 'major stationary source' and 'major modification.'").  Moreover, the "term 'major modification' serves as the definition of 'modification' or 'modified' when used in the Act in reference to a major stationary source."  44 Fed. Reg. 51,948, 51,952 (1979).

Colorado has promulgated regulations that implement the federal PSD program as part of its State Implementation Plan ("SIP"), including the requirements applicable to "major

modifications."[1]  *See* Ex. A, 5 C.C.R. 1001-5, Part B, IV.D.3; 40 C.F.R. § 52.21(b)(2).  The PSD

regulations exempt certain changes from the definition of "major modification," such as routine

maintenance, repair and replacement and the use of certain alternative fuels or raw materials.

Ex. A, 5 C.C.R. 1001-5, Part A, I.B.35.B.; s*ee* 40 C.F.R. § 52.21(b)(2)(iii).  A project that is

determined to be a major modification must undergo a control technology review – including the

application of Best Available Control Technology ("BACT") – a source impact analysis, and a

pre-application air quality analysis, among other requirements.  Ex. A, 5 C.C.R. 1001-5, Part B,

IV.D.3; *see* 40 C.F.R. § 52.21(j), (k), (m).

    Therefore, to determine PSD applicability for a change to an existing source under the

1980 PSD regulations and the 1997 SIP provisions, the crux of the matter is whether a change is

a "major modification."  A "major modification" is defined as "any physical change in [or

change in] the method of operation of . . . a major stationary source that would result in a

significant net emissions increase of any pollutant subject to regulation" under the Clean Air Act.

Ex. A, 5 C.C.R. 1001-5, Part A, I.B.35.B.; *see* 40 C.F.R. § 52.21(b)(2)(i).  Whether a change

would "result in a significant net emissions increase" requires further resort to the regulatory

definitions.  A "net emissions increase" is defined as "[a]ny increase in actual emissions from a

particular physical change or change in method of operation" and any other actual emissions

increase or decrease at the source that is contemporaneous and creditable.  Ex. A, 5 C.C.R. 1001-

5, Part A, I.B.36.; *see* 40 C.F.R. § 52.21(b)(3)(i)(a)-(b).  The regulations further provide that in

---

[1]  Colorado has promulgated regulations that upon EPA approval form the Colorado SIP.  EPA
initially approved the PSD provisions of the Colorado SIP on September 2, 1986.  51 Fed. Reg.
31,125 (1986).  Colorado subsequently re-codified and amended the PSD provisions, which EPA
approved effective February 20, 1997, 62 Fed. Reg. 2910 (1997).  In November 1998, EPA
collected the effective regulations, including the 1997 amendments, into what is known as the
1998 Colorado SIP compilation.  Relevant portions of the 1998 Colorado SIP compilation are
attached as Exhibit A.  The Background section of this brief also references the analogous
provisions in the 1980 PSD regulations, published in the 1981 edition of the C.F.R.

general "[a]ctual emissions as of a particular date shall equal the average rate, in tons per year, at which the unit emitted the pollutant during a two-year period which precedes the particular date and is representative of normal unit operation." Ex. A, 5 C.C.R. 1001-5, Part A, I.B.1.; *see* 40 C.F.R. § 52.21(b)(21)(i)-(ii).  However, to determine post-change emissions for an emissions unit that has not begun normal operations as of the date of the change – like the Lyons Plant in this case[2] – "actual emissions shall equal the potential to emit of the unit on that date." Ex. A, 5 C.C.R. 1001-5, Part A, I.B.1.c.; *see* 40 C.F.R. § 52.21(b)(21)(iv).  A facility's "potential to emit" is its "maximum capacity . . . to emit a pollutant under its physical and operational design." Ex. A, 5 C.C.R. 1001-5, Part A, I.B.44.; *see* 40 C.F.R. § 52.21(b)(4).  Considering these definitional provisions together, to determine whether a proposed change is a "major modification" a facility that has not begun normal operations must compare its pre-change actual emissions (the annual average over the previous two years) to its post-change potential emissions (its maximum capacity to emit under its physical and operational design) and determine if any resulting net emissions increase[3] is "significant."[4]  The comparison of actual and potential emissions in the PSD applicability analysis is known as the "actual-to-potential" test.

---

[2] This Court has already determined that the Lyons Plant had not "begun normal operations" within the meaning of the Colorado SIP and that any increase in emissions will be determined by the actual-to-potential test. *See* Docket No. 184 at 10.

[3] The "significant net emissions increase" analysis necessarily entails an assessment of whether there is a significant increase in actual emissions that results from a project, and then, if so, an assessment of the contemporaneous and creditable increases and decreases at the source (known as "netting"). *See* Ex. A, 5 C.C.R. 1001-5, Part A, I.B.36.  The focus of this brief is on the analysis of the emissions increase from the project, not the netting component. But references to "significant net increase" or "significant net emissions increase" in this brief should be considered to refer to the total analysis necessary to determine whether a major modification "results in" an increase in emissions as prescribed in the 1980 PSD regulations or 1997 SIP provisions.

## SUMMARY OF CONTESTED OPINIONS

Mr. Hofmann states at several points in his expert report that "PSD does not apply unless the source finds that there is a causal link between the proposed change and any post-change increase in emissions." Exhibit B, Expert Report of John E. Hofmann (May 10, 2011) ("Hofmann Report") at 4-4, 5-4. This might initially appear to be a poor paraphrase of the "result in a significant net emissions increase" language in the definition of "major modification." But Mr. Hofmann means something quite different. He contends that a causation analysis is a preliminary step the source undertakes *before* it conducts a PSD applicability review rather than a fundamental component of PSD review itself. CEMEX summarized this aspect of Mr. Hofmann's opinion in the parties' joint Rule 702 motion as follows:

> If a project does not cause an actual or potential increase in NOx emissions (*i.e.*, if the project is not causally related to an increase in NOx emissions), a source does not need to apply an emissions test to determine the magnitude of the (nonexistent) emissions increase, and no PSD review is required.

Parties' Joint Motion Under Fed. R. Evid. 702 Regarding Opinions of Defendant's Experts Mr. Hofmann and Young (Docket No. 176), at 4, Opinion 3. Mr. Hofmann, then, views the "results in" language in the definition of major modification as establishing a preliminary causation step in the PSD applicability analysis that may allow a source to avoid the actual-to-potential emissions comparison.

Mr. Hofmann further contends that a change is not causally related to an emissions increase where the source "reasonably believes" that the change will not increase emissions. In the joint 702 motion, for example, CEMEX restates Mr. Hofmann's opinion as:

> It was reasonable for CEMEX to believe that the 1997 combustion chamber project would not cause an increase in actual or potential NOx emissions (*i.e.*, the

---

[4] A net emissions increase of NOx is "significant" if it equals or exceeds 40 tons per year. Ex. A, 5 C.C.R. 1001-5, Part A, I.B.57; *see* 40 C.F.R. § 52.21(b)(23)(i).

project was not causally related to an increase in NOx emissions) and that no PSD review was required for this project.

*Id.* at 5, Opinion 4.  He similarly opines that it would have been "reasonable for CEMEX to believe" that each of the other projects at issue in this case – which he identifies as the 1997 ID fan motor replacement, the oxygen enrichment project, changes to the raw mill and finish mill, and the booster fan project – would not cause an increase in actual or potential NOx emissions, such that no PSD review was required.  *Id.* at 5, Opinion 5 (ID fan replacement); 5, Opinion 6 (oxygen enrichment); 7, Opinion 9 (changes to raw and finish mill); 7, Opinion 10 (booster fan).

Mr. Hofmann offers several subsidiary opinions that purportedly support his contention that CEMEX "reasonably believed" the projects were not "causally related" to an increase in emissions.  For example, he contends that CEMEX "reasonably believed" the calciner improvement project, the ID fan motor replacement project, and the Lyons expansion project would not cause a NOx emissions increase because there was no increase in *actual* (as opposed to *potential*) NOx emissions before and after the projects.  Ex. B, Hofmann Report at 5-5, 5-10, 5-27.  He contends that the calciner improvement and oxygen enrichment projects increased the efficiency of the Lyons Plant  *Id.* at 5-4, 5-16, 5-25, without assessing how or whether the purported efficiency increase would impact the actual-to-potential analysis required under the 1980 PSD regulations and the 1997 SIP provisions.  Finally, Mr. Hofmann supports his opinion with an analysis of the regulatory status of the 1998-2000 projects under EPA's *2002* PSD regulations.  *Id.* at 4-7.

**ARGUMENT**

I.     **MR. HOFMANN'S OPINION THAT CEMEX MAY AVOID PSD REVIEW
       BASED ON A PRELIMINARY DETERMINATION THAT THERE IS NO
       "CAUSAL RELATIONSHIP" BETWEEN THE 1997-2000 PROJECTS AND AN
       INCREASE IN NOX EMISSIONS SHOULD BE EXCLUDED UNDER RULE 402
       BECAUSE IT IS NOT RELEVANT**

Mr. Hofmann's opinion that the 1980 PSD regulations permit a source to avoid PSD

review (including the actual-to-potential test for a facility that has not begun normal operations)

based on a preliminary determination that there is no "causal relationship" between a project and

an increase in emissions is incorrect as a matter of law.  It is inconsistent with the regulatory

language, EPA guidance interpreting the regulations, and case law.  As such, Mr. Hofmann's

opinion on causation is not "of consequence in determining the action" and therefore is not

relevant and not admissible under Rules 401 and 402.  It should, then, be excluded.

A.     **The 1980 PSD Regulations Establish a Two-Step Process for Determining
       Whether a Project Is a "Major Modification"**

The 1980 PSD regulations and the 1997 SIP provisions define a "major modification" –

changes to a facility that are subject to PSD permit requirements – as "any physical change in [or

change in] the method of operation of a major stationary source that would result in a significant

net emissions increase" of a regulated pollutant.  *See* 40 C.F.R. 52.21(b)(2)(i); Ex. A, 5 C.C.R.

1001-5, Part A, I.B.35.B.  There are, then, two steps to the analysis of whether a project is a

major modification:  it must (1) constitute a physical change or change in the method of

operation of a major stationary source and (2) result in a significant net emissions increase.

Parsing the definition of "net emissions increase" – which requires reference to the definitions of

"actual emissions" and "potential to emit" – reveals that for a unit that has "not begun normal

operations" a major modification occurs when post-change potential emissions exceed pre-

change actual emissions by the regulatory significance level.  If application of the actual-to-

potential test shows that a change will "result in" a significant net increase in pollution, then PSD

requirements are triggered.  The 1980 PSD regulations and 1997 SIP provisions simply do not

permit the preliminary causation analysis Mr. Hofmann espouses.

EPA's longstanding interpretation of its regulations clearly supports this point.  In the

1992 rulemaking modifying the PSD applicability test for electric utilities, EPA described the

two-step applicability analysis for non-utility sources under the 1980 PSD regulations:

> The modification provisions of the NSPS and NSR programs are based on the
> broad NSPS definition of "modification" in section 114(a)(4) of the CAA.  That
> section contemplates a two-step test for determining whether activities at an
> existing facility constitute a modification subject to new source requirements.  In
> the first step, which is largely the same for NSPS and NSR, the reviewing
> authority determines whether a physical or operational change will occur.  If so,
> the reviewing authority proceeds in the second step to determine whether the
> physical or operational change will result in an emissions increase over baseline
> levels.

57 Fed. Reg. 32,314, 32,316 (1992).  With regard to the second step, EPA stated:

> Because the applicability determination must be made in advance of construction,
> EPA's NSR regulations provide that when an emissions unit "has not begun
> normal operations," actual emissions equal the "potential-to-emit of the unit." [see
> 40 CFR 52.21(b)(21)(iv)].  This approach is referred to as the actual-to-potential
> methodology.

*Id*. at 32,316-17.  *See also* 61 Fed. Reg. 38,250, 38,253-54 (1996) (same interpretation).  The use

of a facility's post-change potential emissions as a point of comparison in the second step means

that in some circumstances the actual-to-potential test will find an emissions increase when in

fact the facility owner does not intend to operate it in a manner that actually increases emissions

(such as with projects that may increase efficiency within a given period of operations).  As

EPA has recognized, the actual-to-potential test:

> reflects an initial presumption that a unit that has undergone a non-routine
> physical or operational change will operate at its full capacity year-round.  A
> source owner or operator may rebut the presumption that the unit will operate at
> its full potential by agreeing to limit its PTE through enforceable restrictions that

> limit the units' ability to emit more than their pre-modification actual emissions
> (plus an amount that is less than significant).

63 Fed. Reg. 39,857 (1998).  Accordingly, EPA's longstanding interpretation of the 1980 PSD

regulations is that a source that has not begun normal operations must use the actual-to-potential

test to determine whether a change "results in" a significant net increase in emissions such that

PSD requirements are triggered.  This interpretation stands in stark contrast to Mr. Hofmann's

opinion that a facility may assess the relationship between a project and an increase in emissions

separate and apart from the actual-to-potential emissions test.

　　　　Under well-settled principles of administrative law, EPA's interpretation of its

regulations is entitled to deference.  The rule in the Tenth Circuit is that "[a]n agency is entitled

to *substantial* deference when it acts pursuant to an interpretation of its own regulation."

*Arizona Public Service Co. v. U.S. Environmental Protection Agency*, 562 F.3d 1116, 1123 (10th

Cir. 2009) (upholding EPA's interpretation of its regulations under the CAA.)  "The agency's

interpretation is 'controlling unless plainly erroneous or inconsistent with the regulation.'"  *Id.*,

*citing Gonzales v. Oregon*, 546 U.S. 243, 256 (2006.)  Accordingly, the court must defer to

EPA's longstanding interpretation of the 1980 PSD regulations.

　　　**B.　　Courts Have Recognized that the Actual-To-Potential Test Is the
　　　　　　Appropriate Mechanism for Determining Whether a Proposed Change
　　　　　　"Results In" an Emissions Increase Under the 1980 PSD Regulations**

　　　　The Supreme Court has made clear that the 1980 PSD regulations set forth a two-step

process for determining whether a project is a major modification.  *See Environmental Def. v.*

*Duke Energy Corp.*, 549 U.S. 561, 578-79 (2007) (noting the "two separate components of the

regulatory definition of 'major modification'").  The leading case interpreting the second step in

the major modification provision is *Puerto Rican Cement Co., Inc. v. EPA*, 889 F.2d 292 (1st

Cir. 1989).  Here, the First Circuit examined EPA's use of the actual-to-potential emissions test

to determine that the proposed change at the facility in question resulted in a significant net increase in emissions:

> The statute applies its PSD requirements to the Company's proposed modification of its kilns only if the modification will "increase [ ] the amount of any air pollutant emitted." 42 U.S.C. §§ 7411(a)(4), 7479(2)(C). In deciding whether or not the kiln conversion would result in such an increase, EPA calculated the *actual* historical amount of pollutants that Kilns 3 and 6 emitted in the past (which, under the regulations, equals the average emissions over the past two years, *see* 40 C.F.R. § 52.21(b)(21)(ii)) and compared that with the amount of pollutants that the converted kiln would be *capable* of emitting in the future.

*Id*. at 296 (emphasis added). In other words, EPA undertook an actual-to-potential emissions comparison to determine whether the project would result in an emissions increase and therefore constitute a major modification. The defendant challenged EPA's analysis as representing "an improper, arbitrary, and contradictory interpretation of EPA's own regulations." *Id*. The court disagreed, stating,

> EPA's application of its regulation to the facts of this case complies with the expressed intent of the regulation's writers as well. In a preamble to the regulation, EPA says that, when calculating whether a physical change will bring about a significant net increase in emissions, "the source owner must [first] quantify the amount of the proposed emissions increase. This amount will generally be the *potential to emit* of the new or modified unit." 45 Fed. Reg. 52,677 (emphasis added).

*Id*. at 297. Significantly, the cement company in the *Puerto Rican Cement* case objected to EPA's interpretation of the regulations as it would, in its view, discourage the installation of more efficient equipment that would emit less pollution. *Id*. This is not unlike Mr. Hofmann's argument here: that increased efficiency at the Lyons plant means there would be no "causal relationship" between the project and an increase in emissions. The First Circuit rejected the company's argument because it did not account for the facility's increased *capacity*, noting that its emissions could increase notwithstanding the improved efficiency. *Id*. The court agreed with EPA that the actual-to-potential comparison was the appropriate test for determining whether the

facility's changes would result in an emissions increase and therefore constitute a modification under the Clean Air Act. *Id.* at 297-98 (a "new, more efficient kiln might give [the company] the economic ability to increase production; consequently, EPA could plausibly fear an increase in actual emissions").

In a recent decision in *United States v. Westvaco Corp.*, the defendant argued – like Mr. Hofmann here – that EPA must prove "that the physical change in question actually caused an increase in emissions" before applying the actual-to-potential test. *United States v. Westvaco Corp.*, No 00-2602, slip op. at 10 (D. Md. 2011) (attached as Exhibit C). The court disagreed, finding that "the nature of the post-change potential to pre-change actual emissions rate comparison renders unnecessary a causation test as proposed by Westvaco." *Id*. The court thus recognized that it is the actual-to-potential test itself that determines whether the change "results in" an emissions increase. There is not a preliminary causation test.

C.   **Mr. Hofmann's Opinion on Causation Should Be Excluded Under Rule 402 Because It Is Not "Of Consequence in Determining the Action" and Is Therefore Inadmissible**

Evidence must be relevant to be admissible. Fed. R. Evid. 402. To be relevant, the evidence must both "have a tendency to make a fact more or less probable" and be "of consequence in determining the action." Fed. R. Evid. 401. The Tenth Circuit has recognized that evidence is "of consequence in determining the action" where "the proposition for which the evidence is offered is properly *provable* in the case." *Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870, 881 (10th Cir. 2006) (emphasis in original). Whether evidence is "properly provable" depends on the substantive law governing the case. *Id.*; *Telum, Inc. v. E.F. Hutton Credit Corp.*, 859 F.2d 835, 838 (10th Cir. 1988) ("Substantive law . . . determines which facts are of consequence in a given action."). Evidence that is not permitted under the substantive law governing the case is not properly provable and should be excluded. *See Sims*, 469 F.3d at 882

11

(evidence supporting a defense that is not permitted "is of no consequence to the action and therefore not properly provable").

Mr. Hofmann advocates a three-step process for determining PSD applicability:  (1) Is a project a physical or operational change; (2) Is it causally related to an increase in emissions; and (3) If so, will it result in a significant net increase in emissions.  This is wrong as a matter of law.  The 1980 PSD regulations and the 1997 SIP provisions, EPA guidance, and case law provide for a two-step process.  If a project (step 1) constitutes a physical or operational change, the source must (step 2) determine whether the change will "result in a significant net increase in emissions." In a case like this one, where the source has not begun normal operations, this is done by comparing pre-change actual emissions to post-change potential emissions.  There is no preliminary causation analysis; causation is embedded in the actual-to-potential comparison.  As a result, Mr. Hofmann's opinion is not "properly provable" under the 1997 SIP provisions, the substantive law at issue in this case.  It is thus irrelevant and inadmissible under Rule 402.

## II.   MR. HOFMANN'S OPINION THAT IT WAS "REASONABLE FOR CEMEX TO BELIEVE" THAT THE 1997-2000 PROJECTS WOULD NOT RESULT IN AN EMISSIONS INCREASE SHOULD BE EXCLUDED UNDER RULE 402 BECAUSE IT IS NOT RELEVANT

Mr. Hofmann contends that CEMEX "reasonably believed" that the projects at issue in this case would not cause an increase in emissions.  This opinion is not relevant, and is therefore inadmissible, for three reasons.  First, like his opinion on causation, a facility's "reasonable belief" regarding the impact of proposed changes is not part of the PSD applicability analysis required under the regulations.  As it is not the analysis required under the applicable substantive law, it is not "of consequence in determining this action" and is therefore not relevant.  Second, an analysis of whether beliefs are "reasonable" does not require specialized understanding.  It is thus not helpful to the trier of fact.  Third, the Clean Air Act is a strict liability statute that

requires no proof of intent, so CEMEX's belief regarding the impact of the projects (whether reasonable or not) does not excuse it from violations of the Act.

A.   **Mr. Hofmann's Opinion Regarding CEMEX's Purported "Reasonable Belief" That The 1997-2000 Modifications Did Not Cause an Increase in Emissions Is Not "Of Consequence To a Determination of This Action" and Is Therefore Irrelevant and Inadmissible**

Mr. Hofmann's opinion that CEMEX "reasonably believed" that the projects would not cause an emissions increase is closely linked to his opinion on causation – discussed above – and is inadmissible for the same reason. The 1980 PSD regulations and 1997 SIP provisions provide that a physical or operational change triggers PSD requirements where it would "result in a significant net emissions increase" – comparing pre-change actual emissions with post-change potential emissions for a unit that has not begun normal operations. The facility's "reasonable belief" as to the impact of the change is not part of the regulatory calculus. As a result, Mr. Hofmann's "reasonable belief" opinion is not "of consequence to a determination of this action" under the 1980 PSD regulations and the 1997 SIP provisions, the substantive law at issue in this case. It is thus irrelevant and inadmissible under Rule 402.

The subsidiary opinions Mr. Hofmann offers to support his contention that CEMEX "reasonably believed" the projects would not cause an emissions increase are similarly deficient. For example, he supports his "reasonable belief" opinion with the contention that there was no increase in *actual* NOx emissions before and after the calciner improvement project, the ID fan motor replacement project, and the Lyons expansion project. Ex. B, Hofmann Report at 5-5, 5-10, 5-27. But this after-the-fact comparison of pre- and post- change actual emissions has no bearing on whether the changes constitute a major modification for purposes of a PSD applicability analysis. This Court has already determined that the Lyons Plant had not begun normal operations prior to the 1997-2000 projects, and that the actual-to-potential emissions test

(as opposed to an actual-to-actual comparison) is the appropriate method for determining whether the projects constituted a major modification. *See* Docket No. 184 at 2, 5, 10. Mr. Hofmann's analysis of the actual NOx emissions before and after the project is therefore not relevant to determining PSD applicability.

Mr. Hofmann's discussion of the "net emissions increase" definition in the 2002 amendments to the PSD regulations is similarly immaterial. *See* Ex. B, Hofmann Report at 4-7. While the new definition does permit an actual-to-projected-actual emissions comparison to determine whether a change is a "major modification" in certain circumstances, *see* 67 Fed. Reg. 80,186, 80,196 (Dec. 31, 2002), EPA did not adopt the new language until 2002 and it did not become part of the Colorado SIP until May 10, 2012. *See* 77 Fed. Reg. 21,453 (April 10, 2012). The new language simply has no applicability to projects undertaken in the 1997-2000 time frame. *See Southern Utah Wilderness Alliance v. Palma*, 2013 WL 71780 at *2 (10th Cir., Jan. 8 2013) (applying BLM regulations in effect at the time leases were suspended); *Wyoming v. Livingston,* 443 F.3d 1211, 1227 n. 10 (10th Cir. 2006) ("We focus on the regulations in effect at the time of the relevant acts.") It is also inconsistent with this court's prior order adopting the actual-to-potential emissions test and implicitly rejecting an actual-to-projected-actual test. *See* Docket No. 184 at 2, 5, 10.

Finally, Mr. Hofmann contends that the calciner improvement and oxygen enrichment projects increased the efficiency of the Lyons Plan. Ex. B, Hofmann Report at 5-4, 5-16. But as the First Circuit has recognized, efficiency projects can increase a facility's potential emissions. *Puerto Rican Cement*, 889 F.2d at 297-98. The 1980 PSD regulations and 1997 SIP provisions do not provide an "efficiency project" exception to the actual-to-potential emissions comparison for determining whether a change is a major modification.

Mr. Hofmann's subsidiary opinions supporting his "reasonable belief" opinion are not an appropriate part of the "major modification" determination under the 1980 PSD regulations. They are not "of consequence to a determination of this action" and are therefore not relevant under Rule 401 or admissible under Rule 402.

> **B.     Mr. Hofmann's Opinion That "It Was Reasonable for CEMEX To Believe" That The 1997-2000 Modifications Would Not Result In An Emissions Increase Is Not Relevant Because it is Not Helpful to the Trier of Fact**

Mr. Hofmann, an environmental engineer, proposes to provide "expert" testimony on whether CEMEX employees' beliefs regarding the emissions increases were "reasonable." Even if CEMEX's beliefs were relevant under the applicable regulations, which the United States contests, Mr. Hofmann has no specialized training that would assist the court in determining the reasonableness of CEMEX's deliberations on the topic. Nor would such analysis be appropriate, as it is within the everyday knowledge of a lay person. Referencing the Advisory Committee Notes to Rule 702, the Tenth Circuit has recognized that:

> There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.

*United States v. Rice,* 52 F.3d 843, 847 (10th Cir. 1995)

If the expert testimony is offered on an issue that the trier of fact is capable of assessing for itself, it fails the relevance test for expert testimony, which is that it must be helpful to the trier of fact. *See North Am. Ins. Co. v. Britt Paulk Ins. Agency, Inc.,* 579 F.3d 1106, 1112 (10th Cir. 2009) (upholding exclusion of expert witness testimony comparing insuror's actions against the industry standard and opining that insuror had not acted in bad faith, because the jury was capable of deciding the issue without expert assistance); *Rice,* 52 F.3d at 847 ("the inquiry of whether expert testimony will assist the trier of fact is essentially a question of relevance").

Moreover, the Tenth Circuit has held that unhelpful testimony is also inadmissible under Rule 403.  In *Thompson v. State Farm*, the court found that expert testimony regarding an insurance company's "bad faith" was excludable because the jury was competent to determine that issue on its own, and the testimony was not helpful to the trier of fact and therefore irrelevant.  As further grounds, the court stated:

> Expert testimony, like any other evidence, is subject to exclusion if it fails the Fed.R.Evid. 403 balancing test.  And whereas here expert testimony is offered on an issue that a jury is capable of assessing for itself, it is plainly within the trial court's discretion to rule that testimony inadmissible because it would not even marginally "assist the trier of fact," while it must be viewed as a "needless presentation" (Fed. R. Evid. 403).

*Thompson v. State Farm Fire and Casualty Co.,* 34 F.3d 932, 941 (10th Cir. 1994).

In this instance, the "reasonableness" of CEMEX's purported deliberations at the time of the modification does not rest on scientific facts, but instead requires an evaluation of the thought processes undertaken by CEMEX's employees in light of the information available to them. Evidence at trial will be presented in the form of testimony from CEMEX personnel and consultants who were involved in the projects and who can testify to the deliberations undertaken by CEMEX at that time.  This will include testimony regarding the facts known by the witnesses prior to the modification and their assessment of those facts.  The witnesses will be subject to cross examination and the court will be in the best position to assess the witnesses' credibility and the reasonableness of their analysis, as opposed to Mr. Hofmann, who has no firsthand knowledge of the CEMEX employees' deliberations and can provide the court with no special insight into the analysis that CEMEX undertook 15 years ago.  He can only attempt to retrospectively guess at the considerations undertaken by the CEMEX employees.  "It is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate."

*Christiansen v. City of Tulsa,* 332 F.3d 1270, 1283 (10th Cir. 2003), *citing Goebel v. Denver &*

*Rio Grande Western R.R. Co.,* 215 F.3d 1083, 1088 (10th Cir. 2000).

The "reasonableness" of CEMEX employees' beliefs is not a topic that requires expert

testimony, and Mr. Hofmann's opinion is nothing more than subjective, non-scientific surmise.

It is irrelevant because it is not helpful to the trier of fact and further constitutes a waste of time

under Rule 403.  Mr. Hofmann's testimony on this point should be excluded.

   **C.     Mr. Hofmann's Opinion That "It Was Reasonable for CEMEX To Believe"
           That the 1997-2000 Modifications Would Not Result In An Emissions
           Increase Are Not Relevant Because the Clean Air Act Is a Strict Liability
           Statute**

Mr. Hofmann's testimony regarding CEMEX's "reasonable belief" that its modifications

were not subject to the PSD permitting requirements should also be excluded because the Clean

Air Act is a strict liability statute.  As noted by the Tenth Circuit, "the CAA has been interpreted

to impose 'strict liability upon owners and operators' of polluting facilities that violate the Act."

*United Steelworkers of Am. v. Oregon Steel Mills, Inc.,* 322 F.3d 1222, 1229 n.4 (10th Cir.

2003), *citing United States v. Dell'Aquilla,* 150 F.3d 329, 332 (3rd Cir. 1998); *United States v. B*

*& W Investment Properties,* 38 F.3d 362, 367 (7th Cir. 1994).  *See also Sierra Club v. Public*

*Service Co. of Colorado,* 894 F. Supp. 1455, 1459 (D. Colo. 1995).

Consequently, even if CEMEX "reasonably" believed that it was not subject to PSD

applicability, this purported belief does not excuse it from violations of the Clean Air Act

because strict liability statutes require no proof of intent.  *See B&W Investment Properties,* 38

F.3d at 367 (holding that because the Clean Air Act imposes strict liability on owners and

operators, "B&W has no valid challenge against application of the Act, regardless of how

minimal the company's responsibilities or knowledge may actually have been").  *In accord*

*Dell'Aqua,* 150 F.3d at 332 (holding that even though the respondent may have believed that all

necessary permits had been obtained, because the Clean Air Act imposes strict liability, "those assertions are not relevant to our analysis, and we need not respond").  Mr. Hofmann's testimony on this point is therefore irrelevant because it adds nothing to the determination of whether CEMEX violated the Clean Air Act, and should be excluded.

## III.   MR. HOFMANN'S "CAUSAL RELATIONSHIP" AND "REASONABLE BELIEF" OPINIONS CONSTITUTE IMPERMISSIBLE TESTIMONY ON THE GOVERNING LAW AND SHOULD BE EXCLUDED

The outcome of this case critically rests on a determination of the applicable law.  This will require the court to decide which regulations control, and how those regulations should be applied.  This is the sole province of the court.  As stated by the Tenth Circuit,

> [I]t is axiomatic that the judge is the sole arbiter of the law and its applicability.  As one scholar noted:  A witness cannot be allowed to give an opinion on a question of law . . . In order to justify having courts resolve disputes between litigants, it must be posited as an a priori assumption that there is one, but only one, legal answer for every cognizable dispute.  There being only one applicable legal rule for each dispute or issue, it requires only one spokesman of the law, who of course is the judge. . . .  To allow anyone other than the judge to state the law would violate the basic concept.

*Specht v. Jensen,* 853 F.2d 805, 807 (10th Cir. 1988), *citing* Stoebuck, *Opinion on Ultimate Facts: Status, Trends, and a Note of Caution,* 41 Den. L. Cent. J. 226, 237 (1964).

Mr. Hofmann purports to instruct the court on the applicable law by testifying that the regulations require proof of causation, and the regulations allow for the application of a test other than the "potential-to-emit" test to determine CEMEX's liability.  Aside from the fact that Mr. Hofmann's opinions are incorrect and irrelevant, his testimony would encroach on the function of the court to determine the law governing this case.

The controlling regulations in this matter set forth the requirements for determining PSD applicability.  The court has the sole authority to interpret the law, giving due deference to the agency's interpretation of its regulations.  And while the proper application of the law may be an appropriate subject for argument by counsel, an expert may not testify as to how the regulations

should be applied by the trier of fact.  In a case in which the expert was allowed to testify to the meaning of a federal regulation before a jury, the Tenth Circuit found that the admission of the testimony was an abuse of discretion by the trial court because instructing the jury on the law was the function of the trial judge.  The Tenth Circuit stated that "such testimony also violates the rule against experts testifying as to the law governing the jury's deliberations." *United States Aviation Underwriters, Inc. v. Pilatus Business Aircraft, Ltd.*, 582 F.3d 1131, 1151 (10th Cir. 2009).  *See also Wildearth Guardians v. Public Service Co. of Colorado,* 853 F. Supp. 2d 1086, 1090 (D. Colo. 2012) (in bench trial, excluding expert testimony interpreting Clean Air Act regulations and the Colorado SIP, stating "an expert will not be allowed to tell the Court how he thinks the Clean Air Act, the regulations, or the Colorado SIP should be interpreted").

The court, and not Mr. Hofmann, is the authority on the controlling legal principles in this case.  His testimony on how the regulations and the Colorado SIP should be interpreted and applied is an impermissible encroachment on the function of the court and should be excluded.

## CONCLUSION

For the foregoing reasons, the Court should exclude testimony of Mr. John E. Hoffmann contending that the 1980 PSD regulations and the 1997 SIP provisions did not require CEMEX to conduct a PSD review for the 1997-2000 projects because there was no "causal relationship" between the projects and an increase in emissions and that CEMEX "reasonably believed" the projects would not cause an emissions increase, and subsidiary opinions.

Respectfully Submitted,

*/s/ John Moscato*

JOHN N. MOSCATO
JAMES D. FREEMAN
LEIGH P. RENDE
U.S. Department of Justice
Environmental Enforcement Section
999 18th Street, South Terrace - Suite 370
Denver, CO 80202
Telephone: (303) 844-1380
Email:  john.moscato@usdoj.gov


LINDA S. KATO
Special Assistant U.S. Attorney
1595 Wynkoop, Mail Code 8ENF-L
Denver, CO 80202

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 1, 2013, the foregoing UNITED STATES' MOTION *IN LIMINE* TO EXCLUDE CERTAIN TESTIMONY OF JOHN E. HOFMANN PURSUANT TO FEDERAL RULE OF EVIDENCE 402 (Doc. #193) was filed electronically using the Court's ECF system and automatically served on counsel of record, identified below:

Chet M. Thompson
cthompson@crowell.com

Richard E. Schwartz
rschwartz@crowell.com

David Patrick Ross
dross@crowell.com

Derek A. Hahn
dhahn@crowell.com, csolorio@crowell.com

Hugh Q. Gottschalk
gottschalk@wtolaw.com, hart@wtolaw.com, gottesfeld@wtolaw.com

Jessica Scott
scott@wtotrial.com, farina@wtotrial.com

John N. Moscato
John.Moscato@usdoj.gov, Jason.Obold@usdoj.gov, katherine.tribbett@usdoj.gov

James D. Freeman
james.freeman2@usdoj.gov

Leigh P. Rendé
leigh.rende@usdoj.gov

Linda S. Kato
Kato.Linda@epa.gov

*/s/ John N. Moscato*
John N. Moscato, Senior Counsel
U.S. Department of Justice
Environmental Enforcement Section
999 18th Street, South Terrace - Suite 370
Denver, CO 80202
Telephone: (303) 844-1380
Email: john.moscato@usdoj.gov